# 14-1405-CV

# United States Court of Appeals
### for the
## Second Circuit

———————◆❖◆———————

R.B., individually, and on behalf of D.B., M.L.B., individually and on behalf of D.B.,

*Plaintiffs-Appellants,*

– v. –

NEW YORK CITY DEPARTMENT OF EDUCATION,

*Defendant-Appellee.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

GARY S. MAYERSON
MARIA C. MCGINLEY
MAYERSON & ASSOCIATES
*Attorneys for Plaintiffs-Appellants*
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... *iii*

APPENDIX OF ACRONYMS.......................................................................*vii*

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION .............................1

ISSUES PRESENTED ................................................................................1

STATEMENT OF THE CASE ......................................................................4

STATEMENT OF FACTS .........................................................................5

> D.B.'S PROGRAM AT THE REBECCA SCHOOL AND D.B.'S PROGRESS TOWARDS INDEPENDENCE AND SELF-REGULATION CONSTITUTED "PRESENT LEVELS" OF EDUCATIONAL PERFORMANCE THAT DEFENDANT MISSED WITH ITS UNDULY EARLY FEBRUARY 9, 2011 IEP...................................5

> DEFENDANT'S JUNE 18, 2011 FNR NOTICE MISREPRESENTS THAT THE 2011-2012 SCHOOL SITE WAS IDENTIFIED AND SELECTED BY THE CSE TEAM— IN ACTUALITY, DEFENDANT UNILATERALLY SELECTED THE SITE ........10

> DEFENDANT FAILED TO GIVE PLAINTIFFS CLEAR AND RELIABLE NOTICE OF THE PLACEMENT AND PROGRAM BEING OFFERED FOR 2011-2012...............12

SUMMARY OF THE ARGUMENT .................................................................17

STANDARD OF REVIEW .........................................................................22

ARGUMENT ......................................................................................23

I.     DEFENDANT FAILED TO MEET ITS PRONG I BURDEN ........................................23

       A.     DEFENDANT FAILED TO MAINTAIN THE FULL "CONTINUUM" AND VIOLATED THE IDEA'S LRE MANDATE BY OFFERING D.B. AN IEP PROGRAM THAT WAS REGRESSIVE AND UNDULY RESTRICTIVE ..............23

       B.     DEFENDANT VIOLATED PLAINTIFFS' PROCEDURAL SAFEGUARD RIGHT TO ADEQUATE AND RELIABLE NOTICE AND PARENTAL PARTICIPATION IN THE SITE SELECTION PROCESS SO THAT PLAINTIFFS COULD EVALUATE WHAT DEFENDANT WAS OFFERING PRIOR TO THE START OF THE 2011-2012 SCHOOL YEAR .........................28

i

C.  THE DOE IMPERMISSIBLY RELIED ON "RETROSPECTIVE EVIDENCE" TO TRY TO CURE DEFECTS WITHIN ITS IEP DOCUMENT, AS WRITTEN .........................................................31

D.  DEFENDANT FAILED TO INCLUDE STATUTORILY MANDATED PARENT TRAINING IN D.B.'S IEP .........................................................32

E.  DEFENDANT'S FAILURE TO COMPLETE ANY FBA OR BIP WAS BOTH A SERIOUS PROCEDURAL VIOLATION AND A SUBSTANTIVE VIOLATION BECAUSE THE IEP DOES NOT ADEQUATELY IDENTIFY D.B.'S BEHAVIORS AND THE APPROPRIATE WAY TO MANAGE THOSE BEHAVIORS .........................................................34

F.  LITTLE, IF ANY, DEFERENCE IS REQUIRED AS TO ADMINISTRATIVE FINDINGS WHERE, AS HERE, THE UNDERLYING ADMINISTRATIVE DEVISIONS FAILED TO APPLY THE CORRECT REVIEW STANDARDS, GLOSSED OVER A COMPELLING EVIDENTIARY RECORD, LARGELY IGNORED DEFENDANT'S ADMISSIONS, AND WERE NEITHER CAREFUL NOR THOROUGH .........................................................38

G.  THE CUMULATIVE IMPACT OF DEFENDANT'S NUMEROUS PROCEDURAL AND SUBSTANTIVE VIOLATIONS CERTAINLY RISE TO THE LEVEL OF FAPE DEPRIVATION FOR D.B..........................................................40

II. NEITHER THE IHO, THE SRO NOR THE DISTRICT COURT MADE ANY PRONG II OR PRONG III FINDINGS .........................................................41

A.  D.B.'S REBECCA SCHOOL PROGRAM AND PLACEMENT WAS "REASONABLY CALCULATED" TO PROVIDE D.B. WITH MEANINGFUL EDUCATIONAL BENEFITS, AND THE EVIDENCE AT THE TRIAL SHOWS THAT HE WAS, IN FACT, RECEIVING SUCH BENEFIT...........41

B.  EQUITABLE CIRCUMSTANCES SUPPORT A REIMBURSEMENT AWARD IN D.B.'S FAVOR .........................................................43

CONCLUSION .........................................................45

CERTIFICATE OF COMPLIANCE .........................................................46

# TABLE OF AUTHORITIES

## FEDERAL CASES

*B.R. v. N.Y.C. Dep't of Educ.,*
910 F. Supp. 2d 670 (S.D.N.Y. 2012) ....................................14, 38, 39

*Board of Education v. Rowley*
458 U.S. 176 (1982)........................................................................38, 42

*C.F. v. New York City Department of Education,*
746 F.3d 68 (2d Cir. 2014) .............................................................*passim*

*C.L. v. N.Y.C. Dep't of Educ.*
No. 12 Civ. 1676 (JSR), 2013 U.S. Dist. LEXIS 3474 (S.D.N.Y. Jan. 2,
2013), *aff'd* 2014 U.S. App. LEXIS 1520 (2d Cir. Jan. 27, 2014) ....................39

*C.U. v. New York City Department of Education*
2014 U.S. Dist. LEXIS 72075 (S.D.N.Y. May 27, 2014) ..........................*passim*

*Cypress-Fairbanks Independent School District v. Michael F.,*
118 F.3d 245 (3d Cir. 1997) .................................................................23

*D.C. ex rel. E.B. v. New York City Department of Education,*
950 F. Supp. 2d 494 (S.D.N.Y. 2013) ...................................................14

*D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.,*
430 F.3d 595 (2d Cir. 2005) ...............................................................42

*D.L. v. Springfield Board of Education,*
536 F. Supp. 2d 534 (D.N.J. 2008).......................................................24

*Eugene B. v. Great Neck Union Free Sch. Dist.,*
635 F. Supp. 753 (E.D.N.Y. 1986) ......................................................44

*Florence Cnty. Sch. Dist. Four v. Carter,*
510 U.S. 7 (1993)............................................................................4, 41

*Frank G. v. Bd. of Educ.,*
459 F.3d 356 (2d Cir. 2006) ...........................................................41, 42

*Gagliardo v. Arlington Central School District,*
489 F.3d 105 (2d Cir. 2007) .......................................................18, 38, 42

*Harris v. District of Columbia,*
561 F. Supp. 2d 63 (D. D.C. 2008)........................................................35

## FEDERAL CASES CONTINUED

*Justin G. v. Bd. of Educ.,*
148 F. Supp. 2d 576 (D. Md. 2001)....................................................44

*L.B. ex rel. K.B. v. Nebo School District,*
379 F.3d 966 (10th Cir. 2004) .........................................................24

*M.H. v. N.Y.C. Dep't of Educ.,*
685 F.3d 217 (2d Cir. 2012) .............................................18, 38, 39

*M.S. v. Yonkers Bd. of Educ.,*
231 F.3d 96 (2d Cir. 2000) ..............................................................41

*Millay v. Surry School Department,*
707 F. Supp. 2d 56 (D. Me. 2010)...................................................13

*Mrs. C. v. Voluntown Bd. of Educ.,*
226 F.3d 60 (2d Cir. 2000) ..............................................................43

*P. v. Newington Board of Education,*
546 F.3d 111 (2d Cir. 2008) ............................................................24

*P.K. ex al.  v. New York City Department of Education*
526 Fed. Appx. 135 (2d Cir. 2013) (Summary Order) ................38, 39

*R.E. v. New York City Department of Education,*
694 F.3d 167 (2d Cir. 2012) *cert. denied*, 2013 U.S. LEXIS 4528 (U.S.
June 10, 2013) ...........................................................................*passim*

*Rose v. Chester Co. Intermediate Unit,*
No. 95-239 (JTG), 1996 U.S. Dist. LEXIS 6105, *aff'd*, 114 F.3d 1173 (3d
Cir. 1997) ............................................................................... 43-44

*S.A. v. New York City Department of Education*
2014 U.S. Dist. LEXIS 42649 (E.D.N.Y. Mar. 30, 2014)................33

*Schaffer v. Weast,*
546 U.S. 49 (2005)...........................................................................44

*School Community of Burlington v. Department of Education.,*
471 U.S. 359 (1985)..........................................................................4

*Still v. DeBuono,*
101 F.3d 888 (2d Cir. 1996) ............................................................43

*T.M. v. Cornwall Central School District,*
752 F.3d 145 (2d Cir. 2014) .....................................................*passim*

*T.Y. v. New York City Department of Education*
584 F.3d 412 (2d Cir. 2009) .....................................................10, 21

FEDERAL CASES CONTINUED

*V.S. v. New York City Department of Education,*
  2014 U.S. Dist. LEXIS 79067 (E.D.N.Y. June 9, 2014)............................*passim*

*Walczak v. Florida Union Free School District,*
  142 F.3d 119 (2d Cir. 1998) ..........................................................6, 23, 28, 38

*Warren G. v. Cumberland County Sch. Dist.,*
  190 F.3d 80 (3d Cir. 1999) .........................................................................43

*Winkelman v. Parma City School District,*
  550 U.S. 516 (2007)....................................................................................12

*Wolfe v. Taconic-Hills Cent. Sch. Dist.,*
  167 F. Supp. 2d 530 (N.D.N.Y. 2001).........................................................44

STATUTES AND LEGISLATIVE MATERIALS

20 U.S.C. § 1400, *et seq.*...........................................................................1, 4

20 U.S.C. § 1401(9) ......................................................................................34

20 U.S.C. § 1401(14) ....................................................................................12

20 U.S.C. § 1414(d)(1)(A)(i) ........................................................................12

20 U.S.C. § 1414(d)(2)(A) ............................................................................12

20 U.S.C. § 1414(d)(3)(B)(i) ........................................................................35

20 U.S.C. § 1415(b)(3)..................................................................................13

20 U.S.C. § 1415(c)(1)(A) ............................................................................13

20 U.S.C. § 1412(a)(5)(A) ............................................................................24

34 C.F.R. § 300.114 ......................................................................................24

34 C.F.R. § 300.115 ......................................................................................25

34 C.F.R. § 300.324(a)(2)(i) .........................................................................35

34 C.F.R. § 300.515 ......................................................................................16

N.Y. EDUC. LAW § 4404(1)(c) (McKinney 2009) ...................................14, 20

N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.1(r) .....................................35

STATUTES AND LEGISLATIVE MATERIALS CONTINUED

N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.1(oo)....................................................13

N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.1(mmm) ...........................................35

N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.4(b)(1)(v) ...........................................35

N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.4(g)(1)(i) ............................................13

N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.5 ........................................................16

N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.22(a)...................................................35

N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.22(b)...................................................35

OTHER CITED MATERIALS

Brief for Plaintiffs, *V.S. v. N.Y. City Dep't of Educ.,* 2014 U.S. Dist. LEXIS 79067 (E.D.N.Y. June 9, 2014), ECF No. 28 at 21. ....................................................29

*Classroom Schedule - Rebecca School,* www.rebeccaschool.org/the-experience/classroom-schedule (last visited Aug. 5, 2014) ...........................................................................................................5

*Compliance Agreement with the US DOE, Office of Special Education Programs: OSR: NYSED* http://www.sro.nysed.gov/compliance-agreement.html (last visited Aug. 5, 2014) .........................................................................................................17

*DIR Floor Time Therapy & Academics - Rebecca School,* www.rebeccaschool.org/the-experience/dir-floortime-academics (last visited Aug. 5, 2014) ...........................................................................................5

*Greenspan Floortime Approach for Children with Developmental Delays,* www.stanleygreenspan.com (last visited Aug. 5, 2014) ......................................5

Letter brief for United States Department of Education as Amicus Curiae as requested by Court, *T.M. v. Cornwall Central School District,* 752 F.3d 145 (2d Cir. 2014), ECF No. 151..................................................................................25

*To: -1-1aide-jan2012.pdf,* http://www.p12.nysed.gov/specialed/publications/1-1aide-jan2012.pdf (last visited Aug. 5, 2014)..........................................................................................9

**APPENDIX OF ACRONYMS**

| | |
|---|---|
| 1:1 | One-to-one teacher to student ratio |
| BIP | Behavior Intervention Plan – a systematic plan developed upon the results of a Functional Behavior Assessment to address behaviors that interfere with learning. |
| CSE | Committee on Special Education |
| DIR | Developmental Individual-Difference Relationship-based model developed by Dr. Stanley Greenspan. |
| ESY | Extended School Year (services offered over the summer) |
| FAPE | Free and Appropriate Public Education – the education program and services mandated by IDEA for children with disabilities. |
| FBA | Functional Behavior Assessment – an assessment of the frequency, duration, antecedents, and intensity of behaviors to ascertain, among other things, the causes and "function" of a student's behaviors.  The FBA assessment is the recognized foundation for a BIP. |
| IDEA | Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*. |
| IDEIA | Individuals with Disabilities Education Improvement Act (2004 Reauthorization of IDEA) |
| IEP | Individualized Education Program – the written educational plan for a student with an eligible disability |
| IHO | Impartial Hearing Officer – the first level of administrative review |
| LRE | Congress' "least restrictive environment" mandate |
| SRO | State Review Officer – the second level of administrative review in New York |

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is an action commenced on behalf of D.B. and his parents, R.B. and M.L.B., under the 2004 reauthorization of the federal Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq*., now known as the Individuals with Disabilities Education Improvement Act ("IDEA").

D.B. is diagnosed and classified under autism. At issue are plaintiffs' claims for tuition reimbursement and transportation for D.B.'s attendance at the Rebecca School during the 2011-2012 school year.

The district court, while broadly deferring to the State Review Officer ("SRO") and while neglecting to address Prongs II or III, had subject matter jurisdiction over D.B.'s claims. Appellate jurisdiction exists, as the district court's judgment constitutes a final judgment disposing of all the claims that are subject to appeal.

## ISSUES PRESENTED

1.    Did defendant maintain and properly consider the full "continuum," as required, or did it offer D.B. a 6:1:1 program because that is all that defendant *had* to offer?

2.    Did defendant provide plaintiffs with adequate, timely and clear notice of the Individualized Education Plan ("IEP") program and school placement being offered to D.B. for the 2011-2012 school year?

3.      Was defendant's IEP placement and program offer for D.B.'s 2011-2012 twelve-month school year commencing on July 1, 2011 "reasonably calculated," based upon D.B.'s assessments, evaluations and progress reports, to provide D.B. with a free and appropriate public education ("FAPE") in his least restrictive environment ("LRE")?

4.      Did defendant meet its statutory evidentiary burden under Prong I to address and rebut plaintiffs' pleaded claims?

5.      Did the district court misapply the due deference standard, improperly shift the statutory Prong I burden of proof from defendant to plaintiffs, permit the State Review Officer ("SRO") or Impartial Hearing Officer ("IHO") to rely upon impermissible "retrospective" evidence and/or misapply other review standards in failing to reverse the SRO and the IHO?

6.      Did the district court ignore or erroneously minimize the evidence of defendant's multiple violations in isolation, rather than find that there were multiple procedural and substantive violations "cumulatively" amounting to a Prong I FAPE deprivation?

7.      Could defendant's failure to make provision for key requisite components of D.B.'s program in its IEP documents be remedied or cured by retrospective testimony given at trial as to what defendant allegedly "would have" provided for

D.B. had D.B. attended defendant's public program, despite what the IEP expressly provided?

8.    In view of the applicable "reasonably calculated" standard, and in view of the limited and inaccurate placement and programming information that the defendant provided to D.B.'s parents prior to the start of the school year, should defendant's IEP documents have been assessed for Prong I FAPE purposes strictly for what they expressly state and provide, or fail to provide?

9.    Was defendant's IEP process timely for purposes of assessing D.B.'s 2010-2011 performance and his "present levels" for purposes of developing an IEP that was required to be "reasonably calculated" for the 2011-2012 school year?

10.    Did defendant fail to timely mitigate or remediate any of its IEP program violations during the statutory "ten-day" notice period or even by the end of the subsequent thirty-day "resolution period"?

11.    Was the SRO's decision, grossly late by more than four months, careful, thorough and of the quality warranting the sweeping "due deference" that was accorded to the SRO by the district court?

12.    To the extent that this Court reverses the district court as to Prong I, should this action be remanded to the district court to adjudicate Prongs II and III?

## STATEMENT OF THE CASE

This is an appeal from a Memorandum and Order of the United States District Court for the Southern District of New York (Nathan, J.), dated and filed on March 26, 2014 (SPA-34), and from the resulting Judgment dated March 28, 2014. (SPA-58)

The district court broadly deferred to the SRO so as to deny plaintiffs-appellants' modified *de novo* appeal, brought pursuant to the IDEA, 20 U.S.C. Sec. 1400 *et seq*., seeking *Burlington/Carter* tuition funding relief at the Rebecca School for the 2011-2012 school year.[1]

Unfortunately, the district court deferred to an SRO and IHO who had: (a) ignored or glossed over the statutory burden of proof that was on defendant; (b) failed to apply the applicable evidentiary and review standards; (c) ignored or glossed over a compelling evidentiary record reflecting multiple substantive and procedural violations and failures that "cumulatively" amounted to a Prong I FAPE deprivation and worse, had deprived D.B. and his parents of notice and due process; and (d) neglected to address Prongs II and III.[2]

The district court's Decision and Judgment should be reversed.

---

[1] Reference is made to the three-pronged test set forth in the seminal authorities of *Florence County School Dist. Four v. Carter*, 510 U.S. 7 (1993), and *School Comm. of Burlington v. Dep't of Educ*., 471 U.S. 359 (1985).

[2] Accordingly, Prongs II and III of the *Burlington/Carter* test have not been addressed by the IHO, SRO or the district court.

## STATEMENT OF FACTS

D.B.'s PROGRAM AT THE REBECCA SCHOOL AND D.B.'s PROGRESS
TOWARDS INDEPENDENCE AND SELF-REGULATION CONSTITUTED
"PRESENT LEVELS" OF EDUCATIONAL PERFORMANCE THAT DEFENDANT
MISSED ENTIRELY WITH ITS UNDULY EARLY FEBRUARY 9, 2011 IEP

Plaintiff D.B. is diagnosed with autism. At the time of the underlying trial,
D.B. was 12-years-old and attending and succeeding with relative independence at
the Rebecca School in an 8:1:3 ratio classroom (i.e., eight students, one teacher and
three assistant teachers). (A-300)   D.B. did not have, nor did he require, a 1:1
paraprofessional.

At the Rebecca School, D.B.'s daily schedule consisted of morning
meeting, math instruction, individual and full group English Language Arts
instruction, social studies, individual and group "Floortime"[3] sessions, lunch and
two snack periods. (A-134, A-300).   *Classroom Schedule - Rebecca School*,
www.rebeccaschool.org/the-experience/classroom-schedule (last visited Aug. 5,
2014).   In addition, D.B. participated in community walks, adaptive physical

---

[3]  Floortime therapy derives from the Developmental Individual-Difference
Relationship-based model ("DIR") developed by Dr. Stanley Greenspan.
Floortime is a child-led approach that focuses on how adults can help children by
meeting them where they are.  *Greenspan Floortime Approach for Children with
Developmental Delays,* www.stanleygreenspan.com (last visited Aug. 5, 2014).
*DIR   Floor   Time   Therapy   &   Academics   -   Rebecca   School,*
www.rebeccaschool.org/the-experience/dir-floortime-academics (last visited Aug.
5, 2014).

education, art education, counseling, music therapy, dramatic play, occupational therapy and speech therapy. (A-300)

By design, since May, 2011, i.e., months before the start of the 2011-2012 school year, D.B. was becoming increasingly independent at the Rebecca School. The Rebecca School's December, 2011 Interdisciplinary Report of Progress Update[4] reports that "Since May [2011], the classroom program was designed to foster self regulation.  Over the past few months, D.B.'s regulation has changed in that he relies on co-regulation from adults less . . ." (A-300)

D.B., working hard towards greater independence, clearly had no need at the Rebecca School for his own personal one-to-one paraprofessional to prompt or otherwise direct D.B.'s every move.[5]

On February 9, 2011, following defendant's efforts to conduct an even *earlier* IEP meeting in January, 2011 (A-187), defendant's Committee on Special

---

[4]  The December, 2011 Interdisciplinary Report of Progress Update was an update of progress based on the Interdisciplinary Report of Progress dated May, 2011. Had defendant convened an IEP meeting in May or June, 2011 to determine D.B.'s present levels of performance, it would have had the benefit of the May, 2011 progress report as well as updated information regarding D.B.'s progress at the Rebecca School by way of the participation of D.B.'s teacher and therapists.

[5]  As shown *infra*, D.B.'s teacher, Ms. Cohn, testified at the trial that the 1:1 paraprofessional defendant was insisting on for D.B. would provide excessive support, causing at least some *loss* of independence. (A-142 and 155) Accordingly, the record reflects evidence of anticipated regression had D.B. been saddled with his own personal full-time 1:1 paraprofessional.  *See Walczak v. Florida Union Free School District,* 142 F.3d 119 (2d Cir. 1998).

Education ("CSE")[6] met to ostensibly develop an IEP for the then upcoming 2011-2012 twelve-month school year. For students like D.B. who are approved for a twelve-month program, it is undisputed that D.B.'s 2011-2012 school year was to commence on July 1, 2011. (A-69) Accordingly, in the face of statutory requirements mandating that defendant assess D.B.'s "present levels" for purposes of an IEP to be implemented during the 2011-2012 school year, defendant's CSE was convening nearly *five months* before the start of the 2011-2012 school year.

While the CSE agreed that D.B. should be classified on his IEP as having "autism" and that D.B. was entitled to a twelve-month program that would include a special education program during the 2011 Extended School Year ("ESY"), i.e., the months of July and August, and while D.B. was already succeeding and becoming more independent in an 8:1:3 classroom at the Rebecca School (a classroom consisting of 8 students), defendant apparently did not have or maintain an 8:1:3 ratio autism program on its "continuum." (A-184) Accordingly, defendant offered D.B. what it had, that is, a 6:1:1 classroom (i.e., a classroom attended by five other students), and worse, without ever assessing D.B.'s need for the addition of full-time 1:1 support (and against the concerns of D.B.'s parents and the recommendations of D.B.'s existing educators), defendant mandated a one-to-one,

---

[6] Plaintiffs have included an appendix of acronyms for the convenience of the court.

full time paraprofessional for D.B. in its 6:1:1 classroom. (A-54, 57, 173, 186, 217, 221, 229, 300)

While the IEP describes the paraprofessional being offered as a "transitional para," the IEP is silent on the same page as to the "duration" of the paraprofessional's 1:1 support for D.B. (A-186)  Indeed, by the time of defendant's June 18, 2011 Final Notice of Recommendation ("FNR") (A-189), defendant was referring to its paraprofessional as a "crisis" paraprofessional.  A crisis certainly had developed, to say the least.

Aside from the threat of losing communication and socialization access to 29% of his classroom peers (going from an 8:1:3 classroom ratio to a 6:1:1 classroom ratio), defendant's addition of the one-to-one, full-time paraprofessional represented an unduly restrictive, regressive and independence-killing "crutch" that D.B. demonstrably did not need to have to be successful. (A-142)  D.B. needed the addition of a full-time 1:1 paraprofessional for the 2011-2012 school year about as much as Forest Gump needed to acquire a new set of leg braces after the old set disintegrated into shards as Forest, encouraged by "Run, Forest, run!" easily outran a pack of bullies on bicycles.

At the February 9, 2011 IEP meeting, as the underlying decisions acknowledge, D.B.'s parents and representatives from the Rebecca School expressed concern that: (a) D.B. was already succeeding well enough at the

Rebecca School in a less restrictive 8:1:3 classroom without a paraprofessional and with additional peers to interact with; (b) there was no reason to move D.B. into a classroom with fewer peers; (c) based on what plaintiff's mother, M.L.B., had seen, the other (five) students in defendant's (6:1:1) class would likely be unduly low functioning; (d) D.B. did not need to risk regression in his independence and self-sufficiency by being saddled with a one-to-one classroom support in defendant's school placement that D.B. clearly did not need in order to succeed at the Rebecca School; and (e) D.B. merely needed some one-to-one help with his *academics*.[7] (A-57, 58, 63, 70, 71, 141-42, 154, 155)

Despite D.B.'s history of multiple interfering behaviors (A-57, 58-59, 191,[8] 173, 191, 217, 300), defendant further failed to provide D.B. with a FAPE by failing to conduct a Functional Behavior Assessment ("FBA"), the recognized

---

[7] As to this concern, it is the established and published policy of the New York State Department of Education ("NYSED") that paraprofessionals exist for management and behavior support purposes, but they are <u>not</u> permitted to exercise the teaching role. *To: -1-1aide-jan2012.pdf,*
http://www.p12.nysed.gov/specialed/publications/1-1aide-jan2012.pdf (last visited Aug. 5, 2014).

[8] Defendant was clearly on direct notice of D.B.'s interfering behaviors as Feng Ye, one of defendant's CSE members, had observed D.B. "display[ing] self-stimulatory behaviors" prior to the IEP meeting. A-191. Ms. Ye's testimony at trial further confirmed her knowledge of D.B.'s interfering behaviors: "I've seen him in class and he does present with a lot of behaviors . . ." (A-57). "[D.B.] has an anxiety issue, he has presented a lot of behaviors . . . like self-stimulating behavior . . . and also [stereotypy]. A-58-59).

prerequisite to any Behavior Intervention Plan ("BIP"). Nor did defendant develop a Behavior Intervention Plan as a part of D.B.'s IEP program. (A-170-186)

The minutes of the CSE meeting confirm that the defendant apparently was working off "drafts" that were not physically shared with D.B.'s parents. (A-188)("draft read to parents . . ."). Nor were defendant's IEP minutes shared with plaintiffs, for that matter, until they were disclosed at the trial. The IEP apparently was mailed out to plaintiffs on February 11, 2014. (A-171)

While defendant mandated adaptive physical education for D.B., it failed to develop goals for adaptive physical education. (A-170) Defendant also failed to assess D.B. for vocational purposes.

To the extent that defendant thought that it was planning responsibly to support a transition to defendant's placement and program, defendant also failed to make provision in the IEP for statutorily mandated parent training. If ever there was a time to make provision for parent training, it most certainly would be the transition of a student with autism from the student's private school program to an entirely different public school recommendation.

DEFENDANT'S JUNE 18, 2011 FNR NOTICE MISREPRESENTS THAT THE 2011-2012 SCHOOL SITE WAS IDENTIFIED AND SELECTED BY THE CSE TEAM—IN ACTUALITY, DEFENDANT UNILATERALLY SELECTED THE SITE

Consistent with defendant's longstanding practice and policy, and consistent with *T.Y. v. New York City Department of Education*, 584 F.3d 412, 417-19 (2d

Cir. 2009), defendant's CSE did not discuss, identify or offer a school site at D.B.'s IEP meeting and plaintiffs were not afforded the opportunity to participate in the site selection decision. *See also C.F. v. New York City Department of Education,* 746 F.3d 68 (2d Cir. 2014), *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d Cir. 2012) *cert denied* 2013 U.S. LEXIS 4528 (June 10, 2013); *V.S. v. New York City Department of Education*, 2014 U.S. Dist. LEXIS 79067 (E.D.N.Y.  June 10, 2014); *C.U. v. New York City Department of Education,* 2014 U.S. Dist. LEXIS 72075 (S.D.N.Y. May 27, 2014).

On June 17, 2011, with the July 1 start of the 2011-2012 school year then less than two weeks away, and with D.B.'s IEP meeting having concluded many months earlier, plaintiffs still had not received any notification from defendant as to what school site defendant was offering to D.B. for 2011-2012.  (A-288-290) Understandably, this "notice" failure created a great deal of anxiety.  Plaintiffs were faced with having to make a decision as to what to do for D.B.'s 2011-2012 twelve-month school year.  Accordingly, on June 17, in the absence of any proposed site selection by defendant, plaintiffs M.L.B. and R.B. wrote to defendant to reject the IEP as inappropriate and to provide notice of D.B.'s unilateral placement at the Rebecca School. (A-288-290)

It was not until after school on Friday, June 24, 2011, a week later and just *days* before the start of the 2011-2012 school year, that R.B. and M.L.B. finally

received defendant's FNR ostensibly offering D.B. a 2011-2012 placement at P.S. 79, also known as the Horan School. (A-189)

Defendant's FNR notice (A-189) represents that there was a February 9, 2011 CSE meeting. That much is true. Defendant's FNR notice then goes on to state that "the CSE" identified and recommended the Horan School for D.B. That statement is demonstrably false, as defendant is well aware.[9] In actuality, defendant unilaterally chose the Horan School. In actuality, D.B. and his parents were denied any opportunity to participate, meaningfully or otherwise in the site selection process. *See C.U. v. New York City Department of Education,* 2014 U.S. Dist. LEXIS 72075; *Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516 (2007); *V.S. v. New York City Department of Education*, 2014 U.S. Dist. LEXIS 79067 at *6 (E.D.N.Y. June 10, 2014) ("Parents have a procedural right to evaluate the school assignment, i.e., the right to acquire relevant and timely information as to the proposed school.")

### DEFENDANT FAILED TO GIVE PLAINTIFFS CLEAR AND RELIABLE NOTICE OF THE PLACEMENT AND PROGRAM BEING OFFERED FOR 2011-2012

Defendant violated the "prior written notice" requirement that parents are entitled to. *See* 20 U.S.C. §§ 1401(14), 1414(d)(1)(A)(i), 1414(d)(2)(A),

---

[9] In fact, defendant's own IEP witness admitted at the hearing that the IEP team had nothing to do with making a placement recommendation for D.B. "After we develop the IEP, it goes to the placement and the team's responsibility is to develop the IEP and to recommend a *program* or related services if appropriate. We do not implement [the IEP]. It goes to the placement." A-69.

1415(c)(1)(A); N.Y. C<small>OMP</small>. C<small>ODES</small> R. & R<small>EGS</small>., tit. 8 §§200.4(g)(1)(i), 200.1(oo); s*ee also Millay v. Surry Sch. Department*, 707 F. Supp. 2d 56 (D. Me. 2010).  20 U.S.C. § 1415(b)(3) mandates that "prior written notice" be given to a student's parent whenever a school district "proposes to initiate or change . . . the . . . educational placement of the child . . . ."  Here, defendant failed to provide such notice.

D.B.'s mother, after earlier scheduling efforts, went to see the school site reflected on defendant's FNR notice on June 28, 2011.  A-156-57.  During her visit, D.B.'s mother was told that there were "no junior high classes at the time," and that "the junior high kids were housed at <u>another</u> school." A-157. See also SP-33 (noting that classes were held at another location.)  Defendant, however, never disclosed or gave any notice to M.L.B. as to the actual location of D.B.'s "other" school site i.e., where D.B. was to attend. Thus, to the extent that defendant's school site for the ESY (summer of 2011) was situated at a different location than the school location reflected on defendant's FNR notice, <u>D.B.'s parents never received notice of D.B.'s summer, 2011 placement and they were never afforded the opportunity to see and assess that "other" location for purposes of whether or not they would accept or reject defendant's proposed placement and program.</u>  *See V.S. v. New York City Department of Education,* 2014 U.S. Dist. LEXIS 79067 at *6.

While the district court acknowledges the "uncertainty" that resulted, the district court glosses over the notice problem to conclude that the "uncertainty" did not result in the denial of a FAPE.  SPA-55.[10]  In fact, it was the <u>defendant</u> who bore the Prong I burden at the hearing to prove that its program <u>and</u> placement were appropriate for D.B. and that burden necessarily required the DOE to put on competent evidence establishing that: (1) it had timely provided notice of the actual placement to D.B.'s parents (*see V.S. v. New York City Department of Education)*; and (2) the placement was ready, willing and able to actually implement the DOE's IEP program as written.  N.Y. Education Law §4404(1)(c); see *V.S. v. New York City Department of Education,* 2014 U.S. Dist. LEXIS 79067 at *7 ("the school must be capable of implementing the IEP"); *B.R. v. New York City Department of Education*, 910 F. Supp. 2d 670 (S.D.N.Y. 2012) (award to parent upheld where DOE failed to demonstrate that proposed placement could deliver related services mandate of child's IEP); *D.C. ex rel. E.B. v. New York City Department of Education*, 950 F. Supp. 2d 494 (S.D.N.Y. 2013) (award to parent where DOE failed to demonstrate that proposed placement could implement student's IEP).

---

[10] *See V.S. v. New York City Dep't of Educ.*, 2014 U.S. Dist. LEXIS 79067; *C.U. v. New York City Dep't of Educ.,* 2014 U.S. Dist. LEXIS 72075, at *37 (S.D.N.Y. May 27, 2014) ("parents have a procedural right to evaluate the school assignment . . . i.e., the right to acquire relevant and *timely* information as to the proposed school")(emphasis added).

On Saturday, July 9, 2011, D.B.'s mother learned that there was only *one* 6:1:1 class at the Horan School for junior high age children such as D.B. A-157. On Wednesday, July 13, D.B.'s mother *returned* to the Horan School with a social worker from the Rebecca School to meet with, among others, Ms. Grammar, the teacher who plaintiffs were advised would be teaching the junior high classroom that D.B. ostensibly would have attended.[11]  A-131.

By way of a letter dated June 17, 2011, plaintiffs rejected defendant's proposed placement and program and asserted a number of procedural and substantive claims directed to defendant's IEP program and its noticed placement site. (A-225)  These substantive and procedural concerns about the proposed placement included, significantly disparate functioning levels of the students in the *one* classroom M.L.B. was permitted to view, the location and provision of related services, the classifications of the other students attending the school, vocational programming, and lack of sufficient academic programming, among others. (A-157-158)

By Decision dated February 28, 2010, following a four-day hearing, the IHO ruled that defendant had offered D.B. a FAPE. (A-336-357) The IHO reached that

---

[11]  At the hearing, plaintiffs were rightly taken aback to see a *different* teacher testifying and claiming to be the teacher that D.B. would have had. (See the testimony of Janet Sencion, A- 89-109, compare with the testimony of Ms. Kalvin, who visited the school with D.B.'s mother, regarding information from the school as to who the teacher would be, A-130-131).

conclusion by ignoring or glossing over the applicable statutes and review standards, by invoking and relying upon impermissible "retrospective" evidence <u>not</u> reflected in the IEP as to what defendant "would" or "could" do for D.B. and his parents, and by ignoring the record. *See R.E. v. New York City Department of Education,* 694 F.2d 167 at 195 ("We reiterate our principal holding that courts must evaluate the adequacy of an IEP prospectively as of the time of the parents' placement decision and may not consider 'retrospective testimony' regarding services not listed in the IEP.")   In essence, the IHO missed the forest by focusing unduly on some selected trees.

Upon plaintiffs' appeal from the IHO's Decision (as clearly erroneous and contrary to the record and the applicable statutes, regulations and review standards), the State Review Officer ("SRO") was required to decide plaintiffs' appeal by May 30, 2012.[12] (A-432).  However, it was not until October 17, 2012 (i.e.*,* more than four months later) that the SRO, in *extremis* with hundreds of late and undecided appeals, finally rendered a grossly late decision conveniently rubber-stamping the IHO's decision. (A-432)[13]

---

[12] See N.Y. COMP. CODES R. & REGS., TIT. 8 § 200.5and 34 C.F.R. §300.515.

[13] The SRO's backlog of undecided appeals continues to be a serious problem. Most recently, the State Review Office has proposed legislation that, to the extent viable and enforceable in light of contrary federal statutory authority, would accord the SRO a *three year hiatus* from having to comply with the existing state and federal statutory provisions mandating that appeal decisions at the SRO level be

As a technical matter, the SRO did "sustain" plaintiffs' appeal, in part, but it was merely a directive to defendant's CSE to reconvene to consider defendant's failure to make provision in D.B.'s IEP for parent training and counseling. In every other respect, just as the IHO had done, the SRO ignored or glossed over the evidence, the applicable review standards, and defendant's statutory duty to prove, both procedurally and substantively, that it had offered D.B. a FAPE in his LRE.

Plaintiffs then took a further appeal to the district court and by a spare, 24-page Memorandum and Order dated and filed March 26, 2014 (SPA-34), the district court (Nathan, J.) broadly deferred to the IHO and the SRO's ostensible "educational policy" findings to grant summary judgment to defendant, but only as to Prong I of the *Burlington/Carter* test. Thus, the district court did not even bother to address Prongs II or III.

On April 23, 2014, plaintiffs served and filed a Notice of Appeal. (A-436).

## SUMMARY OF THE ARGUMENT

The district court clearly erred in unduly and largely abdicating its review function. The district court accorded an entirely unwarranted level of deference to an SRO and an IHO who had ignored or glossed over the statutory mandates, plaintiffs' claims, and a compelling record demonstrating that defendant had failed

---

rendered on a *30 day* basis. *Compliance Agreement with the US DOE, Office of Special Education Programs: OSR: NYSED*
 http://www.sro.nysed.gov/compliance-agreement.html (last visited Aug. 5, 2014).

to meet its statutory evidentiary burden to establish that defendant had given plaintiffs due notice of D.B.'s 2011-2012 placement and program and that procedurally and substantively, defendant had otherwise offered D.B. a FAPE in his "least restrictive environment."

The "due deference" standard does not entail an abdication of the district court's independent review function. Deference is neither required nor even appropriate in matters involving the interpretation or enforcement of statutory mandates. Further, this Court found in *M.H. v. New York City Department of Education,* 685 F.3d 217, that a "state administrative finding does not merit deference unless it is reasoned and supported by the record." *Id* at 241 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007)).

The SRO's decision was neither careful nor thorough, and it was lacking the fundamental *quality* that is the essence of the due deference standard. Unfortunately, the district court's decision deferring to the SRO suffers from the very same infirmities. Here, rather than employing the critical analysis that was required to assess the viability of plaintiffs' core claims, and the cumulative impact of defendant's numerous substantive and procedural violations, the district court was excessively impressed with the SRO's word count. See SPA-41 (". . . the SRO's single spaced, 33-page opinion . . . ). Due deference is about *quality*, not

quantity.  Moreover, the due deference doctrine does not even apply in matters of statutory interpretation or enforcement.

The applicable "reasonably calculated" test as to Prong I is a *prospective* analysis that the district court should have applied to the four corners of D.B.'s IEP documents, rather than simply defer to the SRO's and IHO's improper reliance upon retrospective, revisionist evidence.  This is particularly true where, as here, defendant failed to cure or remediate any of plaintiffs' due process claims during the statutory thirty-day "resolution period."  As a matter of law and statute, the challenged IEP documents were missing mandatory provisions that the IHO, SRO and the district court were not permitted to waive or ignore.

D.B.'s parents necessarily had to rely upon the express provisions of defendant's proposed IEP documents to determine whether or not to accept or challenge defendant's proposed placement and program.  Accordingly, the district court erred by not rejecting defendant's revisionist and retrospective testimony as to what defendant allegedly "would have" done for D.B.  Rather, the district's court's decision (and the IHO's and SRO's decisions) should have been based solely on the information that D.B.'s parents were actually on notice of.  Based on the express recommendations in defendant's IEP documents, defendant failed to provide D.B. a FAPE.

By statute, defendant, the New York City Department of Education ("DOE"), bore the affirmative evidentiary duty to rebut plaintiffs' claims and to prove that, procedurally and substantively, it had offered D.B. a free and appropriate public education ("FAPE") in D.B.'s "least restrictive environment" ("LRE").   N.Y. Education Law § 4404(1)(c). In this connection, this Court recognized in *C.F. v. New York City Department of Education,* 746 F.3d 68, that, where (1) all witnesses familiar with a student testify that the student requires a particular level of support or services, (2) that testimony is never rebutted, except for impermissible retrospective testimony on the part of the DOE's "placement" witnesses,  and (3) the program being recommended was never actually offered to the student, the DOE has failed to meet its burden that an alternate program recommendation is appropriate.  Here, all of D.B.'s witnesses (and recommendations in the Rebecca School reports) confirmed that D.B. required a <u>less</u> restrictive program than that being offered in defendant's IEP. (A-142, 155, 192-209, 300-316) (*See also T.M. v. Cornwall Central School District,* 752 F.3d 145 (2d Cir. 2014)).  This Court also made clear in *R.E.* that "even minor violations may cumulatively result in a denial of FAPE.  School districts are well advised to ensure the IEP complies with the checklist of requirements specified by state regulations." 694 F.24 167 at 191. Defendant had the duty to fully defend its IEP and proposed school site.

Despite a clear statutory mandate that this Court and other federal district courts have previously honored and enforced, defendant's proposed IEP documents failed to make express provision for individualized "parent counseling and training."  In view of D.B.'s autism diagnosis and history of interfering behaviors, among other concerns, defendant further violated federal and state statutory mandates by failing to conduct any FBA or develop any BIP during the IEP development process.  Further, defendant failed to develop a transition plan during the IEP development process and without a transition plan, D.B.'s IEP was not "reasonably calculated."

Defendant's unilateral school selection process that failed to meaningfully include D.B.'s parents in the decision-making process prior to the placement selection decision deprived D.B. and his parents of a FAPE.  This violation was further compounded by defendant's failure to provide D.B.'s parents with the requisite prior written notice.

This Court's holding in *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412 (2d Cir. 2009), is limited, and this Court expressly cautioned that it was not giving school districts *carte blanche* to select inappropriate placements.  Moreover, even if the site selection decision-making process was not *procedurally* impermissible (we urge that it was), defendant told D.B.'s mother, during her June 28 visit to the proposed placement, that there were "no junior high classes at the time," and that

"the junior high kids were housed at <u>another</u> school." A-157. See also SP-33 (noting that classes were held at another location).  Defendant, however, never disclosed or gave any notice as to the actual location of D.B.'s "other" school site, i.e., where D.B. was to attend. To the extent that defendant's school site for D.B.'s ESY was situated at a different location than the school location reflected on defendant's FNR notice, D.B.'s parents never received notice of D.B.'s summer, 2011 placement and they were never afforded the opportunity to see and assess that "other" location for purposes of whether or not they would accept or reject defendant's proposed placement and program.  *See V.S. v. New York City Department of Education,* 2014 U.S. Dist. LEXIS 79067 at *6.  Defendant's offer of placement was illusory.

The weight of the evidence establishes that the defendant failed to provide D.B. with a FAPE for his twelve-month 2011-2012 school year, D.B.'s placement and program at the Rebecca School was appropriate and "reasonably calculated" under this Court's more relaxed Prong II standard, and the equities favor D.B. and his parents.

## <u>STANDARD OF REVIEW</u>

All issues are reviewed de novo.

# ARGUMENT

## I.   DEFENDANT FAILED TO MEET ITS PRONG I BURDEN

### A.   DEFENDANT FAILED TO MAINTAIN THE FULL "CONTINUUM" AND VIOLATED THE IDEA'S LRE MANDATE BY OFFERING D.B. AN IEP PROGRAM THAT WAS REGRESSIVE AND UNDULY RESTRICTIVE

In *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119 (2d Cir. 1998), this Court ruled that in order for a proposed IEP to meet the "reasonably calculated" test, the IEP, to be appropriate under the IDEA, must be one that is "likely to produce progress, not regression" (citing *Cypress-Fairbanks Independent School District v. Michael F.*, 118 F.3d 245, 248 (3d Cir. 1997) (internal citation omitted). The record must be examined to determine whether a student is likely to make progress or regress under the proposed plan. *Walczak v. Florida Union Free School District,* 142 F.3d at 130.

The requirement of a "reasonably calculated" FAPE, however, is only part of the requisite test. The school district must also offer the FAPE in the student's LRE. The LRE mandate is one of only two maximizing standards in the entire statute. In this regard, IDEA expressly mandates that:

> To the **maximum** extent appropriate, children with disabilities . . . [must be] educated with children who are not disabled, and . . . special classes, separate schooling, or other removal of children with disabilities from the regular education environment [shall] "occur only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily . . . .

20 U.S.C. § 1412(a)(5)(A) (emphasis added); *see also* 34 C.F.R. § 300.114.

There are many reported decisions where paraprofessionals or some other "supplementary aids and services" are put into play to help support a student in a mainstream, "regular" or other LRE setting. *See T.M. v. Cornwall Central School District,* 752 F.3d 145 (2d Cir. 2014); *P. v. Newington Bd. of Education*, 546 F.3d 111 (2d Cir. 2008); *L.B. ex rel. K.B. v. Nebo School District*, 379 F.3d 966 (10th Cir. 2004); *D.L. v. Springfield Bd. of Education,* 536 F. Supp. 2d 534 (D. NJ. March 6, 2008). This is understandable where, as in *T.M.*, the student was placed in a general education program, certainly warranting additional supports and services. Here, however, the LRE violation is far worse in that the DOE did not recommend a 1:1 paraprofessional for D.B. in a general education-type class, but rather, defendant was recommending D.B. for a self-contained special education class that was significantly more restrictive than his Rebecca School program.

In *T.M.,* a case involving a relatively small upstate community, this Court reversed the SRO and the district court to (unanimously) rule that Cornwall violated Congress' LRE mandate by failing to maintain and offer the "full continuum" of placements and programs, stating "the implementing regulations require school districts to ensure that a continuum of alternative placements is available to meet the needs of children with disabilities . . . [and] after considering an appropriate continuum of alternative placements, the school district must place

each disabled child in the least restrictive educational environment that is consistent with his or her needs." *T.M. v. Cornwall Central School District,* 752 F.3d at 161.

Following this Court's important ruling in *T.M. v. Cornwall Central School District*, Cornwall moved for rehearing *en banc* and, in response, this Court invited the U.S. Department of Justice to provide its position and policy. By letter dated July 14, 2014, the Department of Justice advised this Court that, as a condition of funding, one of the federal regulations implementing the LRE requirement, 34 C.F.R. Sec. 300.115, provides that school districts "must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities . . .", that "placement in the child's least restrictive environment is driven by and intertwined with the content of the IEP" and that "a school district's selection of an appropriate placement must take into account the child's abilities and needs." (*See* Letter brief for United States Department of Education as Amicus Curiae as requested by Court, *T.M. v. Cornwall Central School District,* 752 F.3d 145 (2d Cir. 2014), ECF No. 151).

The record shows that, prior to the 2011-2012 school year, D.B. was already successful being educated in an 8:1:3 Rebecca School classroom consisting of eight students, one teacher and three teaching assistants *without* being saddled with a full-time, one-to-one paraprofessional assigned only to D.B. who would direct

and "prompt" D.B.'s every move. A-70. Indeed, the evidence is that, by design, D.B. was becoming more independent and materially less reliant on adult support in his Rebecca School program. (A-300)

The record reflects that defendant does not maintain or offer the "full continuum" and for that reason, defendant, by default, offered D.B. its more restrictive 6:1:1 classroom consisting of only 6 students. (A-57, A-184**).** This proposal represented a 29% reduction in the number of students with whom D.B. could communicate and socialize. Defendant then compounded that problem by mandating in the proposed IEP that D.B. would be assigned his own full-time, one to one paraprofessional.

The anticipated regressive impact of assigning a 1:1 paraprofessional for a student with autism was recently addressed by Judge Cote in *C.U. v. New York City Department of Education,* 2014 U.S. Dist. LEXIS 72075. The student in *C.U. v. New York City Department of Education* also was diagnosed with autism and, like D.B., was a student at the Rebecca School who was being offered a public school placement at the Horan School (for the same 2011-2012 school year). While Judge Cote ruled for the student on the grounds that the record showed that the student's parents were denied the right to evaluate the school placement "offered" by defendant, Judge Cote ruled that there was a lack of evidence

showing that the assignment of a one-on-one crisis management paraprofessional was overly restrictive, stating:

- "Thus, contrary to the Parents' insistence otherwise, the 1:1 crisis para is a necessary component of the Student's IEP because it addresses the crucial issue of the student's [seizure disorder]" 2014 U.S. Dist. LEXIS 72075 at *54.

- "…the Rebecca Director and teacher…stated that the Student does not "require" a 1:1 crisis para…[but the fact] that a student does not require a particular intervention fails to demonstrate that the intervention will lead to regression…" 2014 U.S. Dist. LEXIS 72075 at *55.[14]

Here, in stark contrast, D.B. thankfully does not have a seizure disorder requiring a crisis management paraprofessional.  Rather, the instant record shows that prior to the start of the 2011-2012 school year, D.B. was making considerable progress learning how to regulate himself and be successful with *less* help from adults i.e., D.B. was learning how to be independent.  Here, unlike the record in *C.U. v. New York City Department of Education,* D.B.'s teacher testified that the addition of a 1:1 full-time paraprofessional would have an adverse impact and would result in the loss (regression) of at least some of D.B.'s independence. (A-142)[15]  Accordingly, here, the district court should have found for plaintiffs on

---

[14] Moreover, as the district court's decision in *C.U. v. New York City Department of Education* notes, in 2009, the student's parents had referred their daughter for an evaluation upon her school's express *request* that defendant obtain a one to one paraprofessional.

[15] D.B.'s teacher, Ms. Cohn, testified: "I had stated [at the IEP meeting] that a [1:1] para would . . . give [D.B.] too much support.  He didn't need one on one all the time . . . And if he was given one on one attention all the time, then he would . . .

Prong I on the ground that defendant's proposed IEP program was unduly restrictive and was "reasonably calculated" to cause regression by eroding D.B.'s increasing independence and self-sufficiency. *See Walczak v. Florida Union Free School District,* 142 F.3d 119 (in order for a proposed IEP to meet the "reasonably calculated" test, the IEP, to be appropriate under the IDEA, must be one that is "likely to produce progress, not regression").

> B. DEFENDANT VIOLATED PLAINTIFFS' PROCEDURAL SAFEGUARD RIGHT TO ADEQUATE AND RELIABLE NOTICE AND PARENTAL PARTICIPATION IN THE SITE SELECTION PROCESS SO THAT PLAINTIFFS COULD EVALUATE WHAT DEFENDANT WAS OFFERING PRIOR TO THE START OF THE 2011-2012 SCHOOL YEAR

Two recent district court decisions, one from the Southern District (Cote, J.) and one from the Eastern District (Weinstein, J.), highlight parental participation rights in the selection and evaluation of defendant's school site. *See C.U. v. New York City Dep't of Educ.,* 2014 U.S. Dist. LEXIS 72075; *V.S. v. New York City Dep't of Educ.*, 2014 U.S. Dist. LEXIS 79067.

In *C.U. v. New York City Department of Education,* although the student's annual review IEP meeting was held in March of 2011, and although the student's 2011-2012 school year was to start on July 1, as of June 14, 2011, defendant still had not yet provided notice of defendant's offered school site. On or about June

---

definitely lose some of his independence and he would . . . look to that person as a crutch in order to do things for him that he's able to do on his own." (A-142)

18, while the parents were on vacation, defendant's FNR notice arrived. Just as in the case at bar, defendant's recommended placement was the Horan School.

There were numerous unsuccessful attempts to contact the Horan School. Just as what occurred in D.B.'s case, in *C.U. v. New York City Department of Education,* Judge Cote held that the student's parents were denied a meaningful opportunity to participate in the school placement decision and that they also were denied the right to evaluate defendant's school placement before the school year began. In *C.U. v. New York City Department of Education,* Judge Cote reversed the SRO to award full reimbursement for the student's attendance at the Rebecca School.

Similarly, in *V.S. v. New York City Department of Education*, Judge Weinstein ruled that "parents have a procedural right to evaluate the school assignment, i.e., the right to acquire relevant and timely information as to the proposed school. 2014 U.S. Dist. LEXIS 79067 at *6.

In *V.S.*, defendant's FNR notice chose the Marathon School. V.S.'s mother, relying upon the FNR notice, went to visit and evaluate the Marathon School and rejected that site in writing because, inter alia, her son was only 11, virtually all the students at the Marathon School were significantly older than V.S. and many of the students had moustaches. Brief for Plaintiffs, *V.S. v. N.Y. City Dep't of Educ.,* 2014 U.S. Dist. LEXIS 79067 (E.D.N.Y. June 9, 2014), ECF No. 28 at 21.

At trial in *V.S.*, defendant did <u>not</u> defend the Marathon School site that was the subject of defendant's FNR.  Instead, without any prior notice to the child's parents, at trial, defendant sought to defend an entirely <u>different</u> school site located some six miles from the site that was the subject of defendant's FNR notice.

In *V.S. v. New York City Department of Education*, Judge Weinstein ruled that "the SRO and the IHO erred by failing to consider the parent's right to meaningfully participate in the school selection process . . ." and that "D.S. [V.S.'s mother] was therefore denied her right to evaluate the child's school site when the DOE directed her to inspect a school her child would not attend."  2014 U.S. Dist. LEXIS 79067 at *13.  After considering Prongs II and III, Judge Weinstein then awarded V.S. full tuition at the Rebecca School.[16]

Here, just as in *V.S. v. New York City Department of Education* and in *C.U. v. New York City Department of Education*, D.B.'s parents were denied any opportunity to meaningfully participate in the school selection process and to visit and gather relevant information as to the multiple school sites that D.B. would need to attend during 2011-2012.  A-158.  Defendant's FNR identifies only one of those sites. A-89.

As even the district court acknowledges, there was a great deal of "confusion" about D.B. and his actual placement, especially as to what school site

---

[16] Defendant never took an appeal from Judge Weinstein's decision in V.S. Accordingly, that decision has now become final and non-appealable.

D.B. was expected to attend during the summer of 2011. The only party to bear blame on this failure to elucidate and illuminate the record is the DOE – the party bearing the Prong I burden. For this reason, D.B.'s parents were denied their right to evaluate and assess defendant's site offer. Here, however, the IHO, SRO and district court ignored or glossed over what was a material procedural violation.

In addition to defendant's fatal "prior written notice" failure as to the recommended placement and failure to include D.B.'s parents in the placement selection process, the record further establishes that the Horan School was substantively inappropriate to meet D.B.'s individual needs.

C. THE DOE IMPERMISSIBLY RELIED ON "RETROSPECTIVE EVIDENCE" TO TRY TO CURE DEFECTS WITHIN ITS IEP DOCUMENT, AS WRITTEN

In *R.E. v. New York City Department of Education*, 694 F.3d 167, 190 (2d Cir. 2012), this Court articulated its rule against impermissible "retrospective" evidence; that is, testimony or other evidence given in an effort to prove what the school district "would" or "could" do for the student, despite what the IEP expressly provides. *See also V.S. v. New York City Department of Education*, 2014 U.S. Dist. LEXIS 79067 (E.D.N.Y. June 9, 2014). The retrospective evidence rule does not turn on the credibility or quality of the retrospective testimony. Rather, it is rooted in fundamental principles of fairness, and upon this Court's rationale that

such a rule is necessary to keep school districts from engaging in even an inadvertent "bait and switch."

Here, the IHO and the SRO clearly relied on impermissible retrospective testimony.  See e.g., A-350 ("I find that the lack of parent training as a related service on an IEP does not rise to the level of a denial of FAPE where there is credible testimony that parent training would be provided…"); A-353 ("Ms. Sencion testified that formal assessments [not conducted at the IEP level] would be conducted during the first week of school);   A-353 (Ms. Sencion's further testimony as to what she would do to support D.B.); SPA-5 ("[the parent training violation] did not amount to a denial of FAPE because the evidence showed that the service would be provided…); SPA-33 (during the balance of the 2011-2012 school year, middle school classes would be held at "another" location); SPA-33 (the school district "was capable of implementing the student's IEP…at the public school sites offered by the district").  The district court then broadly deferred to such findings.

### D. DEFENDANT FAILED TO INCLUDE STATUTORILY MANDATED PARENT TRAINING IN D.B.'S IEP

In *C.F. v. New York City Department of Education,* 746 F. 3d 68 (2d Cir. 2014), this Court considered defendant's failure to make express provision in the student's IEP for parent training.  This Court ruled that defendant's failure to include such a provision in the IEP is a procedural violation of the Act and that

"Because the IEP must be evaluated prospectively, without recourse to retrospective testimony, the [defendant] cannot cure such violations by offering testimony that counseling and training would have been offered." 746 F. 3d at 80. *See also S.A. v. New York City Department of Education*, 2014 U.S. Dist. LEXIS 42649 (E.D.N.Y. Mar. 30, 2014).

Accordingly, here, it was clear error for the IHO to find, at pages 14-15 of her Decision, that this violation was a non-event because the "evidence" (defendant's retrospective testimony at trial) described how parent training "would" have been provided in the school being offered by defendant. (A-336-357).  It similarly was error for the SRO to embrace that IHO finding.  (SPA-5) Tellingly, the SRO's Decision reflects a guilty conscience on that point in that he instructs defendant to give consideration to parent training at its "next CSE" and thereafter provide D.B.'s parents with prior written notice. (SPA-33)

Unfortunately, at this juncture, the district court joined the retrospective evidence bandwagon, stating ". . . the failure of an IEP to expressly provide for parent training does not typically mean that parents will not receive required trainings . . . where evidence [i.e., defendant's retrospective testimony at trial] showed that such training was indeed available at the assigned school." (SPA-47)[17]

---

[17] It is axiomatic that this was the singular source of such "evidence" because as at the February 9, 2011 IEP meeting, the school site had not even been identified, much less offered.

Here, it was reckless and irresponsible for defendant to plan in the IEP for a "transition" or "crisis" paraprofessional for D.B. in school, yet leave D.B.'s parents in the lurch as to parent training. Fortunately, and as the IHO and SRO decisions recognize, D.B.'s parents receive parent training from the Rebecca School. (A-123).[18]

    E.   DEFENDANT'S FAILURE TO COMPLETE ANY FBA OR BIP WAS BOTH A SERIOUS PROCEDURAL VIOLATION AND A SUBSTANTIVE VIOLATION BECAUSE THE IEP DOES NOT ADEQUATELY IDENTIFY D.B.'S BEHAVIORS AND THE APPROPRIATE WAYS TO MANAGE THOSE BEHAVIORS

The failure to properly consider and assess behavior that interferes with or impedes a child's learning or the learning of others is a material violation of the student's right to a free appropriate public education. *See* 20 U.S.C. §§ 1401(9). Defendant failed to conduct any FBA or BIP in direct violation of law and statute. For students, like D.B., who engage in behaviors that impede learning, school districts are required to conduct, as necessary, FBAs that determine *why* the student engages in such behaviors and *how* the behaviors relate to the environment.

---

[18] "So every family under the umbrella of parent training . . . is provided [at Rebecca School] a social worker who works with that family on concrete surfaces, providing counseling for family members, parent support groups, parent training groups, sibling counseling, sibling support groups, any sort of counseling or mental health support for the entire family." This is significant in that D.B.'s parents continued to require parent counseling and training even while D.B. continued to be enrolled at the Rebecca School. Certainly were D.B. to attend an alternate program and placement, D.B.'s parents would require ongoing parent counseling and training.

N.Y. COMP. CODES R. & REGS., TIT. 8 §§ 200.1(r), 200.4(b)(1)(v), 200.22(a).
School districts are further charged with developing BIPs, based on the FBA, that
create a baseline and performance criteria to measure improvement in behavior and
identify intervention strategies. N.Y. COMP. CODES R. & REGS., TIT. 8 §§
200.1(mmm), 200.22(b); see also 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. §
300.324(a)(2)(i).

In *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d Cir.
2012), this Court ruled that "the failure to conduct an adequate FBA is a serious
procedural violation because "it may prevent the CSE from obtaining necessary
information about the student's behaviors, leading to their being addressed in the
IEP inadequately or not at all . . . The entire purpose of an FBA is to ensure that
the IEP's drafters have sufficient information about the student's behaviors to craft
a plan that will appropriate address those behaviors." 694 F.3d at 189, *citing
Harris v. District of Columbia*, 561 F. Supp. 2d 63, 68 (D.D.C. 2008) ("The FBA
is essential to addressing a child's behavioral difficulties and, as such, it plays an
integral role in the development of an IEP.").

D.B. does not display any aggressive or self-injurious behaviors, but
behaviors do not need to rise to that hazardous, crisis level to warrant doing a
Functional Behavioral Assessment (FBA) and resulting Behavior Intervention Plan
(BIP). The trigger warranting an FBA and BIP is simply that the student has

displayed behaviors that impede or otherwise interfere with the student's learning process, or the learning of other students who are in proximity. *See C.F. v. N.Y. City Dep't of Educ.,* 746 F.3d 68.

The record reflects a litany of behaviors that would be expected to impede and interfere with D.B.'s learning process. See, e.g. A-173 (noting "dysregulation," "crying," D.B.'s "struggles to remain engaged," his "issues with attention, impulse control and self regulation that impact upon his functioning"). The foregoing references appear on defendant's own IEP.   See also A-217 (hand-flapping, squinting, distractibility and inappropriate vocalizations).   The IEP failed, however, to actually appropriately plan for how to address and decrease these behaviors.

In *C.F. v. New York City Department of Education,* this Court held that "the Department failed to adequately create and implement behavioral *strategies* in its behavior plan.  The plan failed to match strategies with specific behaviors, instead simply listing behaviors and strategies." 746 F.3d at 80.  Here, not only did the DOE fail to develop <u>any</u> strategies for addressing and decreasing the above-listed behaviors, the DOE did not even bother to develop or create <u>any</u> kind of plan nor did it conduct any behavioral assessments in direct contravention of the law.  This failure alone, but most certainly when viewed with the cumulative impact of defendant's gross violations, deprived D.B. of a FAPE.

In *R.E. v. New York City Department of Education*, this Court cautioned that "the failure to conduct an FBA will not always rise to the level of a denial of a FAPE but when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors." Here, the IHO, SRO and district court glossed over the fact that the challenged IEP is woefully lacking in that regard. The IEP cavalierly concludes that no behavior plan is necessary (A-173). Indeed, the IEP makes D.B. singularly responsible for managing his own behaviors! (A-182)("[D.B.] will identify emotional triggers that lead to dysregulation"). The IEP also is lacking any meaningful behavioral goals for the "crisis paraprofessional."

Defendant's failure to perform an FBA assessment or develop a BIP for D.B. was a "serious" procedural violation that was not cured by defendant's IEP and the absence of appropriate behavioral planning for D.B. renders the IEP substantively inappropriate to meet D.B.'s needs. Accordingly, it was error for the IHO, SRO and the district court to give this claim such short shrift.

F. <u>LITTLE, IF ANY, DEFERENCE IS REQUIRED AS TO ADMINISTRATIVE FINDINGS WHERE, AS HERE, THE UNDERLYING ADMINISTRATIVE DECISIONS FAILED TO APPLY THE CORRECT REVIEW STANDARDS, GLOSSED OVER A COMPELLING EVIDENTIARY RECORD, LARGELY IGNORED DEFENDANT'S ADMISSIONS, AND WERE NEITHER CAREFUL NOR THOROUGH</u>

As the Second Circuit held in *M.H.,* a "state administrative finding does not merit deference unless it is 'reasoned and supported by the record.'" *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 241 (*quoting Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007)).  Here, as in *M.H.*, the underlying administrative decisions are not "reasoned and supported by the record" and therefore, they merit little, if any, deference. *M.H. v. New York City Dep't of Educ.*, 685 F.3d at 241; *see B.R. v. New York City Dep't of Educ.*, 910 F. Supp. 2d 670 (S.D.N.Y. 2012); *see also P.K. et al. v. New York City Dep't of Educ.*, 526 Fed. Appx. 135 (2d Cir. 2013) (Summary Order).  As the Second Circuit held in *R.E.,* "[b]ecause the SRO's conclusion was against the weight of the evidence and thus flawed, deference to it is not warranted." *R.E. v. New York City Department of Education*, 694 F.3d at 194.

It is well settled that the district court's review of the record and proceedings below is in no way a pro forma, "rubber stamp[ing]" exercise.  See *Walczak v. Florida Union Free School District* (quoting *Board of Education v. Rowley*, 458 U.S. 176, 206, 208 (1982)); *see also R.E. v. New York City Department of*

*Education,* 694 F.3d at 184; *P.K. New York City Department of Education,* 526 Fed. Appx. 135; *B.R.*, 910 F. Supp. 2d 670.

In *M.H.,* this Court reiterated that the standards for reviewing administrative determinations "require a more critical appraisal of the agency determination than clear-error review . . . the *persuasiveness* of a particular administrative finding, or lack thereof, is likely to tell the tale." *M.H. v. New York City Department of Education*, 685 F.3d at 244 (emphasis added).

As this Court explained in *R.E. v. New York City Department of Education,* the deference that may be owed "depends on the *quality* of that opinion." *R.E. v. New York City Department of Education*, 694 F.3d at 189 (2d Cir. 2012)(emphasis added); see also *B.R. v. New York City Department of Education,* 910 F. Supp. 2d 670; *C.L. v. New York City Department of Education,* No. 12. Civ. 1676 (JSR), 2013 U.S. App. LEXIS 1520 (S.D.N.Y. Jan. 2, 2013), *aff'd* 2014 U.S. Dist. LEXIS 3474 (2d Cir. Jan 27, 2014) (Summary Order).

Where, as here, the district court (and the IHO and SRO) rendered decisions that were not thorough or well-reasoned, and are not supported by the underlying record, little, if any, deference should be accorded.

G.  THE CUMULATIVE IMPACT OF DEFENDANT'S NUMEROUS
PROCEDURAL AND SUBSTANTIVE VIOLATIONS CERTAINLY
RISE TO THE LEVEL OF FAPE DEPRIVATION FOR D.B.

This Court's "cumulative" violation doctrine represents the Court's efforts to make sure that even when the IHO and the SRO fail to do so, the district court will look at the totality of the situation and see the forest for the trees.  In *R.E. v. New York City Department of Education*, 694 F.3d 167, 190 (2d Cir. 2012), this Court ruled that "multiple procedural violations may *cumulatively* result in the denial of a FAPE even if the violations considered individually do not."  Here, rather than apply a cumulative violation approach, the IHO and the SRO focused myopically on a single violation and then ruled a la carte that each particular singular violation was not itself "enough" to trigger a finding by the court that there was a Prong I FAPE deprivation.  See, e.g., A-350 (discussing parent training violation), A-352 (defendant's failure to develop any goals for D.B. to work on during adaptive physical education); SPA-5 (discussing parent training violation); SPA-19 (discussing lack of adaptive physical education goals); SPA-19 (no real plan or goals for the paraprofessional).

Unfortunately, the district court embraced such an approach by broadly deferring to the SRO on these same points.  While the record amply supports a finding that defendant's substantive and procedural violations, viewed on an individual basis, rise to the level of FAPE deprivation, a fair review of the record

reveals that these (and additional) violations – when viewed in their totality –  most

certainly deprived D.B. of a FAPE and deprived both D.B. and his parents of due

process.

## II.    NEITHER THE IHO, THE SRO NOR THE DISTRICT COURT MADE ANY PRONG II OR PRONG III FINDINGS

### A.    D.B.'S REBECCA SCHOOL PROGRAM AND PLACEMENT WAS "REASONABLY CALCULATED" TO PROVIDE D.B. WITH MEANINGFUL EDUCATIONAL BENEFITS, AND THE EVIDENCE AT THE TRIAL SHOWS THAT HE WAS, IN FACT, RECEIVING SUCH BENEFIT

The burden that parents must meet to satisfy the applicable Prong II standard

is somewhat less stringent than the Prong I standard to which a school district must

adhere in offering a child a FAPE.  Accordingly, parents are not necessarily barred

from reimbursement where a private school that they choose for their handicapped

child does not perfectly meet the IDEA's definition of a FAPE had a school district

recommended such placement.  *See Frank G. v. Bd. of Educ.,* 459 F.3d 356 at 364

(2d Cir. 2006) (*citing Carter*, 510 U.S. at 14); *see also M.S. v. Yonkers Bd. of

Educ.*, 231 F.3d 96 (2d Cir. 2000).

In *Frank G.*, this Court held that once the evidence establishes a Prong I

deprivation, the unilateral placement on Prong II need not be perfect, need not

meet all of the child's special education needs, and need not even be in the child's

least restrictive environment.   In essence, "the test for the parents' private

[unilateral] placement is that it is appropriate, and not that it is perfect." *Id.* (internal citations omitted).

To qualify for reimbursement relief, the Prong II program and services must simply represent "educational instruction specially designed to meet the unique needs of a handicapped child supported by such services as are necessary to permit the child to benefit from instruction." *Frank G.*, 459 F.3d at 365 (*citing Rowley*, 458 U.S. at 188-89). The test of appropriateness under *Frank G.* is simply that the placement and program is "reasonably calculated" to provide meaningful educational benefits to the child. This is also a prospective test that does not even require retrospective evidence of progress and achievement. *Gagliardo*, 489 F.3d 105; *see also D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595 (2d Cir. 2005).

Here, there was both "reasonably calculated" evidence and retrospective evidence on the Prong II issue. The IHO, SRO, and the district court did not even address Prong II and consider whether D.B.'s unilateral program was appropriate. The record amply reflects that D.B.'s Rebecca School program was appropriate to meet his individual needs and provide educational benefit. The record further establishes that D.B. was, in fact, making progress in his Rebecca program.

B.    EQUITABLE CIRCUMSTANCES SUPPORT A REIMBURSEMENT AWARD IN D.B.'S FAVOR

The IHO, SRO and even the district court never addressed Prong III.  Once the fact-finder has made a determination in favor of the parents on the first two Prongs of the *Burlington/Carter* test for reimbursement, he or she may then determine whether equitable circumstances support the parents' claims pursuant to Prong III, and order "appropriate" relief.  *See Still v. DeBuono*, 101 F.3d 888, 891 (2d Cir. 1996); *see also Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000)).

D.B.'s parents cooperated with defendant and acted in good faith at every turn.  D.B.'s parents attended the IEP meeting, shared reports, provided input and expressed concerns, among other things.  D.B.'s parents also timely notified defendant that they were rejecting defendant's proposed placement and program as inappropriate and that they would look to defendant for reimbursement.

In determining to what extent, if any, equitable considerations should reduce or diminish any reimbursement award, the fact finder is also to look at the school district's actions (and omissions) in working toward offering a FAPE.  *See Application of a Child with a Disability¸* Appeal No. 03-003.  Specifically, a school district's denial of FAPE may "rise to such a level that a parent is not to suffer the consequences for the district's violation." *Id.* (*referencing Warren G. v. Cumberland County Sch. Dist.,* 190 F.3d 80 at 86 (3d Cir. 1999); *Rose v. Chester*

*Co. Intermediate Unit*, No. 95-239 (JTG), 1996 U.S. Dist. LEXIS 6105, *aff'd*, 114 F.3d 1173 (3d Cir. 1997); *Schaffer v. Weast,* 546 U.S. 49 (2005); *Wolfe v. Taconic-Hills Cent. Sch. Dist.*, 167 F.Supp.2d 530, 534-535 (N.D.N.Y. 2001); *Justin G. v. Bd. of Educ.*, 148 F.Supp.2d 576, 586 (D. Md. 2001); *Eugene B. v. Great Neck Union Free Sch. Dist.*, 635 F.Supp. 753, 759 (E.D.N.Y. 1986)).  To put it another way, parents' actions (or inactions) may be "outweighed by actions [or inactions] taken by a school district which may have resulted in a denial of a FAPE."  *Id.* Here, of course, D.B.'s parents were entirely cooperative with defendant and the *district's* egregious actions and inactions amply tip the equities balance in D.B.'s favor.

Accordingly, if, as requested, this Court reverses as to Prong I, Prongs II and III should be remanded to the district court for adjudication.

## CONCLUSION

For all of the foregoing reasons, the district court's Decision should be reversed as to its core Prong I finding.  In this connection, this action should then be remanded to the district court so that it might adjudicate the outstanding Prong II and Prong III issues that have not yet been adjudicated at any level.

Dated: August 6, 2014        Respectfully submitted,
     New York, New York

MAYERSON & ASSOCIATES
*Attorneys for Plaintiffs-Appellants*
D.B., and his parents, R.B. and M.L.B.


By: /s Gary S. Mayerson
Gary S. Mayerson (GSM 8413)
Maria C. McGinley (MM 9438)
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Gary S. Mayerson, Attorney of record for D.B. and his parents, do hereby certify that the foregoing brief complies with the type-volume limitation as set forth in the Federal Rule of Appellate Procedure 32(a)(7)(b).   The total number of words in the foregoing brief is 10,459.


<u>*s/ Gary S. Mayerson*</u>
Gary S. Mayerson
Mayerson & Associates
*Attorneys for Plaintiffs-Appellants*
330 West 38th Street, Suite 600
New  York, NY 10018
(212) 265-7200


Dated: August 6, 2014
        New York, New York

46

# SPECIAL APPENDIX

i

## Table of Contents

**Page**

Decision by Justyn P. Bates, State Review Officer,
    Dated October 17, 2012 ................................................... SPA- 1

Memorandum Decision and Order of the Honorable Alison J.
    Nathan, Dated March 26, 2013, and Filed March 26, 2014,
    Appealed From................................................................. SPA-34

Judgment, Dated March 28, 2014, Appealed From .............. SPA-58





# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 12-071

**Application of a STUDENT WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Law Offices of Regina Skyer and Associates, LLP, attorneys for petitioners, Jesse Cole Cutler, Esq., of counsel

Michael Best, Special Assistant Corporation Counsel, attorneys for respondent, Neha Dewan, Esq., of counsel

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioners (the parents) appeal from the decision of an impartial hearing officer (IHO) which denied their request to be reimbursed for their son's tuition costs at the Rebecca School for the 2011-12 school year. The appeal must be sustained in part.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law. § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due


process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; 34 CFR 300.151-300.152, 300.506, 300.511; Educ. Law § 4404[1]; 8 NYCRR 200.5[h]-[l]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law. § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2],[c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.514[c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

The student's educational program has been the subject of a previous administrative appeal (Application of the Bd. of Educ., Appeal No. 11-133) and the parties' familiarity with the student's prior educational history is presumed and will not be repeated here.

On February 9, 2011, the CSE met for its annual review of the student's program and to develop an IEP for the 2011-12 school year (Dist. Exs. 1 at p. 2; 2). The CSE recommended

2



SPA-3

continuation of the student's eligibility for special education and related services as a student with autism, and placement in a 6:1+1 special class in a specialized school with the support of a 1:1 transitional paraprofessional (Dist. Ex. 1 at pp. 1, 14, 17; 2).[1]  The CSE also recommended that the student receive related services of speech-language therapy, occupational therapy (OT), and counseling (Dist. Ex. 1 at p. 16).  Additionally, the CSE recommended the student for adapted physical education, alternative assessment, and 12-month school year services (Dist. Ex. 1 at pp. 1, 5; 2).  At the time of the CSE meeting, the student's mother expressed concerns regarding the scores reported in the district's psychological evaluation, the recommended class ratio, and the qualifications of the transitional paraprofessional, among other things (Tr. pp.28-29, 50, 58-59, 81-82, 84, 86, 344-45, 395-400; Dist. Ex. 2).

On May 14, 2011, the parents executed an enrollment contract with the Rebecca School for the student's attendance from July 5, 2011 through June 22, 2012 (Parent Ex. D).  On May 18, 2011 the parents paid a $10,000 nonrefundable deposit to the school, in accordance with the contract (Parent Exs. E; F).

By a final notice of recommendation (FNR) dated June 14, 2011, the district summarized the February 2011 CSE's recommendations and notified the parents of the particular public school to which the student was assigned for the 2011-12 school year (Dist. Ex. 3).[2]

The parents advised the district by letter dated June 17, 2011, that as of the first day of school for the 2011-12 school year they intended to place the student at the Rebecca School and seek funding for the placement from the district (Parent Ex. C at p. 1).  The parents stated that although they agreed with the CSE's recommendation to place the student in a special class in a specialized school, the program recommendation by the CSE was inappropriate to address the student's needs because the program used a methodology "that would not be able to appropriately address the goals in the student's IEP" (id. at p. 2).  The parents also contended, among other things, that the student should not be excused from testing or evaluation by the district and that the CSE had refused to consider an evaluation provided by the parents and "insisted on including data that was irrelevant or outdated on the IEP" (id.).  The parents further stated that, as of that date, the district had failed to identify a specific public school site for the student to attend school for the 2011-12 school year (id.).[3]  The parents also stated their willingness to meet with the CSE to discuss their concerns (id.).

Following the parents' receipt of the FNR on or around June 24, 2011, the student's mother visited the public school site to which the student had been assigned and concluded that it was not appropriate for the student (Tr. pp. 401-09).

---

[1] The student's eligibility for special education and related services as a student with autism is not in dispute in this proceeding (see 34 CFR 300.8[c][1]; 8 NYCRR 200.1[zz][1]).

[2] The June 14, 2011 FNR reflected that the student was recommended for a 1:1 crisis management paraprofessional, rather than a 1:1 transitional paraprofessional as indicated on his February 9, 2011 IEP (compare Dist. Ex. 3, with Dist. Ex. 1 at p. 17).

[3] The student's mother reported that the parents did not receive the district's June 14, 2011 FNR until June 24, 2011 (Tr. pp. 401-02).



**A. Due Process Complaint Notice**

By due process complaint notice dated July 5, 2011, the parents requested an impartial hearing, asserting that the February 2011 IEP was inappropriate because the February 9, 2011 CSE meeting was held "several months before it would have made sound educational sense to asses [the student's] educational progress" for the 2010-11 school year (Parent Ex. A at pp. 1, 2). The parents also asserted that the recommendations made in the February 2011 IEP were inappropriate because such recommendations were made five months prior to the start of the 2011-12 school year (id.). Next, the parents asserted that the CSE was improperly constituted, that a teacher from the Rebecca School who participated by telephone was not provided with the reports, evaluations, and other written documents concerning the student reviewed by the CSE, and that the CSE should have sent the parents copies of "all requisite documents" five days prior to the CSE meeting (id. at p. 3). The parents also asserted that the CSE should have conducted an evaluation of the student's vocational needs and interests and did not have evaluations supporting its recommendation for a "large and less supportive educational environment" than the student was attending at the time (id. at p. 6).

The parents next asserted that the IEP failed to describe the student's health and physical management needs and that the goals in the IEP were insufficient in that they did not specify a method of measurement, there were no goals concerning adapted physical education, the social/emotional goals were insufficient, and there was only one goal regarding the transitional paraprofessional (Parent Ex. A at pp. 3-5). Additionally, the parents contended that the CSE inappropriately decided to place the student in a 6:1+1 class in a specialized school based not on the student's needs, but on the type of placement it had available within the district's schools (id. at pp. 1, 2). The parents also asserted that the CSE erred in placing the student in a 6:1+1 special class in a specialized school because the student required a smaller and more supportive setting, and that the CSE "summarily ignored" the input of the parents and the student's then-current providers regarding this issue (id. at pp. 2, 6-7). The parents also contended that the IEP should have provided for parent counseling and training, and that the CSE should have conducted a functional behavioral assessment (FBA) and developed a behavioral intervention plan (BIP) for the student (id. at pp. 5-6). The parents next contended that the CSE improperly removed the student from participation in State and local assessments and recommended use of alternative assessments against their wishes (id. at p. 6). The parents next asserted that the district's FNR was untimely because it was received "several days before the end of the school year," thus, the parents were not able to visit the school until the last day of the 2010-11 school year (id. at p. 7).

The parents also challenged the particular school to which the district assigned the student by alleging the school was too large, diverse, and distracting to be appropriate; the school could not meet the student's OT and sensory needs; the math curriculum the school employed was not appropriate; and the school could not provide a "suitable and functional peer group for instructional, sensory, and social/emotional purposes" (Parent Ex. A at pp. 7-8). Lastly, the parents contended that their unilateral placement at the Rebecca School was appropriate and that equitable considerations favored reimbursement (id. at p. 8). For relief, the parents requested tuition reimbursement and transportation to and from the Rebecca School for the 2011-12 school year (id. at pp. 2, 8-9).


SPA-5

**B. Impartial Hearing Officer Decision**

An impartial hearing was convened on August 11, 2011, for purposes of determining the student's educational placement during the pendency (stay put) of the proceedings (Tr. pp. 1-9).[4] The impartial hearing was reconvened on October 26, 2011, to address the merits of the parents' claims and continued on two additional hearing dates, concluding on January 4, 2012 (Tr. pp. 10, 137, 229).

In a decision dated February 28, 2012, the IHO found that the district offered the student an appropriate program for the 2011-12 school year (IHO Decision at pp. 17-18).[5] Regarding the parents' contention that the February 2011 IEP did not reflect all of the student's progress during the 2010-11 school year, the IHO found that the IEP appropriately reflected the student's needs and showed the student's slow, measured progress, noting that according to Rebecca School progress reports most of the goals set forth on the February 2011 IEP had not yet been met by December 2011 (id. at pp. 12-13, 15). As for the allegation that the CSE lacked certain evaluative information, the IHO found that the evaluations the CSE had before it were adequate to draft the student's IEP and that the lack of a specific vocational evaluation was not inappropriate because sufficient information regarding the student's skills, aptitudes, and interests was present in other evaluative data before the CSE (id. at pp. 11-12). Further, the IHO found that the student's IEP accurately described his present academic performance and learning characteristics and was consistent with the findings and conclusions of the psychoeducational evaluations, the Rebecca School teacher reports, and the classroom observation conducted by the district (id. at p. 12).

The IHO rejected the parents' claim that the CSE ignored their input at the meeting and based its placement determination on program availability rather than the student's individual needs, noting that the parents had input at the CSE meeting and that changes had been made to the final IEP reflecting their input (IHO Decision at p. 13). The IHO found that while the IEP annual goals did not have measurement criteria, the short-term objectives related to the goals were sufficient such that the measurement of progress could be ascertained (id. at p. 15). Further, the IHO found that the IEP goals concerning the student's social and emotional needs were adequate and that the lack of specific goals regarding adapted physical education did not deprive the student of a free appropriate public education (FAPE) because the student's sensory needs would have been addressed by the district's "mandated adapt[ed] physical education and by the occupational therapist" (id. at p. 16). The IHO found that while it was "undisputed" that the IEP failed to provide for parent counseling and training in violation of State regulation, this violation did not amount to a denial of FAPE because the evidence showed that the service would be provided in the school to which the student was assigned and that the parents had consistently obtained appropriate training at the Rebecca School previously (id. at pp. 14-15).

---

[4] In an interim decision dated August 12, 2011, the IHO found that the student's pendency placement was at the Rebecca School based on a prior unappealed IHO Decision (Interim IHO Decision at p. 3; see Parent Ex. B).

[5] The IHO included form decisions in the hearing record regarding the parties' requests for extensions, in which she described the factors considered, the reasons why she granted the parties' extension request and her notification to the parties of the new date for rendering her decision (IHO Ex. I pp. 1-6; see 8 NYCRR 200.5[j][5][iv]).



SPA-6

The IHO also determined that a 6:1+1 special class placement with a 1:1 transitional paraprofessional recommended by the CSE was sufficient to address the student's needs and as described in the evaluative information before the CSE (IHO Decision at pp. 13-14). Further, the IHO found that the related services set forth on the IEP were appropriate for the student (id. at p. 14). The IHO found that the circumstances of the parents' visit did not deny the student a FAPE and rejected their claim that the FNR was untimely (id. at p. 16).

With regard to the parents' arguments concerning the classroom at the public school site, the IHO concluded that the school to which the student was assigned would have been able to implement the student's IEP, provide the student with the related services set forth on the IEP, and provide meaningful educational benefits (IHO Decision at pp. 16-18).

Having found that the district offered the student a FAPE during the 2011-12 school year, the IHO determined that it was unnecessary to examine the appropriateness of the Rebecca School and denied the parents' request for tuition reimbursement (IHO Decision at p. 18).

**IV. Appeal for State-Level Review**

The parents appeal the IHO's decision that the district offered the student a FAPE during the 2011-12 school year and her denial of their request for tuition reimbursement. The parents contend that the February 2011 CSE meeting was held too long before the start of the 2011-12 school year to determine student's needs for the upcoming school year and that, contrary to the IHO's finding, the student had made "significant progress" during the intervening time period. Further, the parents assert that the IHO "carelessly stated" that the parents could have requested that the CSE reconvene to address their concerns with the IEP and did not make such a request. However, the parents allege that they requested such a meeting in writing in their June 17, 2011 letter, and the district failed to convene the CSE. The parents next contend that the IHO erred in failing to address the parents' contention that the CSE erred in refusing to consider placing the student at the Rebecca School. The parents also contend that the IHO erred in failing to address the parents' argument that there was not a valid special education teacher present at the February 2011 CSE meeting because the district's teacher who attended the meeting was not a teacher of the student. The parents also contend that the IHO erred in finding that the CSE had adequate evaluations because there was no evaluation of the student's vocational needs and the IHO erred in finding other evaluations before the CSE remedied the lack of evaluations. Further, the parents contend that the CSE did not have any evaluations supporting its choice for moving the student to a large and less supportive setting than his then-current setting at the Rebecca School.

The parents next argue that the IHO erred in finding that the IEP annual goals were sufficient because, among other things, none of the goals contained adequate methods of measurement, there was no "appropriate baseline information," no adapted physical education goals, and only one goal for the 1:1 transitional paraprofessional. Further, the parents argue that the IHO erred in finding that the short-term objectives cured the defects in the annual goals because the district's special education teacher who testified at the impartial hearing stated that there were no short-term objectives in the IEP. The parents also contend that the 1:1 "transitional paraprofessional" assigned to the student should have been an "assistant teacher". The parents next argue that the IHO erred in determining that the lack of identifying parent

6



counseling and training on the IEP did not deny the student a FAPE. The parents also contend that the CSE should not have removed the student from participation in State and local assessments and mandated the use of alternative assessments against their wishes. The parents assert that the CSE improperly recommended that the student attend a 6:1+1 special class in a specialized school because the student required a smaller and more supportive setting, and that the CSE "ignored" the input of the parents and the student's then-current providers related to the special class placement. The parents also argue that they were denied a meaningful opportunity to participate in the development of the student's program by the late issuance of the FNR and the assignment of the student to a vocational school, which was not discussed at the February 2011 CSE meeting. Further, the parents contend that they attempted to have academic goals added to the IEP during the CSE meeting but that the district's representatives refused to do so and refused to engage in a discussion.

Regarding the particular public school site to which the district assigned the student, the parents argue that it was too large, diverse, and distracting to be appropriate; that the school could not meet the student's OT and sensory needs; that the methodologies and vocational training the school employed were inappropriate; and that the school could not provide a suitable functional peer grouping. Further, the parents contend that the student should have been assigned to a middle school rather than a high school due to his age, and that the district did not prove that there would have been a middle school class at the particular school to which the student was assigned. The parents contend that the district's classroom teacher who testified at the impartial hearing was not certified to teach eighth grade special education students and also stated that she would not have followed parts of the student's IEP because she disagreed with them.

The parents assert that their unilateral placement at the Rebecca School was appropriate and that equitable considerations favored reimbursement. The parents request that the IHO's decision be vacated and that the district be ordered to reimburse the parents for the student's tuition at the Rebecca School for the 2011-12 school year.

In its answer, the district denies that the IHO erred in determining that the district offered the student a FAPE during the 2011-12 school year. Regarding the parents' concerns that the February 2011 CSE meeting was held too early, the district contends that the meeting was not premature given the student's slow progress, that most of the goals in the IEP had not been attained by May 2011, that the IDEA does not specify when it is permissible for a CSE to meet, that the parents never informed the district that the student had attained some of the goals on his IEP, and that the parents never requested a second CSE meeting to update the student's goals. The district next contends that the February 2011 CSE was properly constituted, that the CSE had adequate evaluations before it, that a vocational assessment is only conducted for high school students and that because the CSE did not recommend a vocational program for the student, an assessment was not required. Regarding the parents' concerns about the annual goals and short-term objectives in the student's IEP, the district contends that the goals were appropriate and that the math goals the parents wanted added to the IEP were not related to math skills. Regarding the parents' concerns about parent counseling and training, the district asserts that the parents were advised at the CSE meeting that such services did not need to be set forth on the student's IEP because they were "programmatic" and were provided by the individual



schools. The district also denies the parents allegations concerning State and local assessments and asserts that the offered 6:1+1 special class in a special school with a 1:1 transitional paraprofessional and related services would meet the student's needs. Next, the district asserts that the timing of the FNR did not deprive the student of a FAPE and that the parents had a meaningful opportunity to participate in the development of the student's educational program. The district also contends that some of the parents' arguments in the petition were not raised in their due process complaint notice and therefore should not be addressed by an SRO.

Regarding the parents' contentions concerning the particular school to which the student was assigned, the district asserts that because the parents rejected the district's recommended program, the district is not required to prove how it would have implemented the student's IEP. The district further asserts that, in any event, the particular school to which the student was assigned would have been appropriate for the student. The district next contends that the parents' unilateral placement at the Rebecca School was not appropriate for the student and that equitable considerations do not favor reimbursement.

**V. Applicable Standards**

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove v. T.A., 129 S. Ct. 2484, 2491 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (A.C. v. Bd. of Educ., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; A.H. v. Dep't of Educ., 2010 WL 3242234, at *2 [2d Cir. Aug. 16, 2010]; E.H. v. Bd. of Educ., 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with


SPA-9

sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. Dep't of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008] [noting that a CSE must consider, among other things, the "results of the initial evaluation or most recent evaluation" of the student, as well as the "'academic, developmental, and functional needs'" of the student]), establishes annual goals designed to meet the student's needs resulting from the student's disability enabling him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; Gagliardo., 489 F.3d at 111; Cerra, 427 U.S. at 192). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all

along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

## VI. Discussion

### A. Scope of Review

A review of the hearing record supports the district's contention that the parents' have attempted to raise several new claims for the first time on appeal. Specifically, the parents now allege that the CSE erred in refusing to consider placing the student at the Rebecca School and that the parents were denied a meaningful opportunity to participate in the development of the student's IEP because the district's FNR placed the student in a vocational school. The parents also allege for the first time on appeal that the educational methodologies that they saw employed at the assigned public school site with other students were not appropriate for the student in this case. The parents further allege for the first time on appeal that the district's classroom teacher who testified at the impartial hearing was not certified to teach eighth grade special education students and would not have followed parts of the student's IEP because she disagreed with them.[6]

With respect to these contentions, a party requesting an impartial hearing may not raise issues at the impartial hearing that were not raised in its original due process complaint notice unless the other party agrees (20 U.S.C. § 1415[f][3][B]; 34 CFR §§ 300.507[d][3][i], 300.511[d]; 8 NYCRR 200.5[j][1][ii]) or the original due process complaint is amended prior to the impartial hearing per permission given by the IHO at least five days prior to the impartial hearing (20 U.S.C. § 1415[c][2][E][i][II]; 34 CFR § 300.507[d][3][ii]; 8 NYCRR 200.5[i][7][b];

---

[6] To the extent that the Second Circuit recently held that issues not included in a due process complaint notice may be ruled on by an administrative hearing officer when the district "opens the door" to such issues with the purpose of defeating a claim that was raised in the due process complaint notice (M.H. v. New York City Dep't of Educ., 2012 WL 2477649, at *28-*29 [2d Cir. June 29, 2012]), I note that the issues of whether the CSE erred in refusing to consider placing the student at the Rebecca School, parent participation in the context of placing the student in a vocational school, and the qualification of the teacher who testified as a district witness, were first raised by the parent or by counsel for the parent on cross examination of district witnesses (Tr. p. 111, 184-85, 192, 405). Although the district initially elicited testimony regarding the educational methodologies employed in the assigned school (Tr. pp. 151-54), such questioning was in the context of describing a typical day in a district classroom and the district did not argue that the methodologies were specifically appropriate to meet the student's needs in response to a claim in the parent's due process complaint notice and, therefore, I find that the district did not "open the door" to this issue under the holding of M.H. Finally, with respect to the parent's contention that the teacher who testified as a district witness would not have followed parts of the student's IEP because she disagreed with them, to the extent that the district could be considered to have opened the door to the issue by eliciting testimony from the teacher, I note that the parents rejected the recommended placement by letter dated June 17, 2011 (Parent Ex. C at pp. 1-2) prior to the time the district became obligated to implement the February 2011 IEP (20 U.S.C. § 1414[d][2][A]; 34 CFR 300.323[a]; 8 NYCRR 200.4[e][1][ii]).



see R.B. v. Dep't of Educ. of City of New York, 2011 WL 4375694, at *6-*7 [S.D.N.Y. Sept. 16, 2011]; M.P.G., 2010 WL 3398256, at *8; Snyder v. Montgomery County. Pub. Sch., 2009 WL 3246579, at *7 [D. Md. Sept. 29, 2009]; Saki v. Hawaii, 2008 WL 1912442, at *6-7 [D. Hawaii Apr. 30, 2008]; Application of the Dep't of Educ., Appeal No. 10-070; Application of a Student with a Disability, Appeal No. 09-140). Upon review of the parents' due process complaint notice, I find that it may not be reasonably read to raise the issues described above (see Parent Ex. A). Moreover, the hearing record does not suggest that the district agreed to expand the scope of the impartial hearing to include these issues (Application of the Bd. of Educ., Appeal No. 10-073).

Where, as here, the parents did not seek the district's agreement to expand the scope of the impartial hearing to include these issues or an amended due process complaint notice, I decline to review it. To hold otherwise inhibits the development of the hearing record for the IHO's consideration, and renders the IDEA's statutory and regulatory provisions meaningless (see 20 U.S.C. § 1415[f][3][B]; 34 CFR §§ 300.511[d], 300.508[d][3][i]; 8 NYCRR 200.5[j][1][ii]). "By requiring parties to raise all issues at the lowest administrative level, IDEA 'affords full exploration of technical educational issues, furthers development of a complete factual record and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.'" (R.B., 2011 WL 4375694, at *6, quoting Hope v. Cortines, 872 F. Supp. 14, 19 [E.D.N.Y. 1995] and Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1303 [9th Cir.1992]; see C.D. v. Bedford Cent. Sch. Dist., 2011 WL 4914722, at *13 [S.D.N.Y. Sept. 22, 2011] [holding that a transportation issue was not properly preserved for review by the review officer because it was not raised in the party's due process complaint notice]).

**B. February 2011 CSE Process**

**1. Timing of the CSE Meeting**

Regarding the parent's assertion that it was not appropriate to conduct the CSE meeting in February 2011 because that date was too remote in time to the next school year and prevented the CSE from considering progress the student made between the date of the CSE meeting and the start of the 2011-12 school year, I find that the timing of the February 2011 CSE meeting did not impede the student's right to a FAPE, significantly impede the parent's opportunity to participate in the decision-making process, or cause a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; see 34 CFR 300.513; 8 NYCRR 200.5[j][4]). Under the IDEA, a CSE is required to review and, if necessary, revise a student's IEP at least annually (see 20 U.S.C. § 1414[d][4][A]; 34 CFR 300.324[b][1]; 8 NYCRR 200.4[f]).[7] While the IDEA and State Regulations require the CSE to meet "at least annually" (see 20 U.S.C. § 1414[d][4][A] [emphasis added]; 34 CFR 300.324[b][1]; 8 NYCRR 200.4[f]), they do not preclude additional

_____

[7] This obligation continues during the pendency of a challenge to a prior IEP (see Town of Burlington v. Dep't of Educ., 736 F.2d 773, 794 [1st Cir. 1984], aff'd 471 U.S. 359 [1985] ["pending review of an earlier IEP, local educational agencies should continue to review and revise IEPs in accordance with applicable law"]; Lopez v. District of Columbia, 355 F. Supp. 2d 392, 400-01 [D.D.C. 2005]; Grant v. Indep. Sch. Dist. No. 11, 2005 WL 1539805, at *8 [D. Minn. June 30, 2005]; Norma P. v. Pelham Sch. Dist., 19 IDELR 938 [D.N.H. Mar. 15, 1993]).


CSE meetings, prescribe when the CSE meeting should occur, or prevent later modification of an IEP during the school year through use of the procedures set forth for amending IEPs in the event a student progresses at a different rate than anticipated (20 U.S.C. § 1414[d][3][D], [F]; 8 NYCRR 200.4[f]-[g]). Additionally State procedures contemplate changes to an IEP insofar as parents, teachers and administrators are all empowered to refer the student to the CSE if any of those individuals has reason to believe that the IEP is no longer appropriate (8 NYCRR 200.4[e][4]). At the beginning of each school year, a school district must have an IEP in effect for each student with a disability within its jurisdiction (20 U.S.C. § 1414[d][2][A]; 34 CFR 300.323[a]; 8 NYCRR 200.4[e][1][ii]), but there is no requirement that an IEP be produced at a parent's demand (Cerra, 427 F.3d at 194) and there is no indication that the timing in the instant case resulted in a loss of educational opportunity for the student. Consequently, I am not convinced that the district violated any procedures by deciding to conduct an annual review of student's program in February 2011, especially in circumstances such as these in which the parties have previously disagreed and a unilateral private school placement was effectuated in the previous school year and it may be appropriate to allow for more time in the planning process (see Application of the Bd. of Educ., Appeal No. 11-133). I also note that the hearing record does not reflect that at the time of the CSE meeting the parents objected to the timing of the CSE meeting. Moreover, the district's special education teacher testified that the parents and the student's Rebecca School classroom teacher were informed at the CSE meeting that if they observed a significant change in the student, they could request a "reconvene" at any time (Tr. p. 25). Although the parents assert on appeal that they requested another CSE meeting in their June 17, 2011 letter, review of that letter does not support their assertion (see Parent Ex. C). Rather, the parents' June 17 letter states after detailing their concerns with the IEP and stating their intention to seek tuition reimbursement for the Rebecca School, that they were "willing to meet" with the CSE who had conducted the February 2011 meeting or with another CSE "to discuss their concerns" (id.). While this constitutes evidence that supports the parents' continued cooperativeness with the district (Parent Ex. C at p. 2), I decline to adopt so broad an interpretation of their 10-day notice of unilateral placement such that being "willing" to meet with the CSE automatically triggered the district's obligation to reconvene the CSE and review the student's program under the parent referral provision in State regulations (see 8 NYCRR 200.4[e][4]). Instead, I find the purpose of the 10-day notice sent by the parents' counsel was quite clear—that the parents wished to communicate their dissatisfaction with the district's position, their decision that they had reached to unilaterally place the student, and their willingness to remain cooperative and entertain other offers in the event the district was willing to reconsider its position (Parent Ex. C), all actions that are reasonable precursors to a tuition reimbursement claim. However, I do not find support for the conclusion that this notice constituted an affirmative demand for a new CSE meeting to revise the student's IEP based on new information, nor for that matter does it list the timing of the CSE meeting as a concern of the parents (id.). Although the letter was written in mid-June 2011, nearly the end of the 2010-11 school year, it does not state that the student had made progress which was not reflected in the February 2011 IEP (id.).

According to the CSE meeting minutes, it appears that the "12-month school year + deferment" of the student's placement was a topic that was either discussed or explained during the February 2011 CSE meeting as there is a handwritten notation to that effect (Dist. Ex. 2 at p.

1), but there is no evidence regarding a particular outcome or reaction(s) of the participants to such discussion.

Moreover, upon consideration of the student's progress between the date of the CSE meeting and the end of the 2010-11 school year, the student's Rebecca School teacher testified that by May 2011, the student had met one "Floortime" goal and many of the academic short-term objectives found in the school's December 2010 progress report that was reviewed by the February 2011 CSE (Tr. pp. 331-33).[8] The teacher's testimony, however, does not establish that the majority of the goals and objectives found in the student's February 2011 IEP would have been inappropriate as of the start date of that IEP (July 2011). Included in the February 2011 IEP were several short-term objectives that were different in terms of academic content and/or criteria from those found in the December 2010 Rebecca School progress report and there is no evidence in the hearing record that the student had mastered these objectives by May 2011 (compare Dist. Ex. 1 at pp. 6-7, with Dist. Ex. 5 at pp. 10-11; Tr. pp. 331-33). Furthermore, the hearing record suggests that there were many short-term objectives from the December 2010 Rebecca School progress report that had not been met as of May 2011, particularly related services objectives, as the student continued to work on them through December 2011 (compare Dist. Ex. 5 at pp. 10-12, with Parent Ex. H at pp. 9-16). Since the February 2011 CSE adopted, almost verbatim, the related services objectives from the December 2010 Rebecca School progress report, the hearing record indicates that these short-term objectives remained appropriate at least through December 2011 (compare Dist. Ex. 1 at pp. 8-12, with Parent Ex. H at pp. 1-16).

In light of the above, I decline to find that the timing of the February 2011 CSE meeting was a procedural error that impeded the student's right to a FAPE, impeded the parent's ability to participate in the decision making process, or deprived the student of educational benefits.

**2. Composition of the CSE**

Next, I turn to the parents' contention that the February 2011 CSE was improperly composed because the special education teacher who participated in the meeting did not meet the applicable requirements. Participants at the February 2011 CSE meeting included the student's mother, a district special education teacher who also served as the district representative, a district school psychologist, an additional parent member, a social worker from the Rebecca School, and a special education teacher from the Rebecca School who participated by telephone (Dist. Ex. 1 at p. 2).

Regarding the parents' argument that the February 2011 CSE lacked a proper special education teacher, I note that the IDEA requires a CSE to include, among others, one special education teacher of the student, or where appropriate, not less than one special education provider of the student (20 U.S.C. § 1414[d][1][B][ii]-[iii]; see 34 CFR 300.321[a][2]-[3]; 8 NYCRR 200.3[a][1][ii]-[iii]). The Official Analysis of Comments to the federal regulations indicates that the special education teacher or provider "should" be the person who is or will be responsible for implementing the student's IEP (IEP Team, 71 Fed. Reg. 46670 [Aug. 14, 2006]).

---

[8] The student's May 2011 Rebecca School progress report is not part of the hearing record.

13

The hearing record reflects that the district's special education teacher previously taught special education, but was not teaching within a classroom at the time of the February 2011 CSE meeting (Tr. pp. 19-21). The hearing record further reflects the active participation of the student's then-current head classroom teacher at the February 2011 CSE meeting; specifically, that the Rebecca School classroom teacher discussed with the CSE the student's needs, present levels of performance, and annual goals and short-term objectives (Tr. pp. 310, 321-22; Dist. Ex. 2 at pp. 1-2). Moreover, the hearing record reflects that at the February 2011 CSE meeting, the CSE considered a December 2010 interdisciplinary report of progress, prepared by the student's Rebecca School providers (Tr. pp. 21-22; Dist. Exs. 2 at p. 1; 5). In addition, a review of the hearing record reflects that the concerns of the parents and the student's Rebecca School teacher were considered by the February 2011 CSE (Tr. pp. 320-23, 393-400).

Although I find that the February 2011 CSE lacked a special education teacher who either has or would likely have personally implemented the student's IEP had the student attended the district's proposed program, assuming without deciding that this constituted a procedural error, I am not persuaded by the evidence that it impeded the student's right to a FAPE, significantly impeded the parent's opportunity to participate in the decision-making process, or caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; see 34 CFR 300.513; 8 NYCRR 200.5[j][4]), particularly in light of the participation of the student's classroom teacher and social worker from the Rebecca School at the February 2011 CSE meeting and evidence in the hearing record which shows that the student's mother participated and expressed her concerns during the meeting (Tr. pp. 320-23, 393-400; Dist. Ex. 2; see Application of the Dep't of Educ., Appeal No. 12-010; Application of the Dep't of Educ., Appeal No. 11-040; Application of the Dep't of Educ., Appeal No. 08-105).

### 3. Parental Participation

The IDEA sets forth procedural safeguards that include providing parents an opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child" (20 U.S.C. § 1415[b][1]). Federal and State regulations governing parental participation require that school districts take steps to ensure that parents are present at their child's IEP meetings or are afforded the opportunity to participate (34 CFR 300.322; 8 NYCRR 200.5[d]). Although school districts must provide an opportunity for parents to participate in the development of their child's IEP, mere parental disagreement with a school district's proposed IEP and placement recommendation does not amount to a denial of meaningful participation (see P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 383 [S.D.N.Y. 2008] ["A professional disagreement is not an IDEA violation"]; Sch. for Language and Communication Development v. New York State Dep't of Educ., 2006 WL 2792754, at *7 [E.D.N.Y. Sept. 26, 2006] ["Meaningful participation does not require deferral to parent choice"]; Paolella v. District of Columbia, 2006 WL 3697318, at *1 [D.C. Cir. Dec. 6, 2006]).

Although the parents raise a variety of arguments concerning parental participation on appeal, the issue was only raised to a limited extent in their due process complaint notice, specifically that the CSE "ignored" the parents' concern that the 6:1+1 placement would not provide sufficient support for the student (see Parent Ex. A at p. 6). In any event, the hearing record reflects meaningful and active parental participation in the development of the student's



February 2011 IEP, as discussed above. The student's mother participated in the development of the IEP, including providing the CSE with information regarding the student's needs and abilities (Tr. pp. 393-400; Dist. Exs. 1 at p. 2; 2). Both the student's mother and the teacher from the Rebecca School provided information regarding the student's skill levels and social/emotional functioning that is reflected in the student's IEP (Tr. pp. 320-23, 397, 399; compare Dist. Ex. 1 at pp. 3-4, with Dist Ex. 2 at pp. 1-2). Additionally, the student's mother was repeatedly asked for her thoughts regarding the IEP as the draft IEP was read aloud during the CSE meeting (Tr. pp. 35, 38-40; Dist Ex. 2), which tends to show that the district maintained an open mind during the process (J.G. v. Kiryas Joel Union Free Sch. Dist., 2011 WL 1346845, at *30-*31 [S.D.N.Y. Mar. 31, 2011]). Although she disagreed with the CSE's decision, the hearing record shows that the CSE responded to the mother's concerns that the student needed a 2:1 student-to-teacher ratio by adding a 1:1 transitional paraprofessional to the student's IEP (Tr. pp. 399-400). The minutes of the February 2011 CSE meeting also indicated that the student's mother participated in the CSE process and was asked several times for input as well as whether she agreed with the information on the IEP (Dist. Ex. 2). Based upon my review of the hearing record, I find that the student's mother was afforded an opportunity to participate in the development of the student's IEP (see 20 U.S.C. § 1415[b][1]; 34 CFR 300.322; 8 NYCRR 200.5[d]).

## C. February 2011 IEP

### 1. Adequacy of Evaluative Information

An evaluation of a student with a disability must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information provided by the parent, that may assist in determining, among other things, the content of the student's IEP (20 U.S.C. § 1414[b][2][A]; 34 CFR 300.304[b][1][ii]; see Letter to Clarke, 48 IDELR 77 [OSEP 2007]). In particular, a district must rely on technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors (20 U.S.C. § 1414[b][2][C]; 34 CFR 300.304[b][3]; 8 NYCRR 200.4[b][6][x]). A district must ensure that a student is appropriately assessed in all areas related to the suspected disability, including, where appropriate, social and emotional status (20 U.S.C. § 1414[b][3][B]; 34 CFR 300.304[c][4]; 8 NYCRR 200.4[b][6][vii]), and evaluation of a student must be sufficiently comprehensive to identify all of the student's special education and related services needs, whether or not commonly linked to the disability category in which the student has been classified (34 CFR 300.304[c][6]; 8 NYCRR 200.4[b][6][ix]; see Application of the Dep't of Educ., Appeal No. 07-018). A district must conduct an evaluation of a student where the educational or related services needs of a student warrant a reevaluation or if the student's parent or teacher requests a reevaluation (34 CFR 300.303[a][2]; 8 NYCRR 200.4[b][4]); however, a district need not conduct a reevaluation more frequently than once per year unless the parent and the district otherwise agree (34 CFR 300.303[b][1]; 8 NYCRR 200.4[b][4]). A CSE may direct that additional evaluations or assessments be conducted in order to appropriately assess the student in all areas related to the suspected disabilities (8 NYCRR 200.4[b][3]). No single measure or assessment should be used as the sole criterion for determining an appropriate educational program for a student (8 NYCRR 200.4[b][6][v]). In developing the recommendations for a student's IEP, the CSE must consider the results of the initial or most



recent evaluation; the student's strengths; the concerns of the parents for enhancing the education of their child; the academic, developmental, and functional needs of the student, including, as appropriate, the student's performance on any general State or district-wide assessments as well as any special factors as set forth in federal and State regulations (34 CFR 300.324[a]; 8 NYCRR 200.4[d][2]).

As part of the evaluation process, State regulations require that students age 12 and those referred to special education for the first time who are age 12 and over, shall receive an assessment that includes a review of school records and teacher assessments, and parent and student interviews to determine vocational skills, aptitudes and interests (8 NYCRR 200.4[b][6][viii]).

Although the student was 12 years old at the time of the February 2011 CSE meeting, the district's special education teacher who participated in the CSE meeting testified that the district did not conduct a vocational assessment of the student because he was not yet age appropriate (Tr. p. 60). She further testified that the district usually conducted a vocational assessment when a student was entering or reaching high school age (id.; Tr. pp. 108-09). The district's special education teacher opined that February 2011 was too early to pinpoint the student's interest in developing a career (Tr. p. 109). The district's failure to conduct a vocational assessment of the student constitutes a procedural violation. However, in the circumstances of this case and for the reasons described more fully below, I do not find that this procedural violation rose to the level of a denial of a FAPE.

While the parents assert that the district's failure to conduct a vocational assessment of the student was a significant deficiency that denied the student a FAPE in light of the district's placement of the student in a vocational high school, the hearing record does not indicate that the student would have been placed in a vocational program. First, I note that the daily schedule described by the district's classroom teacher for the recommended assigned class did not include vocational activities; rather it reflected an academic program (Tr. p. 150). When asked if the assigned school was a vocational school, the teacher testified "it's a regular school with a lot of vocational" (Tr. p. 192). The student's mother testified that when she visited the public school site in June 2011, she was informed by a district staff person she believed to be the parent coordinator that the school was a high school, not a junior high school, but that "maybe there were going to be some changes for the summer, and maybe there would be a junior high class there" (Tr. p. 405). She further testified that she was informed that the school was a vocational school (id.). During a subsequent visit to the school while the summer program was in session, the student's mother learned that there was a 6:1+1 class for junior high school students at the school (Tr. p. 406). The student's mother testified that she was introduced to the woman who coordinated the vocational program who informed her that starting in ninth grade the students worked for an hour and a half to two hours per day in either a hospital or retail store in the community, and as the students got older they worked more hours (Tr. p. 408). The student's mother confirmed that the student would not have been in ninth grade for the year in question (Tr. p. 422). In light of the above, and under these circumstances, I decline to find that the lack of a specific vocational evaluation prior to the February 2011 CSE meeting in this instance impeded the student's right to a FAPE, impeded the parent's ability to participate in the decision making process for developing the IEP, or deprived the student of educational benefits.

The parents further maintain that the CSE recommendation to place the student in a 6:1+1 special class in a specialized school was also inappropriate without first conducting an evaluation designed to assess the student's ability to be placed in a large and less supportive educational environment than the private school that the student was currently attending at the time. However, as further discussed below in the section addressing the 6:1+1 special class placement with 1:1 paraprofessional services, I find that the evaluative documentation considered at the CSE meeting and the input provided by the student's parent and Rebecca School staff to the CSE was sufficient to determine whether placement in a 6:1+1 special class setting was appropriate to address the student's needs. I also note that the district was responsive to the parent's concern regarding the level of support that would be provided to the student in the district's school and as a result, recommended that he be assisted by a 1:1 paraprofessional.

Based on the above, I find that the evaluative data considered by the February 2011 CSE and the input from the CSE participants during the CSE meeting provided the CSE with sufficient functional, developmental, and academic information about the student and his individual needs to enable it to develop his IEP (D.B. v. New York City Dep't of Educ., 2011 WL 4916435, at *8 [S.D.N.Y. Oct. 12, 2011]; Application of a Student with a Disability, Appeal No. 11-041; Application of a Student with a Disability, Appeal No. 10-100; Application of a Student with a Disability, Appeal No. 08-015; Application of the Dep't of Educ., Appeal No. 07-098; Application of a Child with a Disability, Appeal No. 94-2).

## 2. Annual Goals and Short-Term Objectives

Next, I will consider the parents' claims regarding the sufficiency of the annual goals contained in the February 2011 IEP. As detailed below, a review of the hearing record shows that the annual goals and short-term objectives included in the February 2011 IEP were detailed, measurable, and designed to meet the student's needs.

An IEP must include a written statement of measurable annual goals, including academic and functional goals designed to meet the student's needs that result from the student's disability to enable the student to be involved in and make progress in the general education curriculum; and meet each of the student's other educational needs that result from the student's disability (see 20 U.S.C. § 1414[d][1][A][i][II]; 34 CFR 300.320[a][2][i]; 8 NYCRR 200.4[d][2][iii]). Each annual goal shall include the evaluative criteria, evaluation procedures and schedules to be used to measure progress toward meeting the annual goal during the period beginning with placement and ending with the next scheduled review by the committee (8 NYCRR 200.4[d][2][iii][b]; see 20 U.S.C. § 1414[d][1][A][i][III]; 34 CFR 300.320[a][3]). Short-term objectives are required for a student who takes New York State alternate assessments (8 NYCRR 200.4[d][2][iv]).

Prior to the February 2011 CSE meeting, the parents provided the district with annual goals and short-term objectives developed by Rebecca School staff in December 2010, as part of their interdisciplinary report of the student's progress (see Dist. Ex. 5 at pp. 10-12). The CSE used the goals and objectives developed by the Rebecca School, along with input from the student's mother and Rebecca School teacher, to craft the student's IEP goals and objectives for

the 2011-12 school year (Tr. pp. 34, 40-52; Dist. Ex. 2). The resultant IEP included approximately 15 annual goals and 49 short-term objectives that addressed the student's deficits in reading fluency and comprehension; functional math; writing; motor planning; visual-spatial and perceptual skills; sensory processing and body awareness; reciprocity; shared attention, engagement and communication; pragmatic language skills; receptive and expressive language skills; activities of daily living; and his ability to transition from a private school to a public school environment (Dist. Ex. 1 at pp. 6-13).[9]

Although the annual goals contained in the February 2011 IEP lacked specificity and measurability, all of the goals contained specific short-term objectives related to the student's needs, from which the student's progress could be measured (Dist. Ex. 1 at pp. 6-13). Contrary to the parents' assertions, embedded in the annual goals and short-term objectives were the means by which the student's progress would be measured including teacher observation and assessment, teacher-made tests, writing samples, and clinical observation and checklists (id.). In addition the short-term objectives included targeted levels of mastery such as "with 80% accuracy," "within 5 seconds," and "3/5 opportunities" (id.).

The hearing record supports, in part, the parents' assertion that the CSE did not add certain academic goals—requested by the student's mother—to the February 2011 IEP. The December 2010 Rebecca School report contained two "visual spatial" goals, identified in the report as math goals (Dist. Ex. 5 at p. 10). The first goal required the student to look at a pattern of 7-8 parquetry blocks and then reconstruct the pattern without referencing the original and the second goal required the student to repeat a complex clapping pattern without the use of a visual aid (id. at pp. 10-11). Referring to the visual-spatial goals, the district's special education teacher testified that during the CSE meeting the student's mother and Rebecca School staff proposed some math goals that were "not . . . math related" (Tr. pp. 53-54). The district's special education teacher testified that the goals were not appropriate for the student, given his higher level math skills, and that as written the goals might assist a student with memorization, but not with math (id.; see Dist. Ex. 2 at p. 1). According to the district's special education teacher, when asked, no one was able to answer what specific math skill the visual-spatial goals addressed (Tr. pp 54, 100-01, 106). The student's February 2011 IEP contained a goal targeting the student's visual-spatial and perceptual skills; however, the corresponding short-term objectives addressed different skills than the "math" visual-spatial goals requested by the parent (Dist. Ex. 1 at p. 8).

With respect to the social studies goals requested by the parent, the evidence in the hearing record shows that the CSE included short-term objectives related to map reading skills as part of an activities of daily living (ADL) goal in the proposed IEP (Tr. p. 101: compare Dist. Ex. 5 at p. 11, with Dist. Ex. 1 at p. 12). With respect to the health education goals requested by the parent, the district's special education teacher testified that she informed the parent that health education was part of the district's curriculum (Tr. p. 101; Dist. Ex. 2 at p. 2). Consistent with

---

[9] During the impartial hearing, the district's special education teacher who attended the February 2011 CSE meeting stated, as the parents contend, that the short-term objectives on the student's IEP were actually year-end goals (Tr. pp. 40-41, 93-95). However, I disagree with the parents' contention that this statement shows that the IHO erred in finding that the annual goals, when read together with the short-term objectives, were appropriate. Reading the goals and objectives in concert, I find that the objectives were sufficiently detailed and measurable, and adequately addressed the student's identified educational needs in a way that was reasonably calculated to provided the student with the opportunity to receive educational benefits.

the district's special education teacher's testimony, the student's mother testified that she was told the student didn't require health education goals because health education was part of the standard curriculum and would be addressed in the classroom (Tr. p. 398).

The parents accurately note that the February 2011 IEP did not include goals for the service of adapted physical education. Adapted physical education is defined as "a specially designed program of developmental activities, games, sports and rhythms suited to the interests, capacities and limitations of students with disabilities who may not safely or successfully engage in unrestricted participation in the activities of the regular physical education program" (8 NYCRR 200.1[b]). If a student with a disability is not participating in a regular physical education program, the IEP shall describe the extent to which the student will participate in specially-designed instruction in physical education, including adapted physical education (8 NYCRR 200.4[d][2][viii][d]). In this case, the student's IEP notated adapted physical education would be provided as a service, but it did not provide any description of the extent to which the student would participate in such specially-designed instruction. I find that the general statement of district's special education teacher that the service was "programmatic" and part of the standard curriculum is not sufficient to satisfy the requirement to describe the instruction in the student's IEP (Tr. pp. 90-92, 124-25); however, I cannot conclude, as the parents assert, that the CSE "refused" to include goals to guide and address the provision of this service. The IEP made provision for the adapted physical education and the student's deficits were well described on the IEP. In reading and considering the evidence regarding the services provided by the IEP as a whole, in this instance I decline to find that the vague description of the adapted physical education instruction rose to the level of a denial of a FAPE (Karl v. Bd. of Educ. of the Geneseo Cent.Sch. Dist., 736 F.2d 873, 877 [2d Cir. 1984] [finding that although a single component of an IEP may be so deficient as to deny a FAPE, the educational benefits flowing from an IEP must be determined from the combination of offerings rather than the single components viewed apart from the whole]; see also Bell v. Bd. of Educ. of Albuquerque Pub. Schs., 2008 WL 5991062, at *34 [D.N.M. Nov. 28, 2008] [explaining that an IEP must be analyzed as whole in determining whether it is substantively valid]; Lessard v. Wilton-Lyndeborough Co-op. Sch. Dist., 2008 WL 3843913, at *6-*7 [D.N.H. Aug. 14, 2008] [noting that the adequacy of an IEP is evaluated as a whole while taking into account the child's needs]; W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 146-47 [S.D.N.Y 2006] [upholding the adequacy of an IEP as a whole, notwithstanding its deficiencies]).

Lastly, with respect to the transitional paraprofessional, the parents assert that no plan or appropriate goals for this service were included in the February 2011 IEP. As an initial matter, I note that annual goals must relate to the student's needs that result from the student's disability and need not be tied to a specific service. However, upon reviewing the student's IEP, I find that it appropriately reflects the role of the transitional paraprofessional in supporting the student. According to the student's mother, at the CSE meeting she articulated what she believed to be five duties of the transitional paraprofessional (Tr. p. 400). Among others, those duties included facilitating the student's social interaction, assisting him with academics, and anticipating his emotional and social needs (id.). According to the student's mother, the school psychologist stated that the duties as articulated by the parent would be included in the student's IEP (id.; see Dist. Ex. 2 at p. 2). As the parent claims, the February 2011 IEP does not describe in detail every possible duty that the paraprofessional may have engaged in with the student; however, it

includes an annual goal targeting the student's transition from a private to a public school with the support of the 1:1 transitional paraprofessional (Dist. Ex. 1 at p. 13; see Tr. pp. 50-52). I note that neither the IDEA, nor federal and State regulations require that the duties of district staff be detailed in a student's IEP.[10]  Additionally, I note that the corresponding short-term objectives relate to the student identifying the emotional triggers that lead to dysregulation, accepting sensory strategies when sensory breaks are needed, and engaging in peer interactions and small group instruction (Dist. Ex. 1 at p. 13).  Thus, the implication of the IEP is that the role of the transitional paraprofessional includes, at a minimum, facilitating the student's peer interactions and participation in small group instruction, and helping the student to anticipate his own emotional needs (id.).

In conclusion, I find that the student's annual goals and short-term objectives, when read together, were sufficiently detailed and measurable, and they adequately addressed the student's identified educational needs.  Based upon the forgoing evidence, I find that while the IEP may not have detailed the paraprofessional's duties in a particular manner desirable to the parents, I decline to find that the district denied the student a FAPE on this basis.

### 3. Alternate Assessments

State regulations provide that the use of alternative testing procedures shall be limited to students identified by a CSE as eligible for special education or students whose native language is other than English (see 8 NYCRR 100.2[1][g][1]).  Guidance regarding the development of IEPs states in pertinent part that a CSE must determine whether a student should participate in State and local assessments, or the New York State Alternative Assessment (NYSAA):

> All students with disabilities must be included in State or district-wide assessment programs. If the Committee determines that the student will participate in an alternate assessment on a particular State or district-wide assessment of student achievement, the IEP must provide a statement of why the student cannot participate in the regular assessment, and why the particular alternate assessment selected is appropriate for the student.

("Guide to Quality Individualized Education Program (IEP) Development and Implementation," Office of Special Educ. Mem. [Feb. 2010 Revised Dec. 2010], available at http://www.p12.nysed.gov/specialed/publications/iepguidance/IEPguideDec2010.pdf)

In this case, the student's February 2011 IEP indicated that due to the student's "global developmental and significant academic delays," he would participate in "Alternative Assessment" and that the student would be further assessed by teacher observation, class participation, and a student portfolio (Dist. Ex. 1 at p. 17).  The district's special education

---

[10] Distinguishable from this point are cases in which IHOs or SROs have relied upon their equitable authority to fashion a remedy in a specific case by directing the identification of staff duties in a student's IEP in a manner that is beyond what normally required by the IDEA or attendant federal or State regulations (J.K. v. Springville-Griffith Institute Cent. Sch. Dist. Bd. of Educ., 2005 WL 711886, at *9 [W.D.N.Y. Mar. 28, 2005] [noting that the directive to a CSE to consider the addition of a 1:1 aide and the inclusion of the duties of such aide in writing in the student's revised IEP "as required by SRO Munoz," but also noting that the failure to include such duties in the IEP in accordance with the SRO's order did not constitute a denial of a FAPE]).



teacher explained that due to the student's cognitive level and academic functioning, he would not be able to participate in State and local assessments and therefore his "testing category" was changed to "Alternative Assessment" at the CSE meeting (Tr. pp. 59-60). Although the parents assert on appeal that the CSE failed to meaningfully consider their request to provide accommodations to permit the student to participate in State and local testing, there is no record of the parents making this request in the CSE meeting minutes, there is no testimonial evidence in the hearing record regarding this topic, and in support of this claim, the parents cite only to their due process complaint notice. Under the circumstances herein, I decline to find that CSE's determination to designate the use of "Alternative Assessment" on the student's IEP resulted in a failure of the district to offer the student a FAPE.

**4. 6:1+1 Special Class Placement with 1:1 Paraprofessional Services**

Next, I turn to the parents' challenge to the student's placement in a 6:1+1 special class placement. In developing the student's IEP for the 2011-12 school year, the CSE considered an August 2010 private psychoeducational evaluation, a November 2010 classroom observation, a November 2010 psychoeducational evaluation, a December 2010 Rebecca School interdisciplinary report of progress, and a January 2011 addendum to the December 2010 Rebecca School report (Tr. pp. 21-22; see Dist. Exs. 4-8).

The August 2010 private psychoeducational evaluation was provided to the district by the student's parents (Tr. pp. 22, 71-75, 394). Based on standardized testing of the student's cognitive abilities, the evaluators reported that, in general, the student's knowledge and demonstration of nonverbal concepts was significantly stronger than that of verbal concepts (Dist. Ex. 8 at p. 5).[11] In addition, based on the results of achievement testing, the evaluators reported that the student's academic skills appeared to be impaired overall but with some variability, indicating signs of relative strengths and weaknesses (id. at p. 6). They noted that during testing the student's nonverbal skills such as pattern recognition and making connections could reach the "Average" range and be commensurate with typically developing peers, but that the student's verbal skills, fine motor skills, and academic skills as a whole remained significantly impaired and required intense remediation (id. at p. 7). Based on a classroom observation, the evaluators reported that the student exhibited limited eye contact and tended in engage in self-stimulatory behaviors during 1:1 Floortime instruction (id. at pp. 3-4). They noted, however, that despite the student's self-stimulatory behaviors he appropriately participated in required activities and engaged with and responded well to staff members (id. at p. 4).

The evaluators concluded that the student presented with significant difficulties with receptive, expressive, and pragmatic language and reciprocal interaction skills, as well as perseverative, self-directed behavior and sensory impairments consistent with an autism spectrum disorder diagnosis (Dist. Ex. 8 at pp. 6-7). They further reported that the student's adaptive functioning was underdeveloped and that he exhibited problems with sustained

---

[11] The evaluators reported that they attempted to administer selected subtests from the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV), but due to significant language difficulties and behavior associated with his autism diagnosis the student was only formally able to complete two nonverbal subtests (Dist. Ex. 8 at p. 5). The evaluators supplemented the WISC-IV with additional standardized testing which they used to assess the student's nonverbal and expressive language skills (Dist. Ex. 8 at p. 5).

attention and self-directed behaviors, particularly when he became overwhelmed (id. at p. 7). Throughout their report, the evaluators commented on how the student had benefited from his placement at the Rebecca School based on his familiarity with the setting and instructors, and his response to the strategies and structure provided by the school (id. at pp. 4, 7-8). They opined that placement in a larger academic setting or unfamiliar program that focused less on generalization of skills in more of a natural environment would be greatly detrimental to the student's continued progress and could have the potential for regression in the student's academic abilities, as well as his developmental and adaptive skills (id. at p. 7).

Next the February 2011 CSE considered the November 8, 2010 classroom observation of the student at the Rebecca School, conducted by district's special education teacher (Dist. Ex. 4). Notably, the special education teacher reported that during her observation the student was able to follow directions and respond to redirection (id. at p. 2). He did not engage in peer interaction (id.). Although the special education teacher indicated that the student displayed self-stimulatory behaviors, she reported that no overly disruptive behaviors were observed (id.).

The February 2011 CSE also considered a December 2010 Rebecca School interdisciplinary report of progress that described the student's program at the private school, as well as his performance with regard to academics, emotional development, and motor skills (Dist. Ex. 5). The December 2010 progress report indicated that the student was enrolled in an 8:1+3 class where his schedule consisted of morning meeting; "Thinking Goes to School" activities; instruction in English language arts (ELA), mathematics, and science; related services of speech therapy, OT, and music therapy; Floortime sessions; adapted physical education; snacks; and lunch (id. at p. 1).

With respect to the student's functional emotional development, the Rebecca School teacher reported that the student presented with a generally calm but sensory seeking regulatory state (Dist. Ex. 5 at p. 1). She noted that the student did not frequently become dysregulated, but that when he did his voice became higher pitched and his speech faster, as he attempted to verbally negotiate the situation in an attempt to achieve re-regulation (id.; see Dist. Ex. 6 at p.1). The teacher described the student's periods of dysregulation as "brief" and lasting no more than 10 minutes (Dist. Ex. 5 at p. 1). She explained that the student's dysregulation could be triggered by communicative partners who did not follow the student's rules and expectations that the student transition before he was ready (id.).

Following her description of the student's functional emotional development, the Rebecca School teacher described the student's academic skills and provided an overview of the student's academic curriculum (Dist. Ex. 5 at pp. 3-5). With respect to literacy, the teacher reported that the student was able to read full sentences from familiar texts, and noted that because the student was a strong "sight and phonemic reader" his reading program focused on fluency and comprehension (id. at p. 3).

As detailed by the teacher, the student was able to consistently use math terms such as "greater" and "less" and explain the relationship between numbers (Dist. Ex. 5 at p. 4). The teacher stated that the student had mastered addition and subtraction of single digit numbers, and was working on adding and subtracting double-digit numbers (id.).


Next, the student's occupational therapist at the Rebecca School reported that the student received two individual and two small group sessions of OT per week and also participated in additional groups led or co-led by the reporting therapist (Dist. Ex. 5 at p. 5). She stated that a focus of the student's therapy was on activities that encouraged upper extremity, lower extremity, and core strength (id. at p. 6). According to the occupational therapist, the student presented with a mixed-sensory profile in that he was under-responsive to vestibular input but over responsive to auditory input of increased volume (id.). According to the occupational therapist, the student required moderate verbal and tactile redirection to remain on task with his peers, but that he was overall flexible (id.).

The student's counselor at the Rebecca School reported that the student was seen twice weekly for counseling (Dist. Ex. 5 at p. 7). The first session was conducted as an individual Floortime session that focused on expanding the student's flexibility, reciprocity, and engagement over a broad range of topics and emotions; while the second session was conducted in a 2:2 setting and focused on increasing shared attention, engagement, and communication in peer play (id.). She reported that in recent months the student had demonstrated growth in his reflection and expression of his emotional state (id.). With respect to peer play, the counselor reported that the student continued to require her support to share attention with a peer throughout the counseling session using eye contact, proximity seeking, or verbal response (id.).

According to the December 2010 Rebecca School progress report, the student received mental health services in the form of individual music therapy twice weekly (Dist. Ex. 5 at p. 8). The music therapist explained that the focus of therapy was to develop and broaden the student's functional emotional developmental milestones through interactive music making experiences (id.). According to the therapist, since the start of therapy, the student had become increasingly able to share his musical ideas with others, using them to relate (id.).

Lastly, the December 2010 progress report included Floortime, academic, fine motor, visual-spatial, sensory processing, reciprocity, communication, shared attention and engagement, and two-way purposeful interaction goals for the student (Dist. Ex. 5 at p. 12).

The CSE also considered a January 2011 addendum to the Rebecca School progress report that described the student's communication abilities and speech-language therapy services (Dist. Ex. 6). With respect to receptive language, the speech-language pathologist reported that the student's ability to process and respond to language was dependent upon his level of regulation, engagement, and motivation during a given interaction (id. at p. 2). With respect to expressive language, the speech-language pathologist reported that the student was a verbal communicator who typically used five to seven word utterances to communicate during individual therapy sessions (id.). The speech-language therapist developed goals for the student targeting his engagement/pragmatic language skills, as well as his receptive and expressive language (id. at p. 4).

Also considered by the February 2011 CSE was a November 2010 psychoeducational evaluation contracted for by the district (Tr. p. 68; Dist. Ex. 7). Administration of the Stanford-Binet Intelligence Scales-Fifth Edition (SB5) yielded the following standard scores: nonverbal



IQ 62 (mildly delayed), verbal IQ 46 (moderately delayed), and full-scale IQ 52 (moderately delayed) (Dist. Ex. 7 at p. 2). Based on the student's test scores, the psychologist reported that the student's nonverbal visual-motor reasoning skills were better elaborated than his verbal-linguistic auditory processing skills (id. at p. 3). To assess the student's academic achievement, the psychologist administered the same achievement test administered to the student as part of the August 2010 psychoeducational evaluation, and concluded that the student's academic skills, as well as his ability to apply them were in the "very low" range (id. at p. 4; see Dist. Ex. 8 at p. 6). Overall, the psychologist found that the student exhibited delays in cognitive and adaptive functioning and demonstrated "issues" with attention, impulse control, and self regulation that could impact his overall academic functioning and adjustment (Dist. Ex. 7 at p. 5). The psychologist noted that the student was easily distracted, tended to engage in repetitive and stereotyped behaviors, demonstrated decreased frustration tolerance, and required ongoing external intervention and redirection (id.). The psychologist also cited the student's strengths, noting that he was friendly; cooperative when provided appropriate redirection, prompting, and external support; able to make his needs known; in fair health; and had a supportive family (id.).

The IEP developed by the CSE on February 9, 2011 reflected the results of the district's psychological evaluation, the December 2010 Rebecca School progress report, and the January 2011 Rebecca School addendum, as well as the discussion that took place at the CSE meeting (compare Dist. Ex. 1 at pp. 3-5, with Dist. Exs. 2; 5; 6; 7).

State regulations provide that a 6:1+1 special class placement is designed to address students "whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention" (8 NYCRR 200.6[h][4][ii][a]). To address the student's needs as outlined above, the February 2011 CSE recommended a 12-month placement in a 6:1+1 special class in a specialized school with the assistance of a full-time 1:1 transitional paraprofessional (Dist. Ex. 1 at pp. 1, 17). In addition, based on information from the student's mother, evaluators, Rebecca School teacher, and service providers, the CSE incorporated environmental modifications and human/material resources into the IEP that the CSE believed the student required in order to be successful in a 6:1+1 setting (id. at pp. 3-5). These modifications and resources included the use of visual and verbal cues, teacher prompts, redirection, sensory breaks, calm affect/voice, and building the student's interest in academics, as well as the provision of special education and related services (id.). As discussed above, the CSE also developed annual goals and short-term objectives that targeted the student's deficits in reading fluency and comprehension, functional math, writing, reciprocity, shared attention, ADLs, and his ability to transition from a private school to a public school environment (id. at pp. 6-13). To address the student's speech-language delays, the CSE recommended that the student receive three 30-minute sessions of individual speech-language therapy per week and two 30-minutes sessions of speech-language therapy in a dyad (id. at p. 16). The CSE developed goals and objectives related to the student's weaknesses in engagement and pragmatic language skills, receptive language processing, and expressive language (id. at pp. 11-12). To address the student's sensory processing and motor needs, the CSE recommended the student receive two 30-minute sessions of individual OT per week and two 30-minute sessions of OT in a dyad (id. at p. 16). The CSE also developed goals and objectives related to motor planning, visual-spatial and perceptual skills, and sensory processing (id. at pp. 8-9). Lastly, to address the student's social/emotional difficulties, the CSE recommended that the student receive one 30-minute

session of individual counseling per week and one 30-minute session of counseling in a dyad (id. at p. 16). The CSE also developed goals and objectives targeting the student's weaknesses in reciprocity, identifying emotions, shared attention, and communication during joint play (id. at pp. 9-10).

After carefully reviewing the evidence in the hearing record I find that the February 2011 CSE recommended an appropriate special class placement in the student's IEP for the 2011-12 school year that was designed to address the student's academic, language, motor and social/emotional needs.

Minutes from the February 2011 CSE meeting reflected the participation of the student's mother and Rebecca School teacher in the development of the student's IEP for the 2011-12 school year (Dist. Ex. 2). The student's Rebecca School teacher testified that during the CSE meeting the student's IEP was reviewed section by section and that she was asked to give her opinion regarding each section (Tr. pp. 320-21). She further testified that she was asked to provide input regarding the student's academic abilities, including functional levels and IEP goals (Tr. p. 322).

While the parents assert that the district failed to consider the student's individual educational needs, the hearing record shows that the CSE considered the student's mother's concern that the proposed 6:1+1 class ratio would not provide the student with sufficient support and in response, recommended that the student be provided with a 1:1 transitional paraprofessional. The Rebecca School teacher indicated that during the CSE meeting, she expressed concern regarding the level of support available to the student in a 6:1+1 setting, as well as disagreement with the district's recommendation for a transitional paraprofessional because she believed the paraprofessional would provide the student with too much support and cause him to lose some of his independence (Tr. pp. 344-45). She expressed further concern regarding the qualifications of the paraprofessional and the length of time that a paraprofessional would remain part of the student's IEP (Tr. p. 345). The student's mother also testified that she shared her concerns with the February 2011 CSE regarding the student-to-teacher ratio of the proposed class, among other things (Tr. pp. 394-95). She indicated that in response to the district's recommendation for a 1:1 transitional paraprofessional, she expressed her opinion that the student did not require a 1:1 paraprofessional, rather he required a small class ratio, or a "T.A," as he needed someone to help him with academics (Tr. pp. 399-400). According to the district's special education teacher, a 1:1 transitional paraprofessional was recommended based on the student's mother's concern regarding class ratio and the student's need for assistance in transitioning from the private school to the public school placement (Tr. pp. 81-82). She noted that the student's behavior did not seriously interfere with instruction and was not the basis for the recommendation of a paraprofessional (id.). She confirmed that during the CSE meeting the parent opined that the student did not require a paraprofessional, rather that he required a "2:1 ratio" (Tr. p. 84).

Although a CSE must consider parents' suggestions or input offered from privately retained experts, the CSE is not required to merely adopt such recommendations for different programming (see, e.g., Watson v. Kingston City Sch. Dist., 325 F. Supp. 2d 141, 145 [N.D.N.Y. 2004]; E.S. v. Katonah-Lewisboro Sch. Dist., 742 F. Supp. 2d 417, 436 [S.D.N.Y. 2010]; Z.D. v.

25

Niskayuna Cent. Sch. Dist., 2009 WL 1748794, at *6 [N.D.N.Y. Jun. 19, 2009]). The IDEA does not require the district to offer the student what some may view as the "best opportunities" for the student (Watson, 325 F. Supp. 2d at 144) or "everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132). At the time of the February 2011 CSE meeting, the student was enrolled in an 8:1+3 class at the Rebecca School (Dist. Ex. 5 at p. 1). While the parents may have preferred that the student receive additional classroom support through the provision of an additional teacher assistant rather than a 1:1 transitional paraprofessional, I find that the CSE's recommendation for a 1:1 transitional paraprofessional within a 6:1+1 special class was sufficiently tailored to address the student's individual needs and was an appropriate placement in order to offer the student a FAPE.

**5. Parent Counseling and Training**

State regulations require that an IEP indicate the extent to which parent counseling and training will be provided to parents, when appropriate (8 NYCRR 200.4[d][2][v][b][5]). State regulations further provide for the provision of parent counseling and training for the purpose of enabling parents of students with autism to perform appropriate follow-up intervention activities at home (8 NYCRR 200.13[d]). Under State regulations, the definition of "related services" includes parent counseling and training (8 NYCRR 200.1[qq]). Parent counseling and training is defined as "assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program" (8 NYCRR 200.1[kk]; see 34 CFR 300.34[c][8]). However, some courts have held that a failure to include parent counseling and training on an IEP does not constitute a denial of a FAPE where a district provided "comprehensive parent training component" that satisfied the requirements of the State regulation (see M.W. v. New York City Dep't of Educ., 2012 WL 2149549, at *13 [E.D.N.Y. June 13, 2012]; C.F. v. New York City Dep't of Educ., 2011 WL 5130101, at *10 [S.D.N.Y. Oct. 28, 2011];M.N. v. New York City Dep't of Educ., 700 F. Supp. 2d 356, 368 [S.D.N.Y. Mar. 25, 2010]), or where the district was not unwilling to provide such services at a later date (see M.M. v. New York City Dep't of Educ., 583 F. Supp. 2d 498, 509 [2008]; but c.f., P.K., 2011 WL 3625088, at *9, adopted at, 2011 WL 3625317 [E.D.N.Y. Aug. 15, 2011]; R.K. v. New York City Dep't of Educ., 2011 WL 1131492, at *21 [E.D.N.Y. Jan. 21, 2011]).[12] Recently, the Second Circuit explained that "because school districts are required by [State regulation][13] to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP. Parents can file a complaint at any time if they feel they are not receiving this service" (R.E. v. New York City Dept. of Educ., 2012 WL 4125833 [2d Cir. 2012]). The Court further explained that "[t]hough the failure to include parent counseling in the IEP may, in some cases (particularly when aggregated with other violations), result in a denial of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to warrant reimbursement" (id.).

---

[12] To the extent that P.K. or R.K. may be read to hold that the failure to adhere to the procedure of listing parent counseling and training on an IEP constitutes a per se, automatic denial of a FAPE, I note that Second Circuit authority does not appear to support application of such a broad rule (see A.C., 553 F.3d at 172 citing Grim, 346 F.3d at 381 [noting that it does not follow that every procedural error renders an IEP inadequate]; see also Student X v. New York City Dep't of Educ., 2008 WL 4890440, at *16 [E.D.N.Y. Oct. 30, 2008]).

[13] 8 NYCRR 200.13[d].


SPA-27

Here, it is undisputed that the February 2011 CSE did not recommend parent counseling and training on the student's February 2011 IEP in violation of State regulation. However, neither the parents' claim by itself nor the evidence adduced in the hearing record offer much in the way of insight or rationale regarding how the failure to specify parent counseling and training on the student's IEP in this instance rose to the level of a denial of a FAPE, and as state above, the Second Circuit does not appear to support application of such a broad rule when the principle defect in the student's IEP is failure to set forth parent training and counseling services (R.E., 2012 WL 4125833; see A.C., 553 F.3d. at 172 citing Grim, 346 F.3d at 381 [noting that it does not follow that every procedural error renders an IEP inadequate]; see also Student X v. New York City Dep't of Educ., 2008 WL 4890440, *16 [E.D.N.Y. Oct. 30, 2008]).  Where as here, the lack of parent counseling and training is the only service lacking in the IEP and the hearing record does not contain evidence showing that this defect rose to the level of denying the student a FAPE, I find that the parents' argument must be dismissed.

I further note that in this case, the district's special education teacher testified that parent counseling and training were discussed at the CSE meeting and that the parents were informed that the services were "programmatic for our city-wide programs" and that they could discuss services with the staff of the specific school to which the student was assigned (Tr. p. 59).  The special education teacher further testified that the district recognized that the parents' need for counseling and training may change over time (id.).  I also note that the student's mother testified that the parents made use of parent counseling and training services made available by the Rebecca School and elsewhere in the past (Tr. pp. 389-93).  The Second Circuit has explained that this evidence may not be considered because it constitutes "retrospective testimony" regarding services not listed in the IEP (R.E., 2012 WL 4125833 [explaining that the adequacy of an IEP must be examined prospectively as of the time of the parents' placement decision and that "retrospective testimony" regarding services not listed in the IEP may not be considered, but rejecting a rigid "four-corners rule" that would prevent consideration evidence explicating the written terms of the IEP]).

Even acknowledging that the February 2011 CSE's failure to recommend parent counseling and training violated State regulation, the hearing record ultimately supports the conclusion that this violation, alone, did not impede the student's right to a FAPE, significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or cause a deprivation of educational benefits to the student (W.S. v. Nyack Union Free Sch. Dist., 2011 WL 1332188, at *8-*9 [S.D.N.Y. Mar. 30, 2011]; see 20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman, 550 U.S. at 525-26; A.H., 2010 WL 3242234, at *2; E.H., 2008 WL 3930028, at *7; Matrejek, 471 F. Supp. 2d at 419).  While I find the parents' argument on this issue unavailing in this case in terms of a denial of a FAPE, I continue to be troubled with what appears to be a repeated failure of this particular district to comply with federal and State regulations requiring a district to set forth needed parent counseling and training as a related service on students' IEPs; especially in this case where the district argues on appeal that parent counseling and training is a methodology, rather than a related service (Answer ¶ 57; see, e.g., Application of the Dep't of Educ., Appeal No. 12-091; Application of a Student with a Disability, Appeal No. 12-047; Application of the Dep't of Educ., Appeal No. 12-035; Application of the Dep't of Educ., Appeal

No. 12-034; Application of a Student with a Disability, Appeal No. 12-032; Application of a Student with a Disability, Appeal No. 12-024; Application of a Student with a Disability, Appeal No. 11-145; Application of the Dep't of Educ., Appeal No. 11-137; Application of the Dep't of Educ., Appeal No. 11-136; Application of the Dep't of Educ., Appeal No. 11-133; Application of the Dep't of Educ., Appeal No. 11-118; Application of a Student with a Disability, Appeal No. 11-110; Application of a Student with a Disability, Appeal No. 11-089; Application of the Dep't of Educ., Appeal No. 11-070; Application of a Student with a Disability, Appeal No. 11-068; Application of a Student with a Disability, Appeal No. 11-032; see also 34 CFR 300.34[a], [c][8]; 8 NYCRR 200.1[kk], [qq] [defining parent counseling and training as a related service within the meaning of the IDEA]; 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v][b][5] [noting that a statement of related services must be described on a student's IEP]; 34 CFR 300.320[a][7] [stating that an IEP must describe the anticipated frequency, duration, and location of special education and related services]). Notwithstanding the requirements regarding related to findings of FAPE (see 34 CFR 300.513[a][1]-[2]) an administrative hearing officer may order a district to comply with the procedural safeguards contained in the IDEA (34 CFR 300.513[a][3]). In light of the district's failure in this case to identify parent counseling and training on the student's IEP as required by the IDEA and State regulations, I will order that when the next CSE reconvenes, the district shall consider whether the related service of parent counseling and training is required to enable the student to benefit from instruction and, after due consideration, provide the parents with prior written notice on a form prescribed by the Commissioner that, among other things, specifically describes whether the CSE recommended or refused to recommend parent counseling and training on the student's IEP together with an explanation of the basis for the CSE's recommendation in conformity with the procedural safeguards of the IDEA and State regulations (34 CFR 300.503[b][1]-[2]; see 8 NYCRR 200.1[oo]).[14]

**D. Assigned School**

In their petition, the parents raise a number of concerns regarding the appropriateness of the particular public school site to which the student had been assigned. The IDEA and State regulations require that a district must have an IEP in effect at the beginning of each school year for each child in its jurisdiction with a disability (34 CFR 300.323[a]; 8 NYCRR 200.4[e][1][ii]; Cerra, 427 F.3d at 194; Tarlowe, 2008 WL 2736027, at *6).[15] The IDEA and State regulations also provide parents with the opportunity to offer input in the development of a student's IEP, but they do not permit parents to direct through veto a district's efforts to implement each student's IEP (see T.Y. v. New York City Dep't of Educ., 584 F.3d at 420 [2d Cir. 2009], cert. denied, 130 S. Ct. 3277 [2010]). Once a parent consents to a district's provision of special education services, such services must be provided by the district in conformity with the student's IEP (20 U.S.C. § 1401[9][D]; 34 CFR 300.17[d]; see 20 U.S.C. § 1414[d]; 34 CFR 300.320). With

---

[14] The State's model prior written notice form and guidance materials are located at http://www.p12.nysed.gov/specialed/formsnotices/PWN/home.html.

[15] In New York State, the school year is defined as the "period commencing on the first day of July in each year and ending on the thirtieth day of June next following" (Educ. Law § 2[15]).

regard to the implementation of a student's IEP, a denial of a FAPE occurs if the district deviates from substantial or significant provisions of the student's IEP in a material way (A.P. v. Woodstock Bd. of Educ., 2010 WL 1049297 [2d Cir. Mar. 23, 2010]; see Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811 [9th Cir. 2007]; Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341 at 349 [5th Cir. 2000]). In addition, a delay in implementing an otherwise appropriate IEP may form a basis for finding a denial of a FAPE only where the student is actually being educated under the plan, or would be, but for the delay in implementation (see E.H., 2008 WL 3930028, at *11). The sufficiency of the district's offered program is to be determined on the basis of the IEP itself (see R.E. v. New York City Dep't of Educ., 785 F. Supp. 2d 28, 42 [S.D.N.Y. 2011]).

In R.E., the Second Circuit also explained that the parents' "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement (R.E., 2012 WL 4125833). Thus, in a case such as this one when it became clear that the student was not going to be educated under the proposed IEP, there can be no denial of a FAPE due to the to the speculation that there would be a failure to implement the IEP (see R.E v. New York City Dep't of Educ., 785 F. Supp. 2d 28, 42; see also Grim, 346 F.3d at 381-82 [holding that the district was not liable for a denial of a FAPE where the challenged IEP was determined appropriate, but the parents chose not to avail themselves of the public school program]).

In order to implement a student's IEP, however, the assignment of a particular school is an administrative decision, provided it is in conformance with the CSE's educational placement recommendation (see K.L.A. v. Windham Southeast Supervisory Union, 2010 WL 1193082, at *2 [2d Cir. Mar. 30, 2010]; T.Y., 584 F.3d at 419-20; White v. Ascension Parish Sch. Bd., 343 F.3d 373, 379 [5th Cir. 2003]; see Veazey v. Ascension Parish Sch. Bd., 2005 WL 19496 [5th Cir. Jan. 5, 2005]; A.W. v. Fairfax Co. Sch. Bd., 372 F.3d 674, 682 [4th Cir. 2004]; Concerned Parents & Citizens for the Continuing Educ. at Malcolm X Pub. Sch. 79 v. New York City Bd. of Educ., 629 F.2d 751, 756 [2d Cir. 1980]; Tarlowe, 2008 WL 2736027, at *6; Application of the Dep't of Educ., Appeal No. 11-015; Application of a Student with a Disability, Appeal No. 09-082; Application of a Student with a Disability, Appeal No. 09-074; Application of a Student with a Disability, Appeal No. 09-063).[16]  Additionally, the United States Department of Education (USDOE) has also clarified that a school district "may have two or more equally appropriate locations that meet the child's special education and related services needs and school administrators should have the flexibility to assign the child to a particular school or classroom, provided that determination is consistent with the decision of the group determining placement" (Placements, 71 Fed. Reg. 46588 [August 14, 2006]).

---

[16] The Second Circuit has established that "'educational placement' refers to the type of educational program on the continuum—such as the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school" (T.Y., 584 F.3d at 419-20; see A.L. v. New York City Dep't of Educ., 2011 WL 4001074, at *11 [S.D.N.Y. Aug. 19, 2011]; R.K., 2011 WL 1131492, at *15-*17, adopted at, 2011 WL 1131522 [E.D.N.Y. Mar. 28, 2011]; K.L.A., 2010 WL 1193082, at *2; Concerned Parents, 629 F.2d at 756). While statutory and regulatory provisions require an IEP to include the "location" of the recommended special education services (20 U.S.C. § 1414[d][1][A][i][VII]; 34 CFR 320[a][7]; 8 NYCRR 200.4[d][2][v][b][7]), it does not follow that an IEP must identify a specific school site (T.Y., 584 F.3d at 419-20; A.L., 2011 WL 4001074, at *11).

29


In this case, the district correctly argues that these issues are speculative insofar as the parents did not accept the IEP containing the recommendations of the CSE or the programs offered by the district and instead chose to enroll the student in a private school of their choosing. Consequently the district was not required to demonstrate the proper implementation of services in conformity with the student's IEP at the public school site and, therefore, there is no basis for concluding that it failed to do so. Accordingly, the parents' claims regarding the inadequacy of public school site and classroom must be dismissed.

Even in the absence of the Second Circuit's holding in R.E., as discussed below I note that the hearing record in its entirety does not support the conclusion that had the student actually attended the assigned school, the district would have deviated from substantial or significant provisions of the student's IEP in a material way and thereby precluded the student from the opportunity to receive educational benefits (Rowley, 458 U.S. at 206-07; A.P., 2010 WL 1049297; Cerra, 427 F.3d at 192; see Van Duyn, 502 F.3d at 811; Houston Independent School District, 200 F.3d 341 at 349; see also Catalan v. Dist. of Columbia, 478 F. Supp. 2d 73 [D.D.C. 2007]; DD-S. v. Southold Union Free Sch. Dist., 2011 WL 3919040, at *13 [E.D.N.Y. Sept. 2, 2011]; A.L. v. New York City Dep't of Educ., 2011 WL 4001074, at *9 [S.D.N.Y. Aug. 19, 2011]).

**1. Sensory Needs**

Despite the parents' claims to the contrary, the hearing record reflects that the assigned school was capable of addressing the student's sensory needs, had the student attended the school. The hearing record shows that the student had a mixed sensory profile in that he was under responsive to vestibular input and over responsive to auditory input of increased volume (Dist. Ex. 5 at p. 6). The teacher of the assigned class testified that her classroom included a designated sensory corner with squeaky balls, bean bags, and weighted vests (Tr. pp. 151-52; see Tr. p. 171). She reported that classroom staff had been trained by the occupational therapist on how to apply pressure "massages" to students and that they also had students move heavy things from one place to another as a means of calming their nervous system (Tr. p. 152). In addition, the teacher testified that her class included a morning movement session that used yoga, jumping, and body movements that would assist the student with vestibular input (Tr. pp. 172-73). According to the teacher, if a student required sensory breaks they would be included in the student's individual schedule (Tr. pp. 169, 171, 215). The teacher also reported that there was OT in the classroom (Tr. p. 204). Based on the above, the evidence supports the conclusion that if the student had been enrolled in the public school, his sensory needs could have been adequately addressed at the assigned school.

**2. Functional Grouping**

With regard to the parents' claim related to grouping the student at the public school site, State regulations require that in special classes, students must be suitably grouped for instructional purposes with other students having similar individual needs (8 NYCRR 200.1[ww][3][ii], 200.6[a][3], [h][3]; see Walczak, 142 F.3d at 133 [approving an IEP that placed a student in a classroom with students of different intellectual, social, and behavioral needs, where sufficient similarities existed]; Application of a Student with a Disability, Appeal

SPA-31

No. 09-082; Application of the Dep't of Educ., Appeal No. 08-095; Application of the Dep't of Educ., Appeal No. 08-018; Application of a Child with a Disability, Appeal No. 07-068; Application of a Child with a Disability, Appeal No. 05-102). State regulations further provide that determinations regarding the size and composition of a special class shall be based on the similarity of the individual needs of the students according to: levels of academic or educational achievement and learning characteristics; levels of social development; levels of physical development; and the management needs of the students in the classroom (8 NYCRR 200.6[h][2]; see 8 NYCRR 200.1[ww][3][i][a]-[d]). The social and physical levels of development of the individual students shall be considered to ensure beneficial growth to each student, although neither should be a sole basis for determining placement (8 NYCRR 200.6[a][3][ii], [iii]). Further, the management needs of students may vary and the modifications, adaptations and other resources are to be provided to students so that they do not detract from the opportunities of the other students in the class (8 NYCRR 200.6[a][3][iv]). State regulations also require that a "district operating a special class wherein the range of achievement levels in reading and mathematics exceeds three years shall, . . . , provide the [CSE] and the parents and teacher of students in such class a description of the range of achievement in reading and mathematics, . . . , in the class, by November 1st of each year" (8 NYCRR 200.6[g][7]). However, State regulations do not preclude a grouping of students in a classroom when the range of achievement levels in reading and math would exceed three years (see Application of the Dep't of Educ., Appeal No. 08-018; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 01-073).[17]

In this case, the student's mother initially raised concerns regarding grouping in the district's 6:1+1 special classes at the February 2011 CSE meeting (Tr. pp. 82-83, 399). Specifically she indicated that the 6:1+1 classes that the district had assigned the student to thus far were "really low functioning" and that the student was not (Tr. p. 399). The student's mother testified that at the CSE meeting she was assured by district staff that there were many 6:1+1 classes that were functionally grouped, including high functioning 6:1+1 classes where some of the students were pursuing Regents diplomas, and that the student would be appropriately functionally grouped (id.).

The teacher of the assigned class testified that in July 2011 she taught a 6:1+1 special class "with an autistic population" (Tr. pp. 143, 145). She indicated that at the time there were three paraprofessionals assigned to her classroom, the first paraprofessional worked as a 1:1 aide for a specific student, while the other two paraprofessionals were assigned to the class as a whole

---

[17] In a thoughtful and carefully reasoned opinion regarding adherence to functional grouping regulations and the analysis of claims thereunder, at least one District Court has found that there is some room made for parents to permissibly speculate to a degree regarding the likelihood that the public school would or would not make adjustments to its strategies for complying with State's grouping regulations "if the alleged defects were reasonably apparent to either the parent or the school district," even when such parents have rejected the public school placement without enrolling the student under the proposed plan (see E.A.M. v. New York City Dept. of Educ., 2012 WL 4571794, at *11 [S.D.N.Y. Sept. 29, 2012]); however, I believe the Second Circuit's opinion in R.E., which was promulgated at approximately the same time as the District Court's decision in E.A.M., represents the controlling view that such speculation may not serve as the basis for finding a denial of a FAPE and that the focus of the inquiry under these circumstances must remain on the adequacy of the written IEP (R.E., 2012 WL 4125833).

31


(Tr. pp. 146-47). The teacher indicated that as of the first day of summer school there were five students in the class ranging from age 11 to 14 (Tr. p. 148). According to the teacher, the students were functioning academically between kindergarten and the sixth grade level (Tr. pp. 148-49). She explained that one of the students was functioning at the kindergarten level, one student was functioning at the sixth grade level, and the other three students were functioning at a second to third grade level (id.). The teacher testified that she employed functional grouping throughout the day in her classroom (Tr. p. 149).

At the time the student's IEP was developed in February 2011, the student's academic skills ranged from below kindergarten to a third grade level (Dist. Exs. 1 at p. 3; 7 at p. 4; 8 at p. 9). According to the teacher's testimony, the classroom curriculum included academic instruction in ELA, reading, math, social studies, and science (Tr. pp. 150, 167-68, 210).

While the evidence regarding the range of grade levels in the proposed classroom shows was broad, the evidence also shows that there were similarities between the student and the other students in the proposed class, and there is no indication of how the district would have reacted in light of grouping requirements had the student actually attended the proposed public school site. I am not persuaded that the district would have deviated from substantial or significant provisions of the student's IEP in a material way if district had been responsible for complying with grouping regulations. Accordingly, upon review of the hearing record, I find that the evidence indicates that the district was capable of implementing the student's IEP with suitable grouping for instructional purposes in the 6:1+1 special class at the assigned district school at the start of the 2011-12 school year and did not deny the student a FAPE as a result of improper grouping.[18]

### 3. Math Curriculum

With respect to the claims regarding the math curriculum raised in the parents' due process complaint notice, the teacher of the assigned class reported that she worked on budgeting and managing money, purchasing items in the supermarket, and waiting for change (Tr. p. 158). In addition she reported that the class used manipulatives, math software, hands-on activities, and a smart board to calculate costs (Tr. p. 177). The teacher indicated that she had access to a math coach, who spent time in her classroom, and that she prepared teacher made materials in relation to the specific goals on her student's IEPs (Tr. pp. 153, 155, 205). The teacher confirmed that she did not use "touch point" math in her class during summer 2011 (Tr. p. 216). She testified that she used "News-2-You" and the district's "blueprint for learning" (id.). The teacher reviewed the math goals in the student's IEP and described the manner in which she would implement them (177-78).

Accordingly, upon review of the hearing record, I find that the evidence indicates that the district was capable of implementing the student's IEP with respect to the math goals and objectives on the IEP in the 6:1+1 special class at the assigned district school at the start of the 2011-12 school year.

---

[18] When implementing an IEP, a district can be required to comply with the grouping requirements in State regulations at any point in time that the student is receiving services.

### 4. Assignment to a High School

Regarding the parent's argument that the student should have been assigned to a district middle school rather than a high school due to his age, I note (and as also described above) that the hearing record shows that the public school site to which the student was assigned contained a 6:1+1 class for student's of middle school age during summer session of the 2011-12 school year and further note that during the balance of the school year middle school classes were held at another location (Tr. pp. 187, 405-06, 422).

I find that the evidence indicates that the district had assigned the student to an age-appropriate classroom and was capable of implementing the student's IEP in the 6:1+1 special class at the public school sites offered by the district.[19]

In view of the foregoing evidence, there is no basis to conclude that if the student had been enrolled in the public school and the district been required to implement his IEP, that the district would have thereafter failed to implement the February 2011 IEP in a material or substantial way and thereby denied the student a FAPE.

## VII. Conclusion

Having determined that the district offered the student a FAPE for the 2011-12 school year, it is not necessary for me to consider the appropriateness of the Rebecca School or whether the equities support the parents' claim for the tuition costs at public expense (see MC v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]; C.F., 2011 WL 5130101, at *12; D.D-S., 2011 WL 3919040, at *13). I have also considered the parties' remaining contentions and find that I need not reach them in light of my determination herein.

### THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.

IT IS ORDERED that at the next CSE meeting regarding the student's special education programming, the district shall consider whether it is appropriate to include parent counseling and training on the student's IEP and, thereafter, shall provide the parents with prior written notice consistent with the body of this decision.

Dated:     Albany, New York
           October 17, 2012

JUSTYN P. BATES
STATE REVIEW OFFICER

---

[19] The parents asserted in their due process complaint notice that the assigned school would be too large, diverse and distracting for the student (Parent Ex. A at p. 7). The IHO did not make any findings with respect to this claim. My previous holding in this case that the parents may not speculate that implementation of the IEP would have been unsuccessful is equally applicable to these claims regarding the size and diversity of the public school site and therefore they cannot prevail on them (R.E., 2012 WL 4125833); however I am unable to offer alternative findings on this issue as there was insufficient evidence in the hearing record on this point to draw even speculative conclusions.

FILE COPY

SPA-34

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 6 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
R.B., *et al*,                              :

                  Plaintiffs,     :

          -v-                              :

New York City Department of Education,      :

                  Defendant.      :
-------------------------------------------------------------X

13 Civ. 01131 (AJN)

<u>MEMORANDUM &</u>
<u>ORDER</u>

ALISON J. NATHAN, District Judge:

      Plaintiffs R.B. and M.L.B. bring this action, individually and on behalf of their minor

child D.B., against Defendant New York City Department of Education ("DOE" or

"Department"), seeking review of the October 17, 2012, administrative decision of State Review

Officer ("SRO") Justyn P. Bates, which affirmed the decision of Impartial Hearing Officer

("IHO") Christine Moore that the individualized education plan ("IEP") developed for D.B. by

the DOE was sufficient to provide D.B. with the free appropriate public education ("FAPE") to

which he is entitled under the Individuals with Disabilities Education Act ("IDEA"). Plaintiffs

challenge this decision and seek reimbursement for the cost of his enrollment in the Rebecca

School, a private school in which they unilaterally opted to enroll D.B. for the 2011-12 school

year. The parties have filed cross motions for summary judgment. Dkt. Nos. 11, 15. For the

reasons that follow, the Court grants Defendant's Motion for Summary Judgment and denies

Plaintiffs' motion for the same.

1

## I. BACKGROUND

D.B.'s educational history is described in *R.B. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 3763 (AJN), 2013 WL 5438605 (S.D.N.Y. Sept. 27, 2013) ("R.B. I"), which held that D.B.'s 2010-11 IEP was both procedurally and substantively adequate and denied tuition reimbursement for that school year.  The Court will not repeat that history in detail here.  D.B. has been diagnosed with autism, and his local Committee on Special Education ("CSE") has classified him as a "child with a disability," as defined in the IDEA, 20 U.S.C. § 1401(3), who is eligible to receive an IEP. *R.B. I*, 2013 WL 5438605, at *1.  At the time of the events at issue in this litigation, D.B. was twelve years old.  *See* Ex. 1 at 1.

A. The CSE Meeting

Prior to the CSE meeting to develop D.B.'s 2011-12 IEP, Ms. Feng Ye (a DOE special education teacher) prepared a draft IEP based on her review of D.B.'s December 2010 Report of Progress from the Rebecca School (the "2010 Report"), a January 2011 Addendum to the 2010 Report (the "2011 Addendum"), the DOE's November 2010 psychoeducational evaluation of D.B., and a November 2010 classroom observation of D.B.  Def. 56.1 ¶ 10; Tr. 21-22; Exs. 4-8. At the time, Ms. Ye was in her fifth year as a special education teacher assigned to the CSE, in which capacity she "[went] to schools and observe[d] children with disabilities" and "participate[d] in developing IEPs."  Pl. 56.1 Statement ¶ 10; Def. 56.1 Counterstatement ¶ 10; Tr. 19-20.  Prior to taking on that role, Ms. Ye spent approximately ten years as a classroom special education teacher, and approximately seven or eight years as an education evaluator.  Tr. 19.  Her qualifications include a Master's degree in Special Education and Educational Evaluation and a permanent Special Education teacher's license for grades K through 12.  Tr. 20-21.

The CSE team—which consisted of M.L.B., Ms. Kalvin (a social worker from the Rebecca School), Ms. Cohn (D.B.'s teacher at the Rebecca School), Ms. Fochetta (a DOE school psychologist), and a parent member[1]—met to develop D.B.'s 2011-12 IEP on February 9, 2011. Pl. 56.1 ¶ 2. Shortly before the meeting began, the CSE team reviewed an August 2010 psychoeducational evaluation of D.B. that M.L.B. provided. Def. 56.1 ¶ 10; Tr. 21-22. During the meeting, the CSE team reviewed the draft IEP that Ms. Ye had previously prepared. Def. 56.1 ¶ 10; Tr. 80. First, the team revised the descriptions of D.B.'s academic, socio-emotional, and physical development in the IEP based on input from M.L.B. and Ms. Cohn. Tr. 29-37; Ex. 2. Next, the team discussed the annual goals and short-term objectives in the IEP, many of which were copied directly from the 2010 Report and the 2011 Addendum. *Compare* Ex. 1 *with* Ex. 6. M.L.B. requested that the IEP include specific goals (detailed below), and the CSE team considered those requests. Def. 56.1 Statement ¶ 12; Tr. 51, 54, 101, 103, 106, 125, 398; Ex. 2 at 2.

The CSE team then considered what type of program to recommend for D.B. The team agreed that D.B. required a twelve-month program. Def. 56.1 Statement ¶ 12; Ex. 1 at 15. After consideration, 12:1:1 and 8:1:1 staffing ratios (student : teacher : paraprofessional) were rejected as "insufficiently supportive," and the team recommended a 6:1:1 ratio. Def. 56.1 Statement ¶ 12; Ex. 1 at 15. M.L.B. was concerned about this recommendation because "the 6:1:1 classes that they have so far assigned him to have been really low functioning." Tr. 399. In response to these concerns, Ms. Fochetta and Ms. Ye "assured [M.L.B.] that there were plenty of 6:1:1 classes that are functionally grouped." Tr. 83, 399. The CSE team also recommended a 1:1

---

[1] A "parent member" is a parent in the school district whose child previously received an IEP. N.Y. Educ. Law § 4402(1)(b)(1)(a).

transitional paraprofessional. Ex. 1 at 17.   M.L.B. disagreed with the recommendation of a

paraprofessional, based on her belief that "[D.B.] doesn't need a one-to-one person, he needs a

small class ratio, because sometimes he needs one-to-one help with academics." Tr. 399.

Next, the CSE discussed D.B.'s related service mandates.  The final version of the IEP

recommended: two thirty-minute session of counseling per week (once per week individually,

once per week in a group of two); four thirty-minute sessions of occupational therapy ("OT") per

week (twice per week individually, twice per week in a group of two); and five thirty-minute

sessions of speech and language therapy ("SLT") per week (three times per week individually,

twice per week in a group of two). Ex. 1 at 16.  No one at the IEP meeting objected to these

recommendations.  Tr. 38; Ex. 2 at 2.  The IEP also recommended adapted physical education

("PE"), which Ms. Ye described as "programmatic." Ex. 1 at 1; Tr. 91.  The IEP did not include

goals specifically related to PE, nor did it expressly provide for parent counseling and training.

Pl. 56.1 ¶ 16; *see* Ex. 1.

B. The Recommended Placement

On June 17, 2011, Plaintiffs sent the district a letter indicating that they "intend[ed] to

place [D.B.] at the Rebecca School . . . for academic year 2011-2012, and seek reimbursement

for this placement from the District." Ex. C at 1.  For a description of the Rebecca School's

program, see *R.B. I*, 2013 WL 5438605, at *5.  In addition to objecting to the failure of the

district to identify a specific placement, Plaintiffs indicated that they considered the IEP to be

"inappropriate to address [D.B.'s] individual needs." Ex. C. at 2.

On June 24, 2011, Plaintiffs received a Final Notice of Recommendation ("FNR") dated

June 14, 2011, which restated the CSE's recommendation of a 6:1:1 program in a specialized

school and offered D.B. a placement in P.S. 79, the Horan School ("P.S. 79"). Ex. 3.  The FNR

stated that D.B. was to receive a "crisis para[professional]," Ex. 3, rather than the "transitional

para[professional]" recommended in his IEP, Ex. 1 at 17.

M.L.B. visited P.S. 79 on June 28, 2011 and met the parent coordinator, Ms. Ortega, who

stated that P.S. 79 currently housed a vocational high school, and "that the junior high kids were

housed at another school." Tr. 405. Ms. Ortega also informed M.L.B. that "there were going to

be some changes for the summer, and maybe there would be a junior high class there." Tr. 405.

At Ms. Ortega's suggestion, M.L.B. called P.S. 79 on July 9, 2011, the first day of the summer

session, and "learned that there was one 6:1:1 class for junior high age kids." Tr. 405-06. On

July 13, M.L.B. returned to P.S. 79 with Ms. Kalvin, a social worker from the Rebecca School.

Pl. 56.1 ¶ 33. They were introduced to Ms. Grammer, who said that she was the teacher of "the

class that D.B. would be placed in." Pl. 56.1 ¶¶ 33–34. M.L.B. also spoke with the coordinator

of the school's vocational program, which began in ninth grade. Tr. 408. M.L.B. told the

coordinator that she "would rather [D.B.] focus on learning academics." Tr. 409. Plaintiffs did

not accept the DOE's placement, and D.B. attended the Rebecca School for the 2011-12 school

year. Tr. 409-10.

C. The Administrative Proceedings

On July 5, 2011, M.L.B. and R.B. filed a due process complaint requesting a hearing

before an IHO. Def. 56.1 ¶ 31. After receiving this request, the IHO ordered the DOE to

reimburse Plaintiffs for 80% of D.B.'s tuition at the Rebecca School during the pendency of the

administrative proceedings. Def. 56.1 ¶ 32; Pendency Dec. at 3. This order was based on D.B.'s

placement at the Rebecca School in 2009-10, which was the last placement agreed upon by

Plaintiffs and Defendants. Tr. 6.

Portions of the impartial hearing occurred from October 26, 2011 to January 4, 2012. Pl. 56.1 ¶ 61. Plaintiffs called four witnesses: Ms. McCourt (the Rebecca School's director), Ms. Kalvin (a social worker at the Rebecca School), Ms. Cohn (D.B.'s teacher at the Rebecca School), and M.L.B. Tr. 244, 296, 308, 383. Defendant called Ms. Ye and Ms. Sencion, a DOE special education teacher, as witnesses. Tr. 17, 141. The testimony of these witnesses has been incorporated into the facts above, and will not be repeated here.

In a February 28, 2010 decision, the IHO found that the recommended program "provide[d] the support and structure necessary to address [D.B.]'s needs." IHO Dec. at 14. The IHO determined that the recommended school "was able to implement [D.B.'s 2011-12] IEP and was capable of providing [D.B.] with the recommendations set forth in that IEP . . . [which] would have provided [D.B.] with a meaningful educational benefit." IHO Dec. at 17-18.

The parents appealed this decision to an SRO on April 3, 2012. Pl. 56.1 ¶ 69. Though an SRO is required to issue a decision within 30 days upon receipt of an appeal, the deadline for a decision in this case was extended to May 30, 2012. Compl. ¶¶ 65, 66. On October 17, 2012, the SRO issued a decision holding that "the district offered [D.B.] a free and appropriate public education for the 2011-12 school year." Def. 56.1 ¶ 44. The SRO's specific findings are described in the body of this opinion. Plaintiffs challenged the SRO's decision by filing this action on February 19, 2013.

## II. LEGAL STANDARD

### A. Burlington/Carter Test

When the state fails in its obligation to provide an appropriate public education to a child with a disability, parents may make the unilateral decision to "enroll the child in a private school and seek retroactive reimbursement for the cost of private school from the state." *Frank G. v.*

6

*Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006) (citing *School Comm. of Burlington*

*v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985); *M.S. ex rel. SS. v. Bd. of Educ.*, 231 F.3d

96, 102 (2d Cir. 2000)). Such parents act, however, "at their own financial risk," *Florence Cnty.*

*Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 27, 15 (1993) (quoting *Burlington*, 471 U.S. at

373-74), and are entitled to reimbursement only if a reviewing court finds, by the preponderance

of the evidence, that: (1) "the proposed IEP was inadequate to afford the child an appropriate

public education;" and (2) "the private education services obtained by the parents were

appropriate to the child's needs," *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129

(2d Cir. 1998). In addition to these two prongs, "equitable considerations [relating to the

reasonableness of the action taken by the parents] are relevant in fashioning relief." *Frank G.*,

459 F.3d at 363-64 (alteration in original) (citing *Burlington*, 471 U.S. at 374; *M.C. ex rel. Mrs.*

*C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000)).

    B. Deference to State Administrative Decisions

       The adequacy of a challenged IEP and the child's entitlement to tuition reimbursement is

initially determined by state administrative officers whose "rulings are . . . subject to

'independent' judicial review." *Walczak*, 142 F.3d at 129 (quoting *Bd. of Educ. v. Rowley*, 458

U.S. 176, 205 (1982)). "This 'independent' review," however, "is by no means an invitation to

the courts to substitute their own notions of sound educational policy for those of the school

authorities they review." *Id.* (quoting *Rowley*, 458 U.S. at 206). Reviewing courts should

neither "rubber stamp administrative decisions" nor overlook "that the judiciary generally

'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult

questions of educational policy.'" *Id.* (alteration in original) (quoting *Rowley*, 458 U.S. at 206,

208). "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." *Id.*

Plaintiffs argue that little deference is owed to the IHO and SRO decisions in this case because their opinions "are poorly reasoned, and are not supported by the weight of the evidence in the record." Pl. Br. 11. With respect to the SRO, for example, Plaintiffs allege that he "failed to comply with his legal obligation to issue a decision within 30 days after receipt of a request for review," "applied an incorrect legal standard," "improperly considered retrospective evidence about what the school district claimed that it might have done if D.B. had attended P.S. 79," failed to "weigh the evidence contained within the record," and "failed to apply the statute, regulations, and case law to the evidence, . . . provided only conclusory statements" and issued "a decision that is not well reasoned or supported by the record or in accord with the relevant legal standard." Pl. Br. 11.

The Court disagrees. Having reviewed the SRO's single-spaced, 33-page opinion, as well as the underlying factual record from the proceedings below, the Court concludes that the SRO's decision is thorough and well-reasoned, deserving the ordinary level of deference granted to such final state administrative decisions. *See K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, 530 F. App'x 81, 85 (2d Cir. 2013). The IHO decision is likewise sufficiently thorough and reasoned to merit the ordinary level of deference. The bulk of Plaintiffs' arguments regarding the inadequacy of the SRO decision, by contrast, are "either conclusory or coterminous with their other arguments." *Id.*

Plaintiffs, for example, argue that the SRO's conclusion that the IEP appropriately provided for D.B. to be functionally grouped with students having similar needs "implicitly reversed the burden of production and proof." Pl. Br. 13. In support, Plaintiffs misleadingly

excerpt the SRO Decision to suggest that the SRO concluded that Defendants had met the governing legal standard without requiring them to provide "any indication of how [they] would have reacted in light of grouping requirements had the student actually attended the proposed public school site." *See* Pl. Br. 13. In context, however, it is clear that the SRO in fact considered evidence from Defendants regarding the functional levels of students in the class to which D.B. was to have been assigned—which included one student at the sixth grade level, and four students who functioned at somewhere between a kindergarten and third grade level, like D.B.—in order to reach the reasonable conclusion that D.B. could have been "suitabl[y] group[ed]" in compliance with his IEP if he had joined that class. SRO Dec. at 31-32. This is consistent with the SRO's approach to other issues raised by Plaintiffs and demonstrates that the decision is deserving of the deference ordinarily afforded such state administrative decisions.

The Court also disagrees with Plaintiffs' assertion that the SRO's statement that "the Parents had rejected the Department's recommended placement at P.S. 79 in their June 17, 2011 letter," notwithstanding that the final placement recommendation had not yet been issued, was in error. Pl. Br. 14. As an examination of the June 17, 2011, letter indicates, the letter plainly states that the parents reject *any* placement under the February 2011 IEP, which they contend to be "inappropriate to address [D.B.'s] individual needs." Ex. C. at 2. Under these circumstances, the SRO's characterization of the June 17, 2011, letter was neither obviously "incorrect[]" nor unreasonable, and does not justify departure from the ordinary level of deference afforded to such decisions.

Plaintiffs' other arguments regarding the alleged defects in the SRO decision, including its late issuance, Pl. Br. 11, the consideration of retrospective evidence, Pl. Br. 11, the 6:1:1 classroom, Pl. Br. 12, and the crisis paraprofessional, Pl. Br. 12-13, are addressed below.

9

**III. ADEQUACY OF IEP**

Courts must consider both procedural and substantive adequacy in determining whether a challenged IEP adequately afforded the child a free and appropriate education, or FAPE. *See R.E ex rel. J.E., M.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189-90 (2012); *Rowley*, 458 U.S. at 206-07. Plaintiffs allege that D.B.'s IEP contained both procedural and substantive violations of the IDEA, which resulted in D.B. being denied an appropriate public education. Plaintiffs additionally argue that the DOE improperly assigned D.B. to a school that was unable to implement his IEP. For the reasons set forth below, the Court concludes that D.B.'s 2011-12 IEP was procedurally and substantively adequate, and that D.B.'s assignment to P.S. 79 was not improper.

<u>A. Procedural Adequacy</u>

In determining whether an alleged procedural violation in a child's IEP resulted in the denial of an appropriate public education, the Court first must determine if the DOE deviated from the procedural requirements set forth in the IDEA. *R.E.*, 694 F2d at 189-90 (citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)). The statute is clear, however, that not every violation of the IDEA's procedural requirements will result in the denial of a FAPE. Rather, a procedural violation will result in the denial of a FAPE only if it: "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). For the reasons set forth below, the Court finds that the IEP was procedurally adequate.

### 1. Composition of CSE Team

Plaintiffs seem to argue[2] that the composition of D.B.'s CSE team—and particularly the inclusion of Ms. Ye—deprived D.B. of an appropriate public education. *See* Pl. Mem. 6-7. In particular, Plaintiffs object that: (1) Ms. Ye has never taught in a 6:1:1 classroom, the type of classroom recommended in the IEP; (2) Ms. Ye has never taught middle school students like D.B.; and (3) Ms. Ye had only observed D.B. for 25 minutes in November 2010. *Id.*

The Court observes that Plaintiffs cite no legal authority for the proposition that Ms. Ye's presence on D.B.'s CSE team was improper by virtue of her lack of experience teaching middle school students in a 6:1:1 classroom, or the fact that she had observed D.B. only once before being assigned to his CSE team. Indeed, no law or regulation regulates the composition of the CSE team on these grounds. There was, moreover, ample evidence from which the SRO could find Ms. Ye to be qualified to participate on the CSE team, including her ten years of classroom special education experience, her special education license, and her Master's degree in Educational Evaluation. Tr. 20-21.

That Ms. Ye was concededly not D.B.'s own special education teacher may have resulted in a procedural violation. *See* 8 N.Y.C.R.R. § 200.3(a)(1)(iii) (requiring that the CSE team include a special education teacher "of the student"); 20 U.S.C. § 1414(d)(1)(B)(iii) (requiring that the team include a special education teacher "of such child"). As the SRO, however, found, whatever problems may have been posed by Ms. Ye's relative lack of familiarity with D.B. were significantly mitigated by the inclusion and participation of M.L.B. and Ms. Cohn, D.B.'s Rebecca School teacher, as well as the CSE team's reliance on D.B.'s Rebecca School progress

---

[2] Plaintiffs' briefing is not a model of clarity, and their Argument section more closely resembles an expanded statement of facts. *See, e.g.,* Pl. Opp. 6-7 (describing Ms. Ye's qualifications without indicating whether this is contended to violate any relevant legal provision).


SPA-45

reports. *See* SRO Dec. at 13-14. Under these circumstances, the CSE team had sufficient access to specific information about D.B. in order to make a reasonable recommendation. *Cf.* 20 U.S.C. § 1415(f)(3)(E)(ii). Accordingly, the Court finds that Ms. Ye's participation on D.B.'s CSE team did not result in the denial of an appropriate public education. *Cf. A.M. ex rel. Y.N. v. New York City Dep't of Educ.*, -- F. Supp. 2d. --, No. 12 Civ. 5573 (JMF), 2013 WL 4056216, at *6-7 (S.D.N.Y. Aug. 9, 2013) (finding that inclusion of special education teacher who was not the student's teacher constituted a procedural violation but did not result in the denial of a FAPE).

The Court's conclusion is not altered by the fact that M.L.B. and Ms. Cohn disagreed with the IEP's recommendations that D.B. be placed in a 6:1:1 class, with a 1:1 transitional paraprofessional. *See* Pl. Mem. 7. The hearing record reflects that D.B.'s mother and Ms. Cohn were active participants in the CSE meeting, and that their expressed concerns were considered in the drafting of the IEP, although not all of their recommendations were ultimately adopted. *See* Tr. 320-23 (indicating that Ms.Cohn's opinions were solicited and that the IEP goals were adapted from Rebecca School records); 393-400 (describing mother's participation in CSE team meeting and indicating that the CSE team made recommendations in response to her concerns about the 6:1:1 classroom). This is sufficient to render the CSE procedurally adequate, as "all that is required is a parent's participation, not that the parent have the final word." *A.M.*, 2013 WL 4056216, at *7.

### 2. Failure to Conduct Vocational Evaluation

Plaintiffs further allege that the CSE team's failure to conduct a vocational assessment caused his IEP to be procedurally inadequate by "prevent[ing] the IEP team from obtaining necessary information about [D.B.]," Pl. Mem. 20, particularly in light of D.B.'s assignment to "a vocational high school," SRO Dec. 16. New York regulations require that "students. . . who

arc age 12 and over . . . receive an assessment . . . to determine vocational skills, aptitudes, and interests." 8 N.Y.C.R.R. § 200.4(b)(6)(viii). Thus, as the SRO determined, the CSE team's failure to conduct such an assessment for D.B.—who was twelve years old at the time of the CSE meeting—constituted a procedural violation. SRO Dec. at 16.

Nevertheless, the Court agrees with the SRO's determination that the failure to conduct a vocational assessment did not render the IEP procedurally inadequate. *See* SRO Dec. at 16. As noted in *R.B. I*, "'[t]he absence of one single measure should not itself render an IEP invalid,'" so long as the CSE team otherwise has sufficient information about the student to determine the student's educational needs. *R.B. I*, 2013 WL 5438605, at *9 (quoting *D.B. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 4833 (DLC), 2013 WL 4437247, at *9 (S.D.N.Y. Aug. 19, 2013)). Here, there is evidence that the CSE team considered a host of measures in drafting the IEP, including D.B.'s Rebecca School progress reports, the results of Ms. Ye's classroom observation, and two psycho-educational evaluations. Tr. 21-22; Ex. 4 at 4-8. Plaintiffs' insistence that D.B. should have been vocationally assessed is, moreover, contrary to their position that D.B. requires academic rather than vocational training. Tr. 408-09. Under these circumstances, the Court finds that the failure to conduct a vocational assessment did not result in the denial of a FAPE.

Plaintiffs' argument that the failure to conduct a vocational assessment was especially egregious because D.B. was assigned to a vocational high school is meritless, as D.B. was not assigned to a vocational program. Contrary to Plaintiffs' assertions, *see* Pl. Br. 21 (arguing that "[t]he record makes clear" that D.B. would have been assigned to a vocational program"), this is supported by the record, even when the Court takes into account only what was known to M.L.B. at the time she decided to enroll D.B. in the Rebecca School. As M.L.B. testified, she was expressly informed that the vocational program at the school was for students in the ninth grade

and higher, Tr. 408, at a time when D.B. was twelve years old and not yet in the ninth grade, Tr. 422.

### 3. *Parent Training*

Plaintiffs argue that D.B. was denied a FAPE by virtue of his IEP's failure "to provide D.B. or his Parents with parent training and counseling." Pl. Br. 23; *see* Ex. 1. As the SRO noted, an IEP's failure to address "the extent to which parent counseling and training will be provided to parents, when appropriate" is a procedural violation. *See* SRO Dec. at 26.

"[I]n the ordinary case," the failure of an IEP to provide for parent counseling and training will not result in the denial of a FAPE. *R.E.*, 694 F.3d at 191. As the Second Circuit has observed, "[t]he presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy" of an IEP—and indeed, Plaintiffs have not shown that the absence of a parent-counseling provision has had any impact on the educational recommendations of the IEP. *Id.* (citing *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 811 (8th Cir. 2011)). Moreover, school districts are required to provide parent counseling, and D.B.'s parents were expressly informed of the district's parent training programs at the CSE meeting. *See* Tr. 59. In other words, the failure of an IEP to expressly provide for parent training does not typically mean that parents will not receive required trainings. *See F.B. v. N.Y.C. Dep't of Educ.*, 923 F. Supp. 2d 570, 585-86 (S.D.N.Y. 2013) (finding that failure to include provision on parent training did not result in denial of a FAPE where evidence showed that such training was indeed available at the assigned school). For these reasons, the Court finds that the IEP's failure to provide for parent training and counseling did not result in the denial of a FAPE.

*4. Tardiness of SRO Decision*

Plaintiffs also assert that the SRO "committed legal error" in "fail[ing] to comply with his legal obligation to issue a decision within 30 days of a request for a review." Pl. Mem. 11. The SRO Decision was issued on October 17, 2012, several months after both the initial appeal of the IHO decision on April 3, 2012, and the extended May 30, 2012, deadline obtained by the DOE. Compl. ¶ 64; Def. 56.1 ¶ 34. Under New York law, "[t]he [SRO] must ensure that, not later than 30 days after the receipt of a request for a review, a final decision is reached and a copy of the written decision . . . is mailed to each of the parties." 8 NYCRR § 200.5(k)(2); *see also* 34 CFR § 300.515(b). This provision was clearly violated by the issuance of the SRO Decision in October.

Even if the tardiness of the SRO decision constituted a procedural violation, however, that procedural violation did not result in the denial of a FAPE. *See Antonaccio v. Bd. of Educ.*, 281 F. Supp. 2d 710, 723 (S.D.N.Y. 2003) ("The SRO's failure to issue a timely decision is not relevant to the determination of whether the 1999–2000 IEP that the CSE devised is procedurally appropriate."); *see also Murphy v. Arlington Cent. Sch. Dist.*, No. 99 Civ. 9294 (CSH), 1999 WL 1140872, at *4 (S.D.N.Y. Dec. 13, 1999) (declining to take equitable action until after the extended deadline for the SRO's decision passed, even though extension was granted after the SRO's decision was already late). Indeed, the late issuance of the SRO Decision could have no impact on the substantive recommendations of the IEP or the parent's ability to participate in the IEP process. Nor did it have any other negative impact on the child in this case, as the IHO issued an interim order requiring the DOE to reimburse D.B.'s parents for his tuition at the Rebecca School from July 5, 2011 (when the due process complaint was filed) "until . . . a final decision [was] rendered." Pendency Dec. at 3. *Cf. Mackey ex rel. Thomas M. v. Bd. of Educ.*,

15

386 F.3d 158, 164-65 (2d Cir. 2004) (directing district court to consider fairness of penalizing

plaintiffs for DOE's delay in issuing SRO decision in adjudicating claim for tuition during

pendency of state review proceedings). Accordingly, the Court finds that the late issuance of the

SRO decision caused Plaintiffs no harm and did not result in the denial of a FAPE. *Cf. Grim v.*

*Rhinebeck School Dist.*, 346 F.3d 377, 381-82 (2d Cir. 2003) (finding no denial of a FAPE

resulted from delays in review of IEP and no harm to student, because IEPs were substantively

adequate).

### *5. Goals and Objectives*

Plaintiffs allege that D.B.'s 2011-12 IEP was procedurally inadequate because it "failed

to include measurable annual goals and included no short term objectives." Pl. Br. 22. Plaintiffs

further object that the SRO and IHO improperly "excused [the failure to include measurable

goals] by explicitly reading the annual goals in conjunction with the information contained

within the IEP's short-term objectives section." Pl. Br. 22.

The IDEA requires an IEP to include "a statement of measurable annual goals, including

academic and functional goals." 20 U.S.C. § 1414(d)(1)(A)(i)(II); *see also* 34 C.F.R.

300.320(a)(2); 8 N.Y.C.R.R. 200.4(d)(2)(iii). Each annual goal must additionally include

"evaluative criteria, evaluation procedures and schedules to be used to measure progress toward

meeting the annual goal." 8 NYCRR § 200.4(d)(2) (iii)(b); *see also* 20 USC

§ 1414(d)(1)(A)(i)(III). Having examined the IEP, the Court agrees with the SRO finding that

the goals and objectives set forth therein are sufficiently "detailed, measurable, and designed to

suit the student's needs" to satisfy the requirements of the IDEA. SRO Dec. at 17.

Plaintiffs' arguments to the contrary appear to derive solely from the format of the IEP

form, rather than the substantive content of the goals and objectives actually set forth. *See* Pl.

Reply 11 (arguing that IHO and SRO could not look "to information contained within the short term objectives section of D.B.'s IEP to cure the deficits in D.B.'s annual goals"). For each set of goals and objectives, the IEP form contains a field labeled "Annual Goal," below which is a separate but clearly related field labeled "Short-Term Objectives." *See* Ex. 1, at 6. The "Annual Goal" field is approximately half the size of the "Short-Term Objectives" field. Perhaps as a consequence of this, the text in the "Annual Goal" field sets forth a short and broadly worded goal, which is then broken down into a series of concrete goals in the field labeled "Short-Term Objectives." For example, the second "Annual Goal" states: "In one year, given direct instruction and using visual and verbal cues, [D.B.] will continue to develop reading comprehension skills by demonstrating his ability to:"—a somewhat vague goal that is thus elaborated in the "Short-Term Objectives" field below:

> (1) answer "what, when" questions independently from the stories that he reads in class with 80% accuracy measured by teacher observation and teacher made tests.
>
> (2) answer WHY questions about a familiar story given visual/verbal choices with 60% accuracy measured by teacher observation and teacher-made tests.
>
> (3) recall 3 details independently from short texts using 'beginning, middle, end' with 70% accuracy measured by teacher observation and teacher-made tests.

Ex. 1, at 6.

As this excerpt demonstrates, the IEP contains detailed and objective standards by which D.B.'s progress can be measured on both an annual and short-term basis—for example, D.B.'s reading comprehension skills can be measured, in the short term, by whether he is able to answer certain questions about a text at a sufficient rate of accuracy, according to observation and testing by his teacher. The other goals and objectives set forth in the IEP are similarly detailed, measurable, and suited to D.B.'s individual needs. Accordingly, the Court agrees with the SRO conclusion that there was no denial of a FAPE on this ground. *See R.B. I*, 2013 WL 5438605, at *13 ("[E]ven where certain goals are overly broad, courts have found an IEP to be satisfactory

17



where short-term objectives are sufficiently detailed.") (quoting *E.F. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2217 (MKB), 2013 WL 4495676, at *19 (E.D.N.Y. Aug. 19, 2013)).

The Court is not persuaded otherwise by Plaintiffs' protest that the goals in the IEP cannot be measured because they contain no "baseline levels of functioning." Pl. Br. 22. As the example set forth above demonstrates, the goals are stated in absolute terms and can be measured without reference to a baseline.

### 6. Cumulative Effect

Having determined that none of the procedural violations identified resulted in the denial of a FAPE when considered individually, the Court proceeds to consider their aggregate effect. *See R.E.*, 694 F.3d at 191. Even multiple procedural violations may not result in the denial of a FAPE when the "deficiencies . . . are more formal than substantive." *F.B.*, 923 F. Supp. 2d at 586. Here, the Court agrees with the IHO and SRO findings that procedural violations identified were formal rather than substantive and did not result in the denial of a FAPE, whether considered individually or cumulatively, and that the IEP was procedurally adequate.

### B. Substantive Adequacy of IEP

Having determined that the procedural violations in the IEP process did not result in the denial of a FAPE, the Court turns to the substance of the IEP. The substantive adequacy of an educational placement "turns on whether [it] is 'reasonably calculated to enable the child to receive educational benefits.'" *Frank G.*, 459 F.3d at 364 (quoting *Rowley*, 458 U.S. at 207; *Muller ex rel. Muller v. Comm. On Special Educ.*, 145 F.3d 95, 105 (2d Cir. 1998)). The Second Circuit has held that an IEP meets this substantive standard if it is "'likely to produce progress, not regression' and 'affords the student . . . an opportunity greater than mere trivial advancement.'" *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 487 F. App'x 619, 621 (2d

Cir. 2012) (quoting *Cerra*, 427 F.3d at 195).  Any substantive inadequacy in a student's IEP

results in the denial of a free and appropriate public education and entitles parents to

reimbursement.  *See M.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 143 (2d Cir. 2013) (quoting

*R.E.*, 694 F.3d at 190).

 The Court defers to the IHO and SRO in finding that the recommended 6:1:1 placement,

as supplemented by a 1:1 paraprofessional, was "sufficiently tailored to address [D.B.'s]

individual needs and was an appropriate placement in order to offer [him] a FAPE."  SRO Dec.

26; *see also* IHO Dec. 13-14.  This is exactly the type of "educational policy judgment to which

we owe the state deference."  *R.E.*, 694 F.3d at 192 (deferring to SRO decision that 1:1

paraprofessional support was adequate, where supported by "sufficient evidence").  The record,

moreover, reveals that this recommendation was based upon careful consideration of D.B.'s

particular educational needs, as demonstrated by "the district's psychological evaluation, the

December 2010 Rebecca School progress report, and the January 2011 Rebecca School

addendum, as well as discussion that took place at the CSE meeting."  SRO Dec. 24; *see also* Tr.

21-22.  Accordingly, the Court finds that the IEP to be substantively adequate.

 The Court also finds that the record supports the SRO conclusion that M.L.B. and Ms.

Cohn's concerns regarding D.B.'s need for "a small class size," Tr. 399, were sufficiently

addressed by the IEP, SRO. Dec. 24-26.  In addition to recommending that D.B. receive the

assistance of a full-time transitional paraprofessional, the IEP "incorporated environmental

modifications and human/material resources . . . that the CSE believed the student required in

order to be successful in the" recommended classroom setting.  SRO Dec. 24.  While M.L.B. and

Ms. Cohn may have preferred that D.B. receive 1:1 support from a teaching assistant, rather than

a paraprofessional, *see* Tr. 400, the CSE team was not required to yield to their preferences, and

the IEP was not rendered substantively inadequate by their disagreement. *See Bryant v. N.Y.*
*State Educ. Dep't,* 692 F.3d 202, 215 (2d Cir.2012)  ("The IDEA 'guarantees' only that students
with disabilities are provided 'an appropriate education, not one that provides everything that
might be thought desirable by loving parents.'") (quoting *Walczak,* 142 F.3d at 132).

C. Implementation of IEP

Plaintiffs argue that, even if the IEP were substantively adequate, the DOE failed to
provide a FAPE because the assigned school was unable to implement the IEP.  Pl. Br. 8.  In
particular, Plaintiffs argue that the assigned school was inappropriate because: (1) Plaintiffs were
offered a seat at P.S. 79 with a crisis management paraprofessional instead of a transitional
paraprofessional; (2) during her visit to P.S. 79, M.L.B. was told "that the site was a vocational
school for high school students, that there was no middle school class, but there *might* be a
middle school class during the summer of 2011, that *might* continue in September 2011;"
(3) "P.S. 79 staff had no idea what class D.B. was to be placed in;" (4) "M.L.B. was informed by
P.S. 79's Parent Coordinator that the school lacked an occupational therapy gym and had no
occupational therapy hanging equipment."  Pl. Br. 8-9, 17.

The SRO rejected Plaintiffs' "concerns regarding the appropriateness of the particular
public school site to which [D.B.] had been assigned," finding that the hearing record did not
support their assertion that "the [DOE] would have deviated from substantial or significant
provisions of [D.B.'s] IEP in a material way and thereby precluded the student from the
opportunity to receive educational benefits" if they had accepted the offered placement at P.S.
79.  SRO Dec. 28-30.  Plaintiffs argue that this conclusion can be disregarded because the SRO
improperly relied upon "retrospective evidence," *see* Pl. Br. 15-17, which the Second Circuit has
held cannot be used to "rehabilitate a deficient IEP after the fact," although it is admissible "[to

explain[] or justif[y] the services listed in the IEP," *K.L.*, 530 F. App'x at 85 (quoting *R.E.*, 694 F.3d at 186). The Court, however, need not reach this question, for sufficient permissible evidence supports the SRO's conclusion that P.S. 79 was an appropriate placement. *See id.* at 85.

On June 24, 2011, Plaintiffs received Final Notice of Recommendation ("FNR"), which formally offered D.B. a placement at P.S. 79, and further stated that the IEP had recommended that he receive assistance from a "crisis para[professional]." *Compare* Ex. 1 *with* Ex. 3. According to Plaintiffs, this statement represents a "failure to appropriately implement the IEP's recommendations"—which included the assignment of a *transitional* and not a crisis paraprofessional—in violation of the law. Pl. Br. 8. As Defendants point out, however, the notation on the FNR may have been nothing more than a "clerical error," and there is no evidence in the record that the DOE could not or would not have provided D.B. with a transitional paraprofessional if he had attended P.S. 79. Def. Br 12. There is, furthermore, no evidence that a crisis paraprofessional would not be able to perform the functions of a transitional paraprofessional, or would otherwise cause D.B. to be denied a FAPE. *Cf. K.L.*, 530 F. App'x at 85 (finding no denial of FAPE when "parents offer no argument or evidence" that the assigned "crisis" paraprofessional could not perform the same functions as the "health" paraprofessional requested by parents). Accordingly, the Court finds that the use of the term "crisis para" in the FNR did not result in the denial of a FAPE.

Nor does the record support Plaintiffs' argument that D.B. was improperly assigned to a vocational high school without a middle school class. Pl. Br. 8. M.L.B. testified that, on June 28, 2011, she was told by P.S. 79's parent coordinator there were "no junior high classes at the time," as "the junior high kids were housed at another school." Tr. 405. M.L.B. also testified

that she was told that "maybe there were going to be changes for the summer," so that there

might be a junior high-aged class at the location during the summer that D.B. was scheduled to

enroll. Tr. 405. As this testimony plainly demonstrates, M.L.B. was expressly told that there

*were* classes for junior high-aged students, which were held at another location during the

regular school year, and which might be held in the same building as the high school classes

during the summer. *See* SRO Dec. 33 (noting "that during the balance of the school year middle

school classes were held at another location"). That is, M.L.B. had no reason to doubt that there

would be a class for her son, although she did have reason to question the actual location of his

classroom. This uncertainty regarding the physical location of the junior high class, however,

does not result in the denial of a FAPE, as "there is no requirement in the IDEA that the IEP

name a specific school location." *T.Y. ex rel. T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420

(2d Cir. 2009). In light of the foregoing, the Court finds that the record supports the conclusion

that P.S. 79 would have provided D.B. with an appropriate junior high class.

Plaintiffs' argument that the IEP was rendered defective by the school district's failure to

prospectively identify during M.L.B.'s visit either D.B.'s assigned classroom teacher or the

"ages or academic abilities" of the other students in the assigned class is likewise unavailing.

*See* Pl. Br. 8, 18. "[C]ourts are prohibited from evaluating the adequacy of an unimplemented

IEP based on evidence about the particular classroom in which a student would be placed," and

this includes evidence about the teacher or classmates in that particular classroom. *N.K. ex rel.*

*J.K. v. N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 590 (S.D.N.Y. 2013) (citing *R.E.*, 694 F.3d at

186-87); *see also M.S. v. N.Y.C. Dep't of Educ.*, -- F. Supp. 2d --, 2013 WL 7819319, at *16

(E.D.N.Y. 2013) ("Just as a school district may not justify the adequacy of an IEP based on

evidence that a student would have been assigned a specific teacher, . . . a parent may not

22

challenge the adequacy of a written IEP by attacking the qualifications or experience of the prospective classroom teacher.").

Finally, Plaintiffs argue that P.S. 79 would have been unable to implement D.B.'s IEP because it "lacked an occupational therapy gym and had no occupational therapy hanging equipment." Pl. Br. 8-9. Plaintiffs, however, have not provided evidence that "occupational therapy hanging equipment" was necessary in order to address D.B.'s needs, nor have they shown that Defendant was "unwilling or unable to obtain such equipment." *R.B. I*, 2013 WL 5438605, at *16 (citing *N.K.*, 961 F. Supp. 2d at 592; *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 12 Civ. 2113 (WHP), 2012 WL 6136493, at *7 (S.D.N.Y. Dec. 11, 2012)); *see also D.B. v. N.Y.C. Dep't of Educ.*, -- F. Supp. 2d --, 12 Civ. 4833 (DLC), 2013 WL 4437247, at *16 (S.D.N.Y. Aug. 19, 2013) ( "[T]he fact that [the DOE special education teacher] did not know . . . whether the school had a sensory gym does not render the DOE's recommended placement inappropriate."). There is, moreover, evidence in the record indicating that P.S. 79 was indeed able to meet D.B.'s occupational therapy and sensory needs. *See* Tr. 151-52, 171, 204. The Court therefore defers to the SRO conclusion that D.B.'s "sensory needs could have been adequately addressed at the assigned school." SRO Dec. 30.

**IV. CONCLUSION**

For the foregoing reasons, the Court concludes that the 2011–12 IEP was both procedurally and substantively adequate, and that the assigned school was not improper. As such, the Court need not reach Plaintiffs' claims regarding the propriety of their unilateral placement of D.B. at the Rebecca School. Regardless of the adequacy of that school, the DOE need not reimburse Plaintiffs for tuition for the 2011–12 school year because it offered D.B. a FAPE for that year. Defendant's Motion for Summary Judgment is GRANTED, and Plaintiffs' Motion for Summary Judgment is DENIED.

This resolves Docket Numbers 11 and 15. The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated: March ___ 2013
       New York, New York

ALISON J. NATHAN
United States District Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

R.B., et al.,

                              Plaintiffs,

          -against-

New York City Department of Education,
                              Defendant.

------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/28/2014
```

13 CIVIL 01131 (AJN)

## JUDGMENT

          The parties having cross-moved for summary judgment pursuant, and the matter having

come before the Honorable Alison J. Nathan, United States District Judge, and the Court, on March

26, 2014, having rendered its Memorandum and Order granting defendant's Motion for Summary

Judgment, denying Plaintiffs' Motion for Summary Judgment, and directing the Clerk of the Court

to terminate this action, it is,

          **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum and Order dated March 26, 2014, Defendant's Motion for Summary Judgment

is granted; Plaintiffs' Motion for Summary Judgment is denied; and the case is closed.

**Dated:**  New York, New York
          March 28, 2014

                                        RUBY J. KRAJICK
                                        Clerk of Court

                         BY:

                                        Deputy Clerk


                              THIS DOCUMENT WAS ENTERED
                              ON THE DOCKET ON _____

# ADDENDUM A[1]

## The Nature of the Action

This is an appeal from a Memorandum and Order of the United States District Court for the Southern District of New York (Nathan, J.), dated and filed on March 26, 2014, and from the resulting Judgment that denied plaintiffs-appellants' modified *de novo* appeal, brought pursuant to the federal Individuals With Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. Sec. 1400 et seq., seeking *Burlington/Carter* tuition funding relief at the Rebecca School for purposes of D.B.'s 2011-2012 school year.[2]

Plaintiff D.B. is diagnosed with autism and at the time of the underlying trial, was 12 years old and attending and succeeding well enough at the Rebecca School in an 8:1:3 ratio classroom (*i.e.* with seven other students) *without* the need for a one-to-one classroom aide or paraprofessional to prompt D.B.'s every move.

On February 9, 2011, defendant's Committee on Special Education ("CSE") met to ostensibly develop an IEP for the then upcoming 2011-2012 school year. For students like D.B. who are approved for a 12 month program, D.B.'s 2011-2012 school year was to start on July 1, 2011.

---

[1] On May 7, 2014, we were informed by the Court that its ECF system was "down" and that therefore, this filing would be accepted on May 8.

[2] Reference is made to the three-pronged test set forth in the seminal authorities of *Florence County School Dist. Four v. Carter*, 510 U.S. 7 (1993), and *School Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).

While the CSE agreed that D.B. should be classified under "autism" and that D.B. was entitled to a 12 month program that would include a special education program during the months of July and August, defendant apparently did not have an 8:1:3 ratio autism program on its "continuum." Accordingly, defendant offered D.B. a 6:1:1 classroom (i.e. with five other students), and with a full-time, one-to-one paraprofessional, a restrictive, regressive and independence-killing "crutch" that D.B. did not need at the Rebecca School.

D.B.'s parents and others expressed concern that (a) D.B. was already succeeding well enough at the Rebecca School in an 8:1:3 classroom without a paraprofessional; (b) there was no reason to move D.B. into a classroom with fewer students; (c) based on what plaintiff's mother M.L.B. had seen, the other students in defendant's (6:1:1) class would (likely) be unduly low functioning; (d) D.B. did not need to risk regression in his independence and self-sufficiency by being saddled with a one-to-one classroom support in defendant's school placement that D.B. clearly did not need to succeed at the Rebecca School and (e) D.B. merely needed some one-to-one help with his *academics*.[3]

In addition to the foregoing problems, the IEP did not make provision for parent training, as required by statute. Nor did it include any goals specifically

---

[3] As to this concern, it is the established and published policy of the New York State Department of Education ("NYSED") that paraprofessionals exist for management and behavior support purposes, but are not permitted to exercise the teaching role.

2

related to adaptive physical education. Nor did the IEP team, despite D.B.'s qualifying age, conduct a "vocational assessment," as required by statute. As identified below, there were additional failures and violations.

Consistent with defendant's longstanding practice and policy, defendant's CSE did not discuss, identify or offer a school site at D.B.'s IEP meeting and plaintiffs were not afforded the opportunity to participate in the site selection decision.

On June 17, 2011, with the July 1 start of the 2011-2012 school year then less than two weeks away, and with D.B.'s IEP having concluded four months earlier, plaintiffs still had not received any notification from defendant as to what school site defendant was offering to D.B. for 2011-2012. Understandably, this created a great deal of anxiety. Accordingly, on that date (June 17), plaintiffs M.L.B. and R.B. wrote to defendant to reject the IEP as inappropriate and to comply with a statutory requirement to provide at least ten days' notice of D.B.'s withdrawal and his placement at the Rebecca School.

It was not until after school on Friday, June 24, 2011, a week later and just *days* before the start of the 2011-2012 school year, that R.B. and M.L.B. finally received defendant's Final Notice of Recommendation offering D.B. a placement at P.S. 79, also known as the Horan School. Accordingly, the timing of defendant's

3

FNR notice deprived plaintiffs of the ability to give defendant a "ten day" notice before the start of the 2011-2012 school year.

On Tuesday, June 28, 2011, D.B.'s mother visited the Horan School and met with its parent coordinator, who told her that the Horan School was housing a vocational high school and that "the junior high kids were housed at another school," but that over the summer, "maybe there would be a junior high class there."

On Saturday, July 9, 2011, D.B.'s mother learned that there was but *one* 6:1:1 class at the Horan School for junior high age children. On Wednesday, July 13, D.B.'s mother returned to the Horan School with a social worker from the Rebecca School to meet with the teacher who would be teaching the junior high classroom that D.B. ostensibly would have attended.

Plaintiffs rejected the proposed placement and program and asserted a number of procedural and substantive claims challenging, *inter alia*: (a) the development, adequacy, and unduly restrictive and regressive nature of the IEP and the IEP process; (b) the constitution of the IEP team;[4] (c) the untimeliness of the IEP meeting, as the meeting was convened far too *early* to assess D.B.'s actual progress during the 2010-2011 school year or his "present levels" for purposes of

---

[4] The district court concedes at page 11 of the district court's Memorandum that the fact that Ms. Ye was not D.B.'s own special education teacher may have resulted in yet *another* procedural violation.

4

an IEP for 2011-2012; (d) the CSE's failure to comply with the New York State guidelines for teleconferencing during the IEP meeting; (e) the failure of the CSE to provide copies of reports that were being utilized at the IEP meeting to D.B.'s then current teachers who were participating via telephone; (f) the failure of the CSE team to provide D.B.'s parents, at least five days prior to the IEP, with the written documents, evaluations and reports that would be relied upon at the IEP meeting; (g) the CSE's failure to meaningfully provide for D.B.'s health and physical management needs; (h) the goals and short term objectives contained it the IEP failed to establish an objective method for assessing D.B.'s progress; (i) the CSE's statutory failure to conduct a Functional Behavior Analysis for D.B. to identify and assess the frequency, duration and triggers of his interfering behaviors; (j) the CSE's resulting statutory failure to develop a Behavior Intervention Plan for D.B.; (k) the CSE's statutory failure and refusal to make provision for "parent training" on the IEP as a related service; (l) the decision of the CSE team to exclude D.B. from standardized testing and promotional criteria; (m) the failure of the CSE to evaluate and assess D.B.'s vocational interests and its related failure to base the IEP on all the necessary and appropriate evaluations for D.B.; (n) defendant's failure to individualize a program for D.B., and offering instead defendant's default program for a student with D.B.'s diagnosis; (o) defendant's refusal to consider the private evaluations provided by D.B.'s parent,

5

relying instead on outdated and irrelevant data in developing the IEP; (p) the substantive adequacy and appropriateness of the Horan School program and the inadequate notice that plaintiffs received; (q) the unduly disparate and unsuitable functioning levels of the students who would have been "grouped" in D.B.'s classroom with him; (r) the Horan School's inability to implement and fulfill D.B.'s IEP mandates and meet his needs; and (s) the fact that D.B. did not need to be transferred to a classroom that had fewer students and disparate grouping, and that would have required D.B. to be followed and prompted by a full-time, one-to-one aide that would have orchestrated D.B.'s every move and made him dependent on a regressive level of "one-to-one" assistance that D.B. did not need to succeed at the Rebecca School.

By statute, defendant, the New York City Department of Education ("DOE") bore the affirmative evidentiary duty to rebut plaintiffs' claims and to prove that, procedurally and substantively, it had offered D.B. a free and appropriate public education ("FAPE") in D.B.'s least restrictive environment.

By Decision dated February 28, 2010, the IHO found that defendant had offered D.B. a FAPE. Upon plaintiffs' appeal from the IHO's Decision as clearly erroneous and contrary to the record and the applicable statutes, regulations and review standards, the State Review Officer ("SRO") was required to decide plaintiffs' appeal by May 30, 2012. However, it was not until October 17, 2012

(*i.e.* more than four months later) that the SRO finally rendered a decision essentially rubber-stamping the IHO's decision.

**The Result Below**

Plaintiffs then took a further appeal to the district court and by Memorandum and Order dated and filed March 26, 2014, the district court (Nathan, J.) deferred to the SRO's ostensible "educational policy" to grant summary judgment to defendant.

On April 23, 2014, plaintiffs served and filed a Notice of Appeal in the district court.

## ADDENDUM B

**Questions Presented**

1.    Did the district court misapply the due deference standard, improperly shift the statutory Prong I burden of proof from defendant to plaintiffs and/or misapply other review standards in failing to reverse the SRO and the IHO?

2.    Whether, in view of the applicable "reasonably calculated" standard, and in view of the limited placement and programming information that the defendant school district provided before the start of the school year, defendant's IEP documents should have been assessed for Prong I FAPE purposes strictly for what they expressly state and provide, or fail to provide?

3.    Did defendant provide plaintiffs with adequate, timely and clear notice of the IEP program and school placement being offered to D.B.?

4.    Whether defendant's failure to make provision for key requisite components of the student's program in its IEP documents may be remedied or cured by retrospective testimony given at the hearing as to what defendant allegedly "would have" provided for the student had the student attended defendant's public program, despite what the IEP provided?

5.    Was defendant's IEP timely for purposes of assessing D.B.'s 2010-2011 performance and his "present levels" for purposes of developing an IEP that would be "reasonably calculated" for the 2011-2012 school year?

1

Case: 14-1405    Document: 5-2    Page: 41    05/08/2014    1219658    42

6.    Was defendant's IEP placement and program offer "reasonably calculated" based upon D.B.'s assessments, evaluations and progress reports, to provide D.B. with a FAPE in his LRE?

7.    Did defendant have and properly consider the full "continuum," or did it offer D.B. its one junior high school class located at the Horan School because that is what defendant *had* to offer?

8.    Did the district court ignore or erroneously look at defendant's violations in isolation, rather than find that there were "cumulative" procedural and substantive violations amounting to a Prong I FAPE deprivation?

9.    Did defendant fulfill its statutory evidentiary burden under Prong I to address and rebut plaintiffs' pleaded claims?

10.    Did defendant fail to timely mitigate or remediate its IEP program and school placement violations and deficiencies during the statutory "ten day" notice period or the subsequent thirty-day "resolution period?"

11.    Did the IHO, the SRO or the district court rely upon impermissible "retrospective evidence" to rule for defendant as to Prong I?

12.    Was the SRO's Decision, grossly late by more than four months, careful, thorough and of the quality warranting much, if any, "due deference" by the district court?

2

SPA-68

13.    Should this action be remanded to the district court to adjudicate Prongs II and III?

**Standard of Review**

These issues, questions of law, and mixed questions of law and fact are reviewed *de novo*.